# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

TERESSA JANETTE GALLEGOS,
Individually and as Personal Representative
of the ESTATE OF JOSEPH ORAN WINKLE,
Deceased; and MARY ANN VAN WINKLE,

      Plaintiffs,

vs.                                                             No. CIV 13-1055 JB/KBM

MAUREEN WOOD, M.D.,
MEDICAL DOCTOR ASSOCIATES, LLC;
and the UNITED STATES OF AMERICA,

      Defendants.

consolidated with

TERESSA JANETTE GALLEGOS,
Individually and as Personal Representative
of the ESTATE OF JOSEPH ORAN VAN WINKLE,
Deceased; and MARY ANN VAN WINKLE,

      Plaintiffs,

vs.                                                             No. CIV 15-0184 JB/KBM

MAUREEN WOOD, M.D.,
and the UNITED STATES OF AMERICA,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant United States of America's Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim and Memorandum in Support, filed May 15, 2015 (Doc. 6 in Gallegos v. United States, No. CIV 15-0184 JB/KBM (D.N.M.))("MTD").  The Court held a hearing on October 1, 2015.  The primary

issues are: (i) whether there are private person analogues for Plaintiffs Teressa Janette Gallegos[1] and Mary Ann Van Winkle's malpractice and negligence claims against Dr. Christopher Quintana, a fellow[2] who failed to advise his attending physician of a positive test result, and an unnamed pharmacist or representative of the pharmacy department ("unnamed pharmacist"), who failed to correct a patient's prescriptions; and (ii) whether the Plaintiffs exhausted their administrative remedies as the Federal Tort Claims Act of 1946, 28 U.S.C. §§ 1346(b), 2671-2680 ("FTCA"), requires. First, the Court concludes that private person analogues exist under New Mexico law for the Plaintiffs' claims against both Dr. Quintana and the unnamed pharmacist. Second, the Court concludes that the Plaintiffs exhausted their administrative remedies by providing sufficient notice of the allegations in their 2013 lawsuit, but not their 2015 lawsuit. The Court will thus grant in part and deny in part the United States' MTD.

## FACTUAL BACKGROUND

The Court summarized this case's facts in an earlier opinion. See Gallegos v. Wood, No. CIV 13-1055 JB/KBM, 2015 WL 6393561 (D.N.M. Oct. 1, 2015)(the "October Opinion"). The Court will not repeat all of the facts here, but, rather, will outline only those facts that are relevant to the disposition of the motions before it. The Court takes its facts from the Plaintiffs' Original Complaint for Wrongful Death Damages due to Medical Malpractice, filed March 4, 2015 (Doc. 1 in Gallegos v. United States, No. CIV 15-0184 JB/KBM (D.N.M.))("Complaint"). It accepts as true all non-conclusory factual statements in the Complaint.

---

[1]Joseph Oran Van Winkle was involved in this dispute before his death on September 10, 2013. See Complaint ¶ 15, at 3. His daughter, Plaintiff Teressa Janette Gallegos, is now the personal representative for his estate. See Complaint ¶ 15, at 3.

[2]A fellowship is a postgraduate training period for physicians attempting to enter a particular subspecialty; aspiring heart surgeons, for example, may spend a year focused on mitral valve repair. See How to pursue a postgraduate fellowship, British Medical Journal (Oct. 31, 2012), http://goo.gl/wS8i7m.

1.      __The Alleged Medical Malpractice__.

On May 7, 2012, Joseph Oran Van Winkle sought treatment for abdominal pain at the Raymond G. Murphy Veterans Affairs Medical Center's Emergency Department in Albuquerque, New Mexico.  See Complaint ¶ 3, at 1.  Defendant Maureen Wood, M.D., an internal medicine specialist, diagnosed Van Winkle with septic shock[3] and admitted him to the hospital's intensive care unit.  See Complaint ¶ 4, at 2.

Two other individuals were involved in Van Winkle's care.  See Complaint ¶¶ 7-8, at 2. An unnamed VA pharmacist or representative of the pharmacy department (the "unnamed pharmacist") allegedly "accompanied Dr. Wood on her rounds of patients every day." Complaint ¶ 7, at 2.  Dr. Christopher Quintana, a fellow assigned to Dr. Wood, assisted her in her treatment of Van Winkle.  See Complaint ¶ 8, at 2.  Dr. Quintana "was an agent or employee of the United States at all pertinent times."  Complaint ¶ 9, at 3.

On May 8, 2012, both of Van Winkle's two blood cultures tested positive for Staphylococcus aureus.[4]  See Complaint ¶ 5, at 2.  The unnamed pharmacist "should have known the results of the culture and that the drugs given to Mr. Van Winkle were not appropriate for his treatment because of the results of the culture," and "should have so advised Dr. Wood." Complaint ¶ 7, at 2.  Dr. Quintana received notice from the laboratory that Van Winkle's urine,

---

[3]Sepsis occurs when chemicals released into the bloodstream to fight an infection trigger widespread inflammatory responses; if left untreated, sepsis can lead to septic shock, a form of severe sepsis that can cause extraordinarily low blood pressure, organ damage, and death.  See Diseases and Conditions: Sepsis, Mayo Clinic (Jul. 23, 2014), http://www.mayoclinic.org/diseases-conditions/sepsis/basics/definition/con-20031900 ("Mayo Clinic on Sepsis").

[4]Staphylococcus aureus, more commonly known as "staph," is a common gram positive bacteria present in thirty percent of healthy individuals; although it is normally harmless, it can lead to dangerous infections -- particularly in hospital settings or immunocompromised patients. Serious complications from staph infections include septic shock.  See Mayo Clinic on Sepsis.

as well as his blood, had tested positive for Staphylococcus aureus.  See Complaint ¶ 8, at 2-3.  Dr. Quintana failed to advise Dr. Wood of the test result.  See Complaint ¶ 8, at 2-3.  Van Winkle's medical team did not prescribe or administer Vancomycin,[5] "although it would have been appropriately prescribed for him given the nature of his infection."  Complaint ¶ 11, at 3.  The VA discharged Van Winkle on May 13, 2012.  See Complaint ¶ 10, at 3.

Van Winkle's condition continued to deteriorate after his discharge.  On about June 5, 2012, he was admitted to the Artesia General Hospital in Artesia, New Mexico, with dehydration and a continued infection.  See Complaint ¶ 12, at 3.  His treating physician in Artesia, Dr. Jorge Abalos, ordered him to return to the VA.  See Complaint ¶ 12, at 3.

On June 12, 2012, physicians at the VA diagnosed Van Winkle with severe right-sided endocarditis.[6]  The infection resulted in bacterial growth on one of Van Winkle's heart valves and severe damage to his circulatory system.  See Complaint ¶ 13, at 3.

Van Winkle died on September 10, 2013.  See Complaint ¶ 15, at 3.  His daughter, Teressa Janette Gallegos, has since become the Personal Representative of his Estate.  See Complaint ¶ 15, at 3.

2.   **Correspondence.**

On April 2, 2013, the Plaintiffs mailed a "Tort Claim" letter to the Office of Regional Counsel of the Department of Veterans Affairs.  See Plaintiffs' Letter from Doug Perrin to the

---

[5]Vancomycin is an antibiotic; in serious cases, Vancomycin injections are used to treat bacterial infections throughout the body.  See Drugs and Supplements: Vancomycin (Intravenous Route), Mayo Clinic (April 1, 2015), http://www.mayoclinic.org/drugs-supplements/vancomycin-intravenous-route/description/drg-20068900.

[6]Endocarditis is an infection of the heart's inner lining that occurs when bacteria from other parts of the body enter the bloodstream and settle in the heart; it can damage or destroy heart valves, and lead to life-threatening complications.  See Diseases and Conditions: Endocarditis, Mayo Clinic (Jul. 14, 2014), http://www.mayoclinic.org/diseases-conditions/endocarditis/basics/definition/con-20022403.

Department of Veterans Affairs at 1 (dated April 2, 2013), filed October 17, 2014 (Doc. 55-2)("April 2 Letter").  The April 2 Letter explains that the underlying events began on May 7, 2012.  April 2 Letter at 1.  It describes the course of treatment and the nature and the extent of the injury, and includes a demand for $600,000.00.  See April 2 Letter at 1-3.  The letter focuses on Dr. Wood's conduct, explaining: "What should have been treated simply and effectively turned into a very complex, dangerous situation, as a result of the negligence of Dr. Wood in misdiagnosis, resulting in improper and inadequate treatment."  April 2 Letter at 3.  It makes one reference to unidentified "multiple physicians who followed Mr. Van Winkle." April 2 Letter at 2.  It uses passive voice, however, to avoid attributing actions to specific individuals.  See April 2 Letter at 2-3 ("Zosyn was never ordered nor administrated . . . ."); id. ("Mr. Van Winkle was discharged . . . ."); id. ("Upon discharge, Mr. Van Winkle was given . . . .").  It also includes a list of "witnesses" that includes Van Winkle's family members and over one hundred medical providers who could have been involved in Van Winkle's care.  See April 2 Letter at 4 ("Witness List").  The list of medical providers includes "Chris Quintana" and at least one pharmacist.  Witness List at 1.

The VA's Office of Regional Counsel replied to this initial claim on June 19, 2013.  See Letter from Melinda Frick, Regional Counsel, to Doug Perrin (dated June 19, 2013), filed October 17, 2014 (Doc. 52-3)("First VA Letter").  The First VA Letter states: "Your clients allege Mr. Van Winkle suffered injury as a result of multiple acts of negligence by Dr. Maureen Wood on or about May 2012."  First VA Letter at 1.  It denies the claim on multiple grounds. See First VA Letter at 1-2.  First, it asserts that the FTCA provides compensation "when a Government employee, acting within the scope of employment, injures another by a negligent or wrongful act or omission."  First VA Letter at 1.  It notes that Dr. Wood was an "independent

contract physician" and an employee of a separate company, Defendant Medical Doctor Associates, LLC.  First VA Letter at 1.

Second, the First VA Letter explains that the VA investigated whether Van Winkle "received good care from his other VA-employed providers."  First VA Letter at 1.  Its investigation included "a review of medical records; a review of his claim by three physicians in three different medical specialties in three different parts of the country who acted as reviewing experts; and interviews of medical personnel."  First VA Letter at 1.  The investigation concluded that "there was nothing VA employees acting in the course and scope of their employment . . . did or failed to do that caused any injury to Mr. Van Winkle."  First VA Letter at 1-2.

The Plaintiffs[7] replied to the VA's First Letter on December 2, 2013.  See Plaintiffs' Letter from Doug Perrin to Bonita Ortiz, VA Representational Paralegal at 1 (dated December 2, 2013), filed October 17, 2014 (Doc. 52-4)("December 2 Letter").  The December 2 Letter recites that it was "written to supplement [the April 2] letter," attaches the earlier letter, and incorporates it by reference.  December 2 Letter at 1.  It states:

> We have learned since the April 2, 2013 letter was written, that a pharmacist or representative of the pharmacy department at the VA Hospital in Albuquerque accompanies physicians on their rounds of patients everyday.  This means, of course, that a pharmacist should or would have been with Dr. Wood and other treating physicians when Mr. Van Winkle was being seen in rounds in each day.  The pharmacist therefore should have known that the drugs being given to Mr. Van Winkle did not properly "match up" with his condition and the pharmacist should have known the results of the culture, and therefore should have known that Mr. Van Winkle was receiving the wrong drugs for his condition.

---

[7]Because Van Winkle died on September 10, 2013, his daughter, Gallegos, submitted subsequent letters as the personal representative of his estate.  See Amended Complaint ¶ 16, at 4.

December 2 Letter at 1.  This individual's failure to spot the problem and warn the treating physicians, the Plaintiffs add, lengthened the time required for a proper diagnosis and thus allowed Van Winkle's condition to worsen.  See December 2 Letter at 1.

The Plaintiffs followed up with a one-sentence letter on December 9, 2013, explaining that their "letter of December 2 should be regarded as and is intended as an amendment to the original April 2, 2013 letter."  Letter from Doug Perrin to Bonita Ortiz, Office of Regional Counsel (dated December 9, 2013), filed October 17, 2014 (Doc. 52-5).  The VA responded via facsimile transmission the same day with a letter explaining: "There is no provision to amend a tort claim after this office has adjudicated the claim and issued a final decision."  Letter from Benita Ortiz, Representational Paralegal, to Doug Perrin (dated December 9, 2013), filed October 17, 2014 (Doc. 52-6)("Second VA Letter").

The Plaintiffs submitted a letter requesting reconsideration of the VA's denial the next day.  Letter from Doug Perrin to General Counsel, Department of Veterans Affairs (dated December 10, 2013), filed October 17, 2014 (Doc. 52-7)("Request for Reconsideration").  The request for reconsideration argues: (i) that the VA failed to provide documentation that Dr. Wood was not its employee and that, under Woodruff v. Covington, 389 F.3d 1117 (10th Cir. 2004), she might qualify as an employee under a functional test; and (ii) that the pharmacy employees failed to exercise ordinary care or meet their professional obligations in the performance of their duties.  Request for Reconsideration at 1.

The Plaintiffs submitted a final letter on April 23, 2014.  See Letter from Doug Perrin to General Counsel, VA Department at 1 (dated April 23, 2014), filed October 17, 2014 (Doc. 52-8)("Final Letter").  This letter did not mention or incorporate by reference any of the Plaintiffs' earlier letters.  Final Letter at 1-3.  It restated the same factual obligations, with one exception: it

alleged that Dr. Christopher Quintana, who was "assisting Dr. Wood in the care and treatment of Mr. Van Winkle," received notice of a positive urine test result for Staphylococcus aureus but failed to convey it to Dr. Wood.  Final Letter at 1.

## PROCEDURAL BACKGROUND

On September 25, 2013, the Plaintiffs[8] filed their first Complaint in the First Judicial District Court of the County of Santa Fe, New Mexico.  See Complaint for Wrongful Death Damages Due to Medical Malpractice, filed November 4, 2013 (Doc. 10-1)("Original Complaint").  The Original Complaint names two defendants: Dr. Wood and Medical Doctor Associates, LLC.  Original Complaint ¶ 1, at 1.  It stated that "Dr. Maureen Wood was not an employee of the Department of Veterans Affairs, but was rather an employee of Medical Doctor Associates, LLC, and her acts and omissions are the acts and omissions of Medical Doctor Associates, LLC under the doctrine of *respondeat superior*."  Original Complaint ¶ 5, at 1.  The Plaintiffs allege that Dr. Wood's treatment amounts to medical malpractice, adding that her corporate employer is liable under respondeat superior, and for failing to investigate her abilities, monitor her activities, and supervise her.  See Original Complaint ¶¶ 15-17, at 4-5.

Dr. Wood and Medical Doctor Associates, LLC filed a Notice of Removal on November 4, 2013, moving the case from New Mexico's First Judicial District to the United States District Court for the District of New Mexico.  See Defendants Maureen Wood, M.D. and Medical Doctor Associates, LLC's Notice of Removal, filed November 4, 2013 (Doc. 10)("Notice of Removal").  Their notice is based on diversity of citizenship pursuant to 28 U.S.C. §§ 1332(a)(1)-(2) and 1441(a).  The notice states that removal is appropriate, because the "Plaintiffs are all residents of the State of New Mexico . . . .  Dr. Wood is a resident of the State of New

---

[8]Plaintiff Gallegos, Van Winkle's daughter, brought suit both individually and as the personal representative for Van Winkle's estate.  See Original Complaint ¶ 1, at 1.

Jersey and Medical Doctor Associates, LLC is a foreign limited liability company, and . . . the amount in controversy exceeds $75,000.00."[9]  Notice of Removal ¶ 8, at 3.

The Plaintiffs filed their Amended Complaint on June 30, 2014.  See Plaintiffs' First Amended Complaint for Wrongful Death Damages due to Medical Malpractice, filed June 30, 2014 (Doc. 41)("Amended Complaint").  It repeats the basic factual narrative set out above and condensed its arguments into three claims for relief:

> 18.  Defendant Maureen Wood, M.D., failed to conduct herself as a reasonably qualified internal medicine physician would conduct herself in the same or similar circumstances in her treatment of Mr. Van Winkle and was therefore negligent. Without limitation, her negligence consists of failing to properly diagnose Mr. Van Winkle, failing to review the chart and recognize and properly treat the staph aureus infection and discharging Mr. Van Winkle prematurely, and without sufficient proper antibiotic coverage.
>
> . . . .
>
> 20.  Defendant Medical Doctor Associates, LLC is liable for the negligence of its agent, Maureen Wood, M.D., as set forth above, and is independently and directly liable for its failure to properly and adequately investigate Dr. Wood's credentials and abilities, monitor her activities and supervise her. This also constitutes a breach of Medical Doctor Associates, LLC's contract with the Veterans Administration, of which Plaintiff Joseph Oran Van Winkle is a third party beneficiary.
>
> . . . .
>
> 21.  The United States is liable for the negligence of its agents as set forth in Paragraphs 8-10 above, for their failure to recognize the wrong medications being given and their failure to notify Dr. Wood of the positive culture and drugs to which the staph aureus was susceptible.

---

[9]Medical Doctor Associates, LLC is a foreign corporation with its principal place of business in the State of Florida.  See Original Complaint ¶ 1, at 1.  The Plaintiffs are citizens of New Mexico.  See Notice of Removal ¶ 3, at 2.

Amended Complaint ¶¶ 21-22, at 5.  Paragraphs 8-10 discuss "[a] pharmacist or representative of the pharmacy department employed by the United States VA Medical Center," and Dr. Quintana, whom they call "an agent or employee of the United States."  Amended Complaint ¶¶ 8-10, at 3.

### 1.    The Initial Motion to Dismiss.

Defendant United States of America moved to dismiss the Amended Complaint pursuant to rule 12(b)(1) of the Federal Rules of Civil Procedure on the grounds that the Court lacks subject-matter jurisdiction, because the Plaintiffs failed to exhaust their administrative remedies as 28 U.S.C. § 2675 requires.  See Motion to Dismiss for Lack of Subject Matter Jurisdiction at 1, filed October 17, 2014 (Doc. 52)("Initial Motion").  The FTCA, the United States contends, requires the Plaintiffs to provide "(1) sufficient information for the agency to investigate the claims, and (2) a sum certain amount of damages sought."  Initial Motion at 9 (citing Cizek v. United States, 953 F.2d 1232, 1233 (10th Cir. 1992)).  It alleges that the Plaintiffs failed to provide sufficient notice to the VA.  See Initial Motion at 1.

First, the United States argues, the April 2 Letter fails to provide sufficient notice of the Plaintiffs' subsequent claims against Dr. Quintana and the unnamed pharmacist.  See Initial Motion at 10.  The April 2 Letter "complained only of the care provided by Dr. Wood," and makes "no mention of Dr. Quintana . . . and an unnamed pharmacist."  Initial Motion at 10.  It explains that, "[i]n general, the scope of FTCA litigation cannot be expanded by adding claims not included in the administrative claim."  Initial Motion at 9.  The United States then cites other cases in which a Notice of Claim failed to provide sufficient notice of the complaint's claims.  See Initial Motion at 10.  It concludes that it "could not have known Plaintiffs were alleging an unnamed pharmacist and Dr. Quintana . . . were responsible for failing to catch Dr. Wood's purported malpractice."  Initial Motion at 11.

Second, the United States contends that the Plaintiffs' December 2 Letter neither amended the April 2 Letter nor served as a new claim.  See Initial Motion at 8.  It states that there is no provision allowing amendments after final agency action on a claim under the FTCA. See Initial Motion at 8 (citing 28 C.F.R. § 14.2(c)("A claim presented in compliance with paragraph (a) of this section may be amended by the claimant at any time prior to final agency action or prior to the exercise of the claimant's option under 28 U.S.C. § 2675(a).")).  It refers to the April 23, 2014 Final Letter as the "Second Notice of Claim."  Initial Motion at 11.  It thus attempts to separate all of the parties' correspondence into two formal Notices, drawing a gap between the Plaintiffs' allegedly ineffectual April 2 Letter and their April 23, 2014, Final Letter. See Initial Motion at 8-11.

Third, the United States argues that the allegations against both Dr. Quintana and the unnamed pharmacist are premature.  See Initial Motion at 5.  It explains that FTCA claimants must wait to file suit until: (i) the agency finally denies the claim; or (ii) at least six months have passed after the claim was filed.  See Initial Motion at 5.  It alleges that "both Plaintiffs' original Complaint and Amended Complaint" were filed less than six months after the Plaintiffs' April 23, 2014, Final Letter.  Initial Motion at 11.  Because amendment cannot cure premature lawsuits, it says, the Court must dismiss the case.  See Initial Motion at 11.

Fourth, the United States notes that Gallegos, who brought suit individually and as the personal representative for her deceased father's estate, filed her suit prematurely.  It alleges that she did not file any claims until the Plaintiffs' Final Letter.  See Initial Motion at 12.  It notes that the VA has not yet made a decision, and that six months have not yet passed.  See Initial Motion at 12.  It concludes that she failed to provide sufficient notice to be a plaintiff in this suit.  See Initial Motion at 12.

2.      **The Initial Response**.

Dr. Wood and Medical Doctor Associates, LLC responded to the United States' Motion on October 31, 2014. See Response of Defendants Maureen Wood, M.D., and Medical Doctor Associates, LLC, to Motion to Dismiss for Lack of Subject Matter Jurisdiction [Doc. 52] Filed by Defendant the United States of America, and Application for Relief Pursuant to Fed. R. Civ. P. 56(d), filed October 31, 2014 (Doc. 55)("Wood/Medical Doctor Associates, LLC Response"). They first concede that they would normally be "hard-pressed to demonstrate standing" to oppose the Initial Motion. Wood/Medical Doctor Associates, LLC Response at 2. They argue, however, that the Initial Motion was not "truly limited to seeking dismissal of the amended complaint," but instead contained "attempts to establish certain facts as true." Wood/Medical Doctor Associates, LLC Response at 2. The alleged dispute over material facts compelled them to "oppose the entry of what might well otherwise amount to partial summary judgment." Wood/Medical Doctor Associates, LLC Response at 3.

Dr. Wood and Medical Doctor Associates, LLC argue that Dr. Wood may be a VA employee, noting that her employment status could justify a finding of subject-matter jurisdiction. See Wood/Medical Doctor Associates, LLC Response at 4. The Wood/Medical Doctor Associates, LLC Response invites the Court to apply a functional test based on United States v. Orleans, 425 U.S. 807 (1976)(Burger, J.), and Woodruff v. Covington, 389 F.3d 117 (10th Cir. 2004)(Ebel, J.). See Wood/Medical Doctor Associates, LLC Response at 4. Such a test would consider factors including:

> (1) the intent of the parties; (2) whether the United States controls only the end result or may also control the manner and method of reaching the result; (3) whether the person uses his own equipment or that of the United States; (4) who provides liability insurance; (5) who pays social security tax; (6) whether federal regulations prohibit federal employees from performing such contracts; and (7) whether the individual has authority to subcontract to others.

Wood/Medical Doctor Associates, LLC Response at 6 (quoting Woodruff v. Covington, 389 F.3d at 1117).  The Wood/Medical Doctor Associates, LLC Response then seeks discovery into whether "the United States controls only the end result, or may also control the manner of reaching the result," including the VA's treatment protocols, personnel policies, and other information.  It adds one final observation:

> One has to wonder just how the Office of the Regional Counsel of the Veterans Administration could have thoroughly reviewed Plaintiff's original Notice of Tort Claim . . . without taking note of the role in such failures that might be attributable to the medical center's laboratory, to Dr. Quintana, or to other physicians/personnel.

Wood/Medical Doctor Associates, LLC Response at 7.

The Plaintiffs responded on November 7, 2014.  See Plaintiffs' Response to Defendant United States of America's Motion to Dismiss for Lack of Subject Matter Jurisdiction, filed November 7, 2014 (Doc. 57)("Plaintiffs' Response").  The Plaintiffs first defend the sufficiency of their notice of their allegations against the unnamed pharmacist.  See Plaintiffs' Response at 2. They allege that their December 2 Letter was a new claim rather than an amendment or supplement to the April 2 letter.  See Plaintiffs' Response at 2-3.  Although they admit that they "called [the letter] the wrong thing (an amendment) that should not change the substance." Plaintiffs' Response at 3.  They cite a series of cases emphasizing the underlying purpose of the FTCA's notice requirement -- allowing the agency to begin its own investigation.  See Plaintiffs' Response at 3.  They then note that the VA denied the claim on December 9, 2013, and that they requested reconsideration the next day.  See Plaintiffs' Response at 2-3.  This timeframe would mean that they filed suit within the established deadlines.  See 28 U.S.C. § 2675(a); 28 U.S.C. § 2401(b).

The Plaintiffs do not make a similar argument for the allegations against Dr. Quintana. See Plaintiffs' Response at 1-2. They allow that they provided notice of the claims against him on April 23, 2014. See Plaintiffs' Response at 2. They state that they filed suit on June 30, 2014, which was before the FTCA's six-month waiting period had elapsed. See Plaintiffs' Response at 4, 5. The Plaintiffs instead contend that, because the six-month time period has now expired, the Court should allow them to amend their Amended Complaint and that any dismissal should be without prejudice to refiling. See Plaintiffs' Response at 2. They add that the Court should not require them to serve the United States again. See Plaintiffs' Response at 2.

### 3.    The United States' Initial Reply.

The United States replied to the Plaintiffs and to Dr. Wood and Medical Doctor Associates, LLC on November 20, 2014. See Reply to Response of Defendants Maureen Wood, M.D. and Medical Doctor Associates, LLC and to Plaintiffs' Response to Motion to Dismiss for Lack of Subject Matter Jurisdiction, filed November 20, 2014 (Doc. 60)("United States Reply").

The United States first questions Dr. Wood and Medical Doctor Associates, LLC' standing to oppose its Initial Motion. United States Reply at 1. It notes that they have not asserted any cross-claims against it, that they have no legal interest which a decision would affect, and that even they concede they lack standing. See United States Reply at 1-2.

The United States then attacks Dr. Wood and Medical Doctor Associates, LLC' argument that Dr. Wood's employment status is relevant to its Initial Motion. See United States Reply at 3. The United States contends that the Plaintiffs "do not assert claims against the United States based on the actions of Dr. Wood," as their Amended Complaint focuses on Dr. Quintana and the unnamed pharmacist. United States Reply at 3. It reiterates that disputes over liability are irrelevant to its Initial Motion and that "[t]he single issue before the Court is whether Plaintiffs

exhausted their administrative remedies." United States Reply at 3.  As a backstop, the United States maintains that Dr. Wood is not an employee, citing the Plaintiffs' Amended Complaint, Dr. Wood's deposition testimony, and an agreement between Dr. Wood and Medical Doctor Associates, LLC.  See United States Reply at 2.

The United States addresses all possible notices of claims against it.  See United States Reply at 4-5.  It first concentrates on the April 2 Letter, arguing that "[n]either Plaintiffs, nor Contractor Defendants, dispute that Plaintiffs' First Notice of Claim did not provide the Agency with notice of the claims raised in the Amended Complaint."  United States Reply at 4.  It says it had no "fair opportunity to investigate and possibly settle the claim" before the start of litigation.  United States Reply at 4.

Second, the United States contends that the Plaintiffs' December 2 Letter was not a new or independent notice of claim.  See United States Reply at 4.  It points out that the "Plaintiffs labeled their December 2, 2013 letter, as a 'supplement' to the notice of claim dated April 2, 2013, and later referenced it as an 'amendment.'"  United States Reply at 4.  It argues that 28 U.S.C. § 2401(b), which requires that plaintiffs bring tort claims against the United States within two years of accrual unless they are presented in writing to a federal agency, bars the Plaintiffs' suit.  See United States Reply at 5.

Third, the United States argues that, even if the December 2 Letter is a new claim, (i) the VA has not issued a denial; and (ii) even if the VA has issued a denial, the Plaintiffs sought reconsideration of the wrong claim.  See United States Reply at 5.  On its account, the VA "alerted Plaintiffs that the supplement or amendment to the December 2, 2013 notice of claim had no effect and took no further action."  United States Reply at 5.  The United States contends that, "[t]o the extent that" the Plaintiffs interpreted the message as a denial, however, they failed

to seek reconsideration within six months under 28 U.S.C. § 2401(b).  United States Reply at 5.
The Plaintiffs sent a letter on December 10, 2013, requesting reconsideration, it admits, but the
letter "specifically stated that it was requesting reconsideration of the claim the VA had denied
on June 19, 2013."  United States Reply at 5-6.

Finally, the United States argues that amendments cannot cure the Plaintiffs' failure to
exhaust their administrative remedies for their allegations against Dr. Quintana.  See United
States Reply at 6-7.  It cites cases holding that to do otherwise in this context "would render the
exhaustion requirement meaningless and impose an unnecessary burden on the judicial system."
United States Reply at 7 (citing Duplan v. Harper, 188 F.3d 1195, 1199 (10th Cir. 1999)(Magill,
J.)).

### 4.    **The Initial Hearing**.

The Court held a hearing on the Initial Motion on December 18, 2014.  See Transcript of
Hearing at 1:1 (taken December 18, 2014)("Tr.").[10]   The Court then asked the United States
whether the parties were "just quibbling over the heading" on the Plaintiffs' December 2 Letter.
Tr. at 6:11-12 (Court).  The United States replied that, "frankly, I think it's a good point," but
again argued that the Plaintiffs nonetheless failed to request reconsideration for the December 2
Letter.  Tr. at 6:13-15 (Keegan).  It could not cite any cases on point.  See Tr. at 6:23-25
(Keegan).  It could, however, assure the Court that there would not be statute of limitations
issues for the allegations against Dr. Quintana.  See Tr. at 7:8-8:4 (Keegan).  It pointed the Court
to Glade ex rel. Lundskow v. United States, 692 F.3d 718 (7th Cir. 2012)(Posner, J.).  See Tr. at
9:13-19 (Keegan).

---

[10]The Court's citations to the transcript for this hearing refer to the court reporter's
original, unedited version.  Any final version may contain slightly different page and/or line
numbers.

The Plaintiffs' counsel conceded that he might have "mess[ed] up a two-car parade," but continued to argue that the errors were not fatal to the suit.  Tr. at 11:1-6 (Perrin).  The Plaintiffs maintained that the United States had sufficient information about the allegations against the unnamed pharmacist to investigate the underlying facts by December 2, 2013.  See Tr. at 11:6-13 (Perrin).  They argued that, even if they failed to give proper notice as to their allegations against Dr. Quintana,[11] this reality should not result in dismissal, because: (i) the Court has diversity jurisdiction over Dr. Wood; and (ii) as a practical matter, any separate lawsuit would only be re-consolidated into the present case.  See Tr. at 12:17-13:17 (Perrin).

Dr. Wood and Medical Doctor Associates, LLC stated that they were unsure whether they had standing to discuss jurisdiction.  See Tr. at 14:2-6 (Gay).  They justified their involvement in the case by arguing that the Initial Motion was in fact a motion for summary judgment.  See Tr. at 20:24-21:3 (Gay).  They also noted that the Plaintiffs had included both Dr. Quintana and a possible responsible pharmacist in the lengthy list attached to their initial April 2 Letter.  See Tr. at 14:6-15:9 (Gay).  They added that the United States' First VA Letter states that the VA "wanted to be sure that Mr. Van Winkle received good care from his other VA providers."  Tr. at 15:13-16:9 (Gay).  They concluded that, "[c]learly, the VA looked at the entire case . . . .  This is a denial of the claim as to all VA employees."  Tr. at 16:10-14 (Gay).

---

[11]The Court recognizes that the Plaintiffs appear to concede the Court's lack of jurisdiction with respect to the allegations against Mr. Quintana.  See Tr. at 12:17-20 (Court, Perrin).  Dr. Wood and Medical Associates' counsel, however, subsequently state: "Clearly, the VA looked at the entire case and determined that no VA employee had been negligent.  This is a denial of the claim as to all VA employees, unless I just don't understand the language."  Tr. at 16:10-14 (Gay).  He later added that he believed "that the notice of tort claim is more than adequate" as to all of Plaintiff's allegations.  Tr. at 22:18-23 (Gay).  The Plaintiffs' counsel later stated: "I think I like [Dr. Wood and Medical Associates' counsel]'s argument better than mine."  Tr. at 31:25-32:2 (Perrin).  The Court concludes that these statements preserved the argument that the April 2 Letter provided sufficient notice of the Plaintiffs' allegations against Dr. Quintana.

The United States responded to these arguments, explaining that the VA had the medical records reviewed, but did not discuss them with Dr. Quintana or "the pharmacist," because "they were not the doctors or responsible medical providers of Mr. Van Winkle."  Tr. at 25:9-18 (Keegan).  It cited an unpublished opinion from the Western District of Pennsylvania to overcome the fact that the Plaintiffs' original list of medical providers included Dr. Quintana. See Tr. at 25:21-27:5 (Keegan)(citing Ham v. United States, No. CIV.A. 07-29E, 2008 WL 818197, at *4 (W.D. Pa. March 26, 2008)(McVerry, J.)(unpublished)).  The United States reiterated that Dr. Wood's affirmative defenses are "not a claim against the United States," making her employment status irrelevant.  Tr. at 32:10-16 (Keegan).

**5.    The 2015 Litigation and Motion to Dismiss.**

The Plaintiffs filed the Complaint on March 4, 2015 in the United States District Court for the District of New Mexico.  See Complaint at 1.  The Complaint alleges similar facts to the 2013 Amended Complaint, but focuses on the Plaintiffs' allegations against the unnamed pharmacist and Dr. Quintana.[12]  See Complaint ¶¶ 16-18, at 4.  The Complaint formed the basis for Gallegos v. United States, No. CIV 15-0184 JB/KBM (D.N.M.).

The United States moved to dismiss the Complaint on May 15, 2015.  See MTD at 1.  It raises two primary arguments: (i) the Plaintiffs did not state a claim under circumstances where a private person would be liable -- in other words, they failed to identify a private person analogue; and (ii) the Plaintiffs did not exhaust their administrative remedies, because they gave

---

[12]The Plaintiffs likely filed this separate lawsuit on the assumption that their April 23, 2014, letter was too premature to provide sufficient notice of their claims against Dr. Quintana. See Final Letter at 1; 28 U.S.C. § 2675(a) (barring negligence claims "unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.").  The Court mooted this concern in its prior opinion.  See Gallegos v. Wood, No. CIV 13-1055 JB/KBM, 2015 WL 6393561, at *23 (D.N.M. Oct. 1, 2015)(Browning, J.).

insufficient notice of their allegations against Dr. Quintana and the unnamed pharmacist.  See MTD at 8.  On the first argument, the United States explains that the FTCA's limited grant of subject-matter jurisdiction hinges on "whether a private person could be subject to state law liability under similar circumstances."  MTD at 10 (emphasis in original)(citing United States v. Olson, 546 U.S. 43, 44 (2005)).  It contends that the Court lacks subject-matter jurisdiction, because "New Mexico does not recognize a duty of care of a private person under analogous circumstances."  MTD at 11.  The United States defines the relevant duty as a fellow's duty "to interfere with medical care provided by his supervisor."  MTD at 11-12.  It asserts that the unnamed pharmacist did not owe the Plaintiffs any duty of care.  See MTD at 12.

The United States then elaborates why Dr. Quintana and the unnamed pharmacist did not owe duties of care to Van Winkle.  See MTD at 12-15.  It contends that "New Mexico has never imposed a duty of care under the circumstances alleged in the Complaint."  MTD at 12.  It cites a series of other states' cases that, it states, declined to impose a duty under similar circumstances.  See MTD at 12-13 (citing Buttersworth v. Swint, 53 Ga. App. 602, 186 S.E. 770, 772 (1936); Clarke v. Hoek, 174 Cal. App. 3d 208, 216, 219 Cal. Rptr. 845, 850 (Ct. App. 1985); Rouse v. Pitt County Mem'l Hosp., Inc., 116 N.C. App. 241, 247, 447 S.E.2d 505, 509 (1994)).  It explains that the Plaintiffs did not allege that Dr. Quintana and the unnamed pharmacist "assumed the care of Mr. Van Winkle," or "had the right or ability to control either Dr. Wood or Mr. Van Winkle."  MTD at 13.  It also cites public policy arguments, including the New Mexico Legislature's limitations on malpractice liability.  See MTD at 13-14.

Finally, the United States discusses the similarities between this case and Estate of Haar v. Ulwelling, M.D., 2007-NMCA-032, 154 P.3d 67 ("Haar").  MTD at 14-15.  In Haar, it notes, a psychiatrist saw Haar, a patient, between December, 1999, and March 8, 2000.  See MTD at 14

(citing Haar, 2007-NMCA-032, ¶ 4, 154 P.3d at 69).  After their last meeting, Haar expressed dissatisfaction with the psychiatrist to his girlfriend and mother, and missed his next two scheduled appointments.  See MTD at 14 (citing Haar, 2007-NMCA-032, ¶ 4, 154 P.3d at 69). Later that month, Haar was admitted to the hospital, and two other psychiatrists provided care. See MTD at 14 (citing Haar, 2007-NMCA-032, ¶ 6, 154 P.3d at 69).  Although the psychiatrist was aware of the admission, the patient did not consult him.  See MTD at 14 (citing Haar, 2007-NMCA-032, ¶ 5, 154 P.3d at 69).  "Haar died on May 3, 2000, allegedly by suicide."  MTD at 14 (citing Haar, 2007-NMCA-032, ¶ 6, 154 P.3d at 69).  His estate alleged that the psychiatrist's failure to monitor Haar's medication, compliance with treatment, and subsequent appointments resulted in his suicide.  See MTD at 14 (citing 2007-NMCA-032, ¶ 8, 154 P.3d at 69). According to the United States, the Court of Appeals of New Mexico held that Haar was not the psychiatrist's patient and had no duty to give his views and treatment.  See MTD at 15 (citing 2007-NMCA-032, ¶ 27, 154 P.3d at 73).

Second, the United States argues that the Plaintiffs failed to give proper notice of their allegations against the unnamed pharmacist.  See MTD at 16-21.  Its arguments are almost identical to its arguments in the Initial Motion.  Compare MTD at 16-21 with Initial Motion at 10-12.  It again contends: (i) that the April 2 Letter did not provide sufficient notice, because it did not mention any pharmacist; (ii) that the December 2 Letter neither amended the April 2 Letter nor served as a new claim; and (iii) that the Plaintiffs failed to request reconsideration of the December 9 Letter or file suit within six months.  See MTD at 16-21.  It now adds that the Plaintiffs' decision to amend their Original Complaint in the initial litigation effectively deemed their December 2 Letter claim as denied.  See MTD at 21.  It states that this suit, "filed more than

six months after Plaintiffs deemed the agencies' action (or inaction) as a denial, is untimely." MTD at 21.

6.      **The Consolidation.**

The Complaint effectively creates two parallel proceedings based on the same facts within the District of New Mexico.  Compare Original Complaint at 1 with Complaint at 1.  The Plaintiffs moved to consolidate the two cases on May 22, 2015.  See Plaintiffs' Motion to Consolidate, filed May 22, 2015 (Doc. 8 in Gallegos v. United States, No. CIV 15-0184 JB/KBM (D.N.M.)).  The Court granted the request on June 16, 2015, combining the two proceedings with the 2013 suit as the lead case.  See Order on Plaintiffs' Motion to Consolidate [Doc. 8], filed June 16, 2015 (Doc. 11 in Gallegos v. United States, No. CIV 15-0184 JB/KBM (D.N.M.)).

7.      **The Plaintiffs' Response.**

The Plaintiffs responded to the MTD on June 30, 2015.  See Plaintiffs' Response to Defendant United States of America's Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim, filed June 30, 2015 (Doc. 68)("MTD Response").  The Plaintiffs explain that they filed the 2015 Complaint in response to the United States' argument that joinder was premature "to remove any doubt as to the appropriateness of the joinder and the timing of it."  MTD Response at 4.  The Plaintiffs contend that, "[a]pparently, the position of the United States is that the only person working at the VA Medical Center who owed a duty to Mr. Van Winkle was the physician who was not an employee of the United States," calling this position "preposterous."  MTD Response at 4.

The Plaintiffs make two primary arguments that Dr. Quintana owed duties to Van Winkle.  See MTD Response at 5-8.  First, they characterize his duty differently, explaining that

"providing information about the positive cultures to Dr. Wood would not have 'interfered' with her treatment at all. It would have helped her, and helped the patient."  MTD Response at 5. Second, they note that doctors in New Mexico have a "duty to 'possess and apply the knowledge and to use the skill and care ordinarily used by reasonably well-qualified doctors . . .' in treating, making a diagnosis of, or caring for a patient."  MTD Response at 5 (quoting N.M. Rul. Amend. Civ. UJI 13-1101).  This duty, the Plaintiffs say, applies regardless whether Dr. Quintana was subordinate to Dr. Wood.  See Response at 5.  The Plaintiffs also distinguish Haar on the grounds that the psychiatrist there was "separate and apart from" Haar, because other health care providers were treating Haar at the time of his suicide.  Response at 6-7.

The Plaintiffs apply a similar analysis to the unnamed pharmacist's duties to Van Winkle. See MTD Response at 6.  They summarize their allegations:

> The pharmacist(s) possessed information which Dr. Wood did not have -- the actual results of the culture and the fact that the drugs which were being prescribed for Mr. Van Winkle were not appropriate to treat his infection. The pharmacist(s) knew or should have known that Mr. Van Winkle was receiving the wrong drugs for his condition. Just as the failure of Dr. Quintana to advise Dr. Wood could have improved Dr. Wood's treatment, so disclosure from the pharmacist from what he or she knew could have accomplished the same thing.

MTD Response at 6.

The Plaintiffs then argue that they have complied with the FTCA's notice requirements. See MTD Response at 7-8.  They repeat their initial arguments that the United States received notice of their claims from the December 2 Letter.  See MTD Response at 7.  They also note that the unnamed pharmacist claim "was the subject of a request for reconsideration filed on December 10, 2013."  MTD Response at 8.

8.      **The United States' Reply.**

The United States replied on July 16, 2015.  See Reply in Support of Motion to Dismiss for Lack of Subject Matter Jurisdiction, filed July 16, 2015 (Doc. 12 in Gallegos v. United States, No. CIV 15-0184 JB/KBM (D.N.M.))("MTD Reply").  The United States clarifies that it seeks dismissal on two separate grounds, each under a different provision of the Federal Rules of Civil Procedure.  See MTD Reply at 3-4.  Its private-person-analogue argument, it says, relies on rule 12(b)(6), and thus draws exclusively from the Complaint.  See MTD Reply at 3-4.  Its notice argument, on the other hand, "is not intertwined with the merits of the suit" and thus relies on rule 12(b)(1).  MTD Reply at 4.

The United States clarifies its arguments that Dr. Quintana owed no duty to Van Winkle. See MTD Reply at 4-7.  It explains that, absent a physician-patient relationship, a doctor may be

> liable for injury by parties with known "dangerous propensities" if the doctor exerts control over the patient, a doctor has a duty to warn of specific threats by the doctor's patient, and a doctor may be held liable for administering powerful drugs in his office that result in impairment to the patient.

MTD Reply at 5 (citing Brown v. Kellogg, 2015-NMCA-006, ¶ 8, 340 P.3d 1274, 1276).  It argues that the Court should not impose a new obligation on doctors to "inform the patient's doctor of information that is readily available in the patient's chart."  MTD Reply at 5.  It compares this matter to Thompson v. Potter, 2012-NMCA-014, 268 P.3d 57, in which the Court of Appeals of New Mexico "declined to impose duty of care on a pharmacist that had a contract with the medical provider to review medications prescribed to patients."  MTD Reply at 6.  It disputes that Van Winkle was Dr. Quintana's patient, and notes that Dr. Quintana "had neither the right nor the ability to control Dr. Wood's conduct."  MTD Reply at 6-7.  It concludes this line of argument by noting that New Mexico courts have never recognized a pharmacist's duty to intervene on behalf of a patient.  See MTD Reply at 7.

The United States largely repeats its initial arguments on the Plaintiffs' allegedly inadequate notice.  See MTD Reply at 8-9.  It argues that, even assuming the December 2 Letter was a denial, the Plaintiffs failed to seek reconsideration of that denial or file suit within six months.  See MTD Reply at 9 (citing  28 U.S.C. § 2401(b)).

**9.      The Court's October 1, 2015 Memorandum Opinion and Order.**

The Court issued the October Opinion on October 1, 2015.  See 2015 WL 6393561, at *1. The Court held, in relevant part, that: (i) the Plaintiffs' April 2 Letter provided sufficient notice of their allegations against both Dr. Quintana and the unnamed pharmacist; and (ii) the Plaintiffs' December 2 Letter to the VA was a separate notice of claim, despite its label.  See 2015 WL 6393561, at *18.  On the first issue, the Court noted:

> Courts generally disregard the labels attached to particular pieces of a plaintiff's notice of claim.  In Dynamic Image Technologies, Inc. v. United States, [221 F.3d 34 (1st Cir. 2000)] for example, the First Circuit examined the plaintiff's allegations "regardless of the labels employed in the amended complaint."  221 F.3d at 40.  This rule is consistent with the fact that "Congress did not intend to shield the federal fisc behind an impenetrable thicket of lawyerly technicalities." 221 F.3d at 40.

2015 WL 6393561, at *22.  On the second issue, the Court explained that:

> The underlying purpose of the notice requirement has been more than satisfied here -- the VA was well-aware of the Plaintiffs' argument against the unnamed pharmacist as early as December 2, 2013.  See Williams v. United States, 932 F. Supp. at 361 (holding that it is "only necessary that the agency be put on notice of the injury so that it may begin its own investigation of the matter").

2015 WL 6393561, at *23.

10.     __The Second Hearing__.

The Court heard arguments on the MTD on October 1, 2015.  See Transcript of Hearing at 1:1 (taken October 1, 2015)("Second Tr.").[13]  The Court opened the hearing by noting that its October Opinion "does probably address about half of" the United States' arguments.  Second Tr. at 2:15-19 (Court).  It thus focused on the remaining half, namely "whether the claims that are here are similarly situated to the claims that might be brought under New Mexico law."  Second Tr. at 2:19-23 (Court).  The Court indicated that it was inclined, at least before the hearing, to find that New Mexico recognized a duty applicable to at least the unnamed pharmacist.  See Second Tr. at 3:4-8 (Court).

The United States first explained that it "had not planned on arguing the exhaustion issues simply because the Court has decided the previous motion . . . ."  Second Tr. at 4:15-17 (Keegan).  It then stated that "there is no relationship between the pharmacist, or for that matter Dr. Quintana, [and] the patient."  Second Tr. at 6:21-23 (Keegan).  It contended that the Court should resolve any doubts over unsettled law against jurisdiction and should avoid predicting how the Supreme Court of New Mexico would react to the situation.  See Second Tr. at 7:22-8:22 (Court, Keegan).  Although the United States conceded that "every doctor is responsible for the care that they [sic] provide to a patient," it pointed out that neither Dr. Quintana nor the unnamed pharmacist had an obligation to prevent Dr. Wood's negligence.  Second Tr. at 11:18-12:2 (Keegan).  It also remarked that "the plaintiffs never requested Dr. Quintana or this pharmacist to provide care.  They never agreed to provide that care to Mr. Van Winkle.  And

_____

[13]The Court's citations to the transcript for this hearing refer to the court reporter's original, unedited version. Any final version may contain slightly different page and/or line numbers.

plaintiffs don't allege that either Dr. Quintana or the pharmacist had any control over Dr. Wood."
Second Tr. at 15:24-16:4 (Keegan).

The Plaintiffs began their arguments by attacking the United States' reliance on
Thompson v. Potter and Haar.  See Second Tr. at 18:2-21:1 (Court, Perrin).  The Plaintiffs noted
that the unnamed pharmacist here, unlike the pharmacist in Thompson v. Potter, was present
with the physician and knew or should have known that Dr. Wood was incorrect.  See Second Tr.
at 18:2-19:22 (Court, Perrin).  After questioning from the Court, the Plaintiffs agreed that the
physicians in both Thompson v. Potter and Haar were "too far removed" from the harm to
support liability.  Second Tr. at 20:5-21:6 (Perrin).  The Plaintiffs also argued that Dr. Quintana
and the unnamed pharmacist were "representatives and agents" for the hospital, which had
"unquestioned" liability.   Second Tr. at 21:19-22:4 (Perrin).   They explained this alternative
theory:

> You can't just isolate the doctor from everybody else who is involved in the
> treatment of the patient.  It's like a case where maybe a fax from one of these
> night hawk radiology places comes in at 3:00 in the morning showing some
> serious condition, abdominal condition let say for a patient, the nurse picks up
> the fax and doesn't put it in a file, doesn't tell anybody, doesn't tell a doctor. That
> nurse may never have seen the patient, but certainly still has a duty as an
> employee of the hospital and as someone who has this knowledge to pass it on
> and that's a similar situation that we're in with the pharmacist and Dr. Quintana.

Second Tr. at 22:10-22 (Perrin).  The Court asked whether a medical fellow is really a physician,
noting that its law clerks, for example, are in training and cannot easily commit malpractice.  See
Second Tr. at 23:12-22 (Court).  The Plaintiffs responded that Dr. Wood's patients would be Dr.
Quintana's patients as well, but that he was probably a University of New Mexico employee.
See Second Tr. at 24:19-25:21 (Court, Perrin).

The Court also allowed Dr. Wood and Medical Doctor Associates, LLC to make
arguments on the MTD.  See Second Tr. at 25:24-26:5.  They framed Dr. Quintana's duty as the

"obligation to pass on information" about the test results.  Second Tr. at 28:18-23 (Gay).  They argued that Dr. Quintana had this duty, in part, because he was a "physician, fully trained and licensed, who is undertaking subspecialty training."  Second Tr. at 29:3-7 (Gay).  They also noted that Dr. Quintana and the unnamed pharmacist both had an independent obligation to report Dr. Wood's error "up the chain of command."  Second Tr. at 29:19-31:16 (Gay).  They argued that Dr. Quintana was a federal employee, citing an unspecified United States brief in "the first case."  Second Tr. at 36:19-23 (Gay).  Their counsel also mentioned that he had defended many residents in malpractice suits.  See Second Tr. at 41:13-15 (Gay).  Finally, Dr. Wood and Medical Doctor Associates, LLC noted that Dr. Quintana could have been liable under the state Tort Claims Act as a University of New Mexico employee and should thus be liable under the FTCA.  See Second Tr. at 43:17-44:16 (Gay).

The United States responded that Dr. Quintana "is absolutely an employee of the VA. That is why the United States is the only proper defendant."  Second Tr. at 48:10-12 (Keegan). They emphasized that Dr. Quintana was never assigned to Van Winkle, despite that he had his own patients.  See Second Tr. at 48:23-49:4 (Keegan).  They also noted that he had no authority to tell Dr. Wood how to practice medicine.  See Second Tr. at 50:15-20 (Keegan).  Pharmacists, the United States added, are "not responsible for diagnosing a patient and knowing what the proper medication is for that diagnosis."  Second Tr. at 51:16-20.  The United States noted that pharmacists "can absolutely commit malpractice, but only when acting within the scope of their job, which is to understand medications and their interactions."  Second Tr. at 52:10-13 (Keegan).

The Court then summarized its view of the case.  See Second Tr. at 53:2-54:15 (Court). It remained "inclined to deny this motion" based on its opinion of Dr. Quintana and the unnamed

pharmacist's duties.  Second Tr. at 53:25 (Court).  It raised the United States' request that the

MTD apply across both consolidated cases.  See Second Tr. at 54:12-15 (Court).  Dr. Wood and

Medical Doctor Associates, LLC suggested that collateral estoppel should dispose of the United

States' notice arguments, but the United States reiterated that it had not abandoned the motion.

See Second Tr. at 54:18-55:11 (Court, Gay, Keegan).

### LAW REGARDING MOTIONS TO DISMISS UNDER RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon

which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion

tests the sufficiency of the allegations within the four corners of the complaint after taking those

allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)(Brorby, J.).  The

complaint's sufficiency is a question of law; and, when considering a rule 12(b)(6) motion, a

court must accept as true all well-pled factual allegations in the complaint, view those allegations

in the light most favorable to the non-moving party, and draw all reasonable inferences in the

plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322

(2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the

alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561

F.3d 1090, 1098 (10th Cir. 2009)(Briscoe, J.)("[F]or purposes of resolving a Rule 12(b)(6)

motion, we accept as true all well-pled factual allegations in a complaint and view these

allegations in the light most favorable to the plaintiff.")(citing Moore v. Guthrie, 438 F.3d 1036,

1039 (10th Cir. 2006)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers

labels and conclusions or a formulaic recitation of the elements of a cause of action" is

insufficient.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550

U.S. 544, 555 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. at 678.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010)(Seymour, J.).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."  Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(Kelly, J.)(emphasis omitted). The United States Court of Appeals for the Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(citations omitted).

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions where: (i) the

defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss, see Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009) and Robbins v. Oklahoma, 519 F.3d 1242 (10th Cir. 2008)); and (ii) where the facts establishing the affirmative defense are apparent on the face of the complaint, see Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)(Hill, J.)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim.  If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule.").

## LAW REGARDING SOVEREIGN IMMUNITY AND THE FTCA

"The United States cannot be sued without its consent."  Garcia v. United States, 709 F. Supp. 2d 1133, 1137 (D.N.M. 2010)(Browning, J.).  "Congressional consent -- a waiver of the traditional principle of sovereign immunity --  is a prerequisite for federal-court jurisdiction." Garcia v. United States, 709 F. Supp. 2d at 1137-38.  "The plaintiff bears the burden of proving that Congress has waived sovereign immunity for all of his claims."  Garcia v. United States, 709 F. Supp. 2d at 1138.   Accord Bork v. Carroll, 449 F. App'x 719, 721 (10th Cir. 2011)(unpublished)("So it is that a plaintiff seeking to invoke the jurisdiction of the federal courts bears the burden of identifying an applicable statutory waiver of sovereign immunity when challenged to do so."); Summa v. United States, 936 F.2d 584, 1991 WL 114638, at *3 (10th Cir. 1991)(unpublished table decision)(holding in an FTCA case that the "Plaintiffs bore the burden of proving that the district court had subject matter jurisdiction over their claims" (citing Miller v. United States, 710 F.2d 656, 662 (10th Cir. 1983)).

1.    **General Principles of Sovereign Immunity.**

It is "axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."  United States v. Mitchell, 463 U.S. 206,

212 (1983)(citations omitted).  Accord FDIC v. Meyer, 510 U.S. 471, 475 (1994); United States

v. Testan, 424 U.S. 392, 399 (1976); United States v. Sherwood, 312 U.S. 584, 586 (1941).  As

with any jurisdictional issue, the party bringing suit against the United States bears the burden of

proving that sovereign immunity has been waived.  See James v. United States, 970 F.2d 750,

753 (10th Cir. 1992).   A waiver of sovereign immunity cannot be implied and must be

unequivocally expressed. See United States v. Nordic Vill., Inc., 503 U.S. 30, 33-34 (1992);

United States v. Mitchell, 445 U.S. 535, 538 (1980); United States v. Murdock Mach. & Eng'g

Co. of Utah, 81 F.3d 922, 930 (10th Cir. 1996).

### 2.      The FTCA.

The FTCA waives the United States' sovereign immunity in certain specific tort actions

against the United States for money damages.  See Romanach v. United States, 579 F. Supp.

1017, 1019 (D.P.R. 1984)(Laffitte, J.)  Congress has explicitly provided, however, that the only

proper party in an action under the FTCA is the United States.  See 28 U.S.C. § 2679(a);

Romanach v. United States, 579 F. Supp.  at 1018 n.1 (holding that no suit under the FTCA may

lie against any agency of the United States eo nomine); Painter v. FBI, 537 F. Supp. 232, 236

(N.D. Ga. 1982)(Forrester, J.)(holding that "[t]he FBI may not be sued eo nomine").

In enacting the FTCA, Congress defined the terms and conditions under which the United

States may be sued in tort.  28 U.S.C. § 1346(b) provides, in pertinent part:

> [T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims
> against the United States, for money damages accruing on and after January 1,
> 1945, for injury or loss of property, or personal injury or death caused by the
> negligent or wrongful act or omission of any employee of the Government while
> acting within the scope of his office or employment, under circumstances where
> the United States, if a private person, would be held liable to the claimant in
> accordance with the law of the place where the act or omission occurred.

A companion section of the FTCA provides that the United States is liable "in the same manner

and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. "The law of the place where the alleged negligent conduct took place determines the scope of employment under the FTCA." Garcia v. United States, No. 08-0295, 2010 WL 2977611, at *18 (D.N.M. June 15, 2010)(Browning, J.)(citing 28 U.S.C. § 1346(b); Richards v. United States, 369 U.S. 1, 9 (1962); Williams v. United States, 350 U.S. 857, 857 (1955); Henderson v. United States, 429 F.2d 588, 590 (10th Cir. 1970)).

The Tenth Circuit has emphasized that all dismissals for lack of jurisdiction, including those for a failure to establish a waiver of sovereign immunity under the FTCA, should be without prejudice. See Mecca v. United States, 389 F. App'x 775, 780 (10th Cir. 2010). It has explained: "A longstanding line of cases from this circuit holds that where the district court dismisses an action for lack of jurisdiction . . . the dismissal must be without prejudice." Mecca v. United States, 389 F. App'x at 780 (quoting Brereton v. Bountiful City Corp., 434 F.3d 1213, 1216 (10th Cir. 2006)). The Tenth Circuit held in Mecca v. United States that the district court improperly dismissed with prejudice the plaintiff's FTCA claims after it concluded that it lacked jurisdiction over those claims. See 389 F. App'x at 780-81 ("Here, because the district court found itself without jurisdiction over the FTCA claims, dismissal should have been entered without prejudice, even if the court deemed further amendment futile. We therefore remand with instructions to enter dismissal of these claims without prejudice.").

**3.      Scope of Liability Under the FTCA.**

The FTCA waives the United States' sovereign immunity for certain negligence claims, but it does so only if a private person, performing the same act as the United States, would be liable under the governing state law. See 28 U.S.C. § 2674 ("The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same

extent as a private individual under like circumstances . . . .").  "[T]hese sections ensure that the United States is placed in the same position as a private individual by rendering the United States liable for the tortious conduct of its employees if such conduct is actionable in the state in which the United States' action or inaction occurred."  Cortez v. EEOC, 585 F. Supp. 2d 1273, 1284 (D.N.M. 2007)(Browning, J.).  "The FTCA's waiver of sovereign immunity is limited, however."  Cortez v. EEOC, 585 F. Supp. 2d at 1284.  "If the claim does not fall within the FTCA's express provisions, or if it falls within one of its exceptions, the claim is not cognizable under the FTCA, and the court must deny relief."  Cortez v. EEOC, 585 F. Supp. 2d at 1284 (citing Williams v. United States, 50 F.3d 299, 304-05 (4th Cir. 1995)).

> a.   **Liability Under the Same Circumstances Versus Like Circumstances.**

The Supreme Court of the United States has rejected a reading of the FTCA that would impose liability on the United States only "to the same extent as would be imposed on a private individual 'under the same circumstances.'"  Indian Towing Co. v. United States, 350 U.S. 61, 65 (1955)("The Government reads that statute as if it imposed liability to the same extent as would be imposed on a private individual 'under the same circumstances.'  But the statutory language is 'under like circumstances[]' . . . .").  The FTCA did not spur "the creation of new causes of action but acceptance of liability under circumstances that would bring private liability into existence."  Feres v. United States, 340 U.S. 135, 141 (1950).  It is important for a court to consider the liability of the United States under all the circumstances presented in the case as opposed to selectively considering only a few of the circumstances.  See Feres v. United States, 340 U.S. at 141-42.  The Supreme Court has illustrated:

> One obvious shortcoming in these claims is that plaintiffs can point to no liability of a 'private individual' even remotely analogous to that which they are asserting against the United States.  We know of no American law which ever has permitted a soldier to recover for negligence, against either his superior officers or

the Government he is serving.    Nor is there any liability 'under like circumstances,' for no private individual has power to conscript or mobilize a private army with such authorities over persons as the Government vests in echelons of command.   The nearest parallel, even if we were to treat 'private individual' as including a state, would be the relationship between the states and their militia.   But if we indulge plaintiffs the benefit of this comparison, claimants cite us no state, and we know of none, which has permitted members of its militia to maintain tort actions for injuries suffered in the service, and in at least one state the contrary has been held to be the case.   It is true that if we consider relevant only a part of the circumstances and ignore the status of both the wronged and the wrongdoer in these cases we find analogous private liability.   In the usual civilian doctor and patient relationship, there is of course a liability for malpractice.   And a landlord would undoubtedly be held liable if an injury occurred to a tenant as the result of a negligently maintained heating plant.   But the liability assumed by the Government here is that created by 'all the circumstances,' not that which a few of the circumstances might create.   We find no parallel liability before, and we think no new one has been created by, this Act.   Its effect is to waive immunity from recognized causes of action and was not to visit the Government with novel and unprecedented liabilities.

Feres v. United States, 340 U.S. at 141-42 (footnotes omitted).

>    **b.    Considering the Liability Under State Law of Private Actors Versus Governmental Actors.**

The United States' liability is coextensive with that of private individuals under the respective States' law, even if comparable government actors would have additional defenses or additional obligations under that State's law.   See Ewell v. United States, 776 F.2d 246, 248-49 (10th Cir. 1985); Proud v. United States, 723 F.2d 705 (9th Cir. 1984)("But appellants overlook the fact that in enacting the FTCA, Congress -- not the Hawaii Legislature -- determined the tort liability of the United States.   And the FTCA specifically provides that the federal government's tort liability is co-extensive with that of a private individual under state law."); Cox v. United States, 881 F.2d 893, 895 (10th Cir. 1989)(citing Proud v. United States with approval)("This and other courts have applied the same rationale in holding that the United States may invoke the protection of a [private] recreational use statute.").   The Tenth Circuit illustrated some of these same principles in Ewell v. United States:

The main goal of the FTCA was to waive sovereign immunity so that the federal government could be sued as if it were a private person for ordinary torts. Congress was primarily concerned with allowing a remedy where none had been allowed. There is no evidence that Congress was concerned with the prospect that immunities created solely for private persons would shield the United States from suit. The Supreme Court, in <u>United States v. Muniz</u>, 374 U.S. 150 . . . (1963), considered whether it is appropriate to apply immunities created by state law to the United States when it is sued under the FTCA. The Court was concerned with state laws that immunized prison officials from suits by prisoners and concluded that it is "improper to limit suits by federal prisoners because of restrictive state rules of immunity." 374 U.S. at 164 . . . . The immunity under consideration in that case applied to state, county and municipal prison officials. Noting its decision in <u>Indian Towing Co. v. United States</u>, 350 U.S. at 65, 76 S. Ct. at 124, wherein the Court determined that federal liability had to be determined as if it were a private person and not as if it were a municipal corporation, it concluded that state law immunity applicable to state, county and municipal prison officials would not be applicable to a private person and, therefore, not applicable to the federal government in a suit under the FTCA.

Thus, while immunities afforded state, county and municipal employees are not applicable to the federal government when sued under the FTCA, immunities created by state law which are available to private persons will immunize the federal government because it is liable only as a private individual under like circumstances. It is evident, therefore, that the Utah district court was correct in granting the motion for summary judgment.

<u>Ewell v. United States</u>, 776 F.2d at 249.[14]

In a unanimous decision, the Supreme Court recently reversed "a line of Ninth Circuit precedent permitting courts in certain circumstances to base a waiver" under the FTCA "simply upon a finding that local law would make a 'state or municipal entit[y]' liable." <u>United States v. Olson</u>, 546 U.S. 43, 44 (2005). As the Supreme Court discussed in <u>United States v. Olson</u>, the United States Court of Appeals for the Ninth Circuit based its decision to find a waiver of

---

[14]Some courts have taken into account special expertise that government officials might have in particular areas when evaluating liability under the FTCA. <u>See</u> <u>Allen v. United States</u>, 588 F. Supp. 247, 354-56 (D. Utah 1984)(Jenkins, J.)("As far as nuclear fallout is concerned, the Government possessed an overwhelming superiority in knowledge, as well as an effective monopoly of the special skills, training and experience relevant to open-air atomic testing."), <u>rev'd on other grounds</u>, 816 F.2d 1417 (10th Cir. 1987). <u>But</u> <u>see</u> <u>Gowdy v. United States</u>, 412 F.2d 525, 534 (6th Cir. 1969)("The mere fact that the Government may have had superior knowledge of safety standards did not increase its duty to exercise ordinary care.").

liability under the FTCA on two principles:

> In this case, two injured mine workers (and a spouse) have sued the United States claiming that the negligence of federal mine inspectors helped bring about a serious accident at an Arizona mine.  The Federal District Court dismissed the lawsuit in part upon the ground that their allegations were insufficient to show that Arizona law would impose liability upon a private person in similar circumstances. The Ninth Circuit, in a brief per curiam opinion, reversed this determination.   It reasoned from two premises.   First, where "'unique governmental functions'" are at issue, the Act waives sovereign immunity if "'a state or municipal entity would be [subject to liability] under the law [. . .] where the activity occurred.'"   Second, federal mine inspections being regulatory in nature are such "'unique governmental functions,'" since "there is no private-sector analogue for mine inspections."  The Circuit then held that Arizona law would make "state and municipal entities" liable in the circumstances alleged; hence the FTCA waives the United States' sovereign immunity.

546 U.S. at 45 (alterations in original)(citations omitted).  The Supreme Court "disagree[d] with both of the Ninth Circuit's legal premises."   United States v. Olson, 546 U.S. at 45.   Regarding the first premise, the Supreme Court held:

> The first premise is too broad, for it reads into the Act something that is not there. The Act says that it waives sovereign immunity "under circumstances where the United States, if a private person," not "the United States, if a state or municipal entity," would be liable.  Our cases have consistently adhered to this "private person" standard.   In Indian Towing Co. v. United States, this Court rejected the Government's contention that there was "no liability for negligent performance of 'uniquely governmental functions.'"  It held that the Act requires a court to look to the state-law liability of private entities, not to that of public entities, when assessing the Government's liability under the FTCA "in the performance of activities which private persons do not perform."  In Rayonier Inc. v. United States, the Court rejected a claim that the scope of FTCA liability for "'uniquely governmental'" functions depends on whether state law "imposes liability on municipal or other local governments for the negligence of their agents acting in" similar circumstances.   And even though both these cases involved Government efforts to escape liability by pointing to the absence of municipal entity liability, we are unaware of any reason for treating differently a plaintiff's effort to base liability solely upon the fact that a State would impose liability upon a municipal (or other state governmental) entity.  Indeed, we have found nothing in the Act's context, history, or objectives or in the opinions of this Court suggesting a waiver of sovereign immunity solely upon that basis.

United States v. Olson, 546 U.S. at 45-46 (emphasis in original)(citations omitted).   The

Supreme Court rejected the Ninth Circuit's second premise based on the following rationale:

> The Ninth Circuit's second premise rests upon a reading of the Act that is too narrow.  The Act makes the United States liable "in the same manner and to the same extent as a private individual under like circumstances."  As this Court said in Indian Towing, the words "'like circumstances'" do not restrict a court's inquiry to the same circumstances, but require it to look further afield.  The Court there considered a claim that the Coast Guard, responsible for operating a lighthouse, had failed "to check" the light's "battery and sun relay system," had failed "to make a proper examination" of outside "connections," had "fail[ed] to check the light" on a regular basis, and had failed to "repair the light or give warning that the light was not operating."  These allegations, the Court held, were analogous to allegations of negligence by a private person "who undertakes to warn the public of danger and thereby induces reliance."  It is "hornbook tort law," the Court added, that such a person "must perform his 'good Samaritan' task in a careful manner."

United States v. Olson, 546 U.S. at 46 (alterations in original).

The Court has not located any Tenth Circuit decisions that have discussed the related principles enunciated in United States v. Olson.  The United States Court of Appeals for the Third Circuit has since held, relying on United States v. Olson, that: "Under the FTCA, the federal government can only be held liable for breaches of duties imposed on private, rather than state, parties."  DeJesus v. U.S. Dep't of Veterans Affairs, 479 F.3d 271, 283 n.9 (3d Cir. 2007). The United States Court of Appeals for the Fifth Circuit has held, also relying on United States v. Olson: "Because the federal government could never be exactly like a private actor, a court's job in applying the standard is to find the most reasonable analogy.  Inherent differences between the government and a private person cannot be allowed to disrupt this analysis."  In re FEMA Trailer Formaldehyde Prod. Liab. Litig. (Miss. Plaintiffs), 668 F.3d 281, 288 (5th Cir. 2012)(citations omitted).

According to one commentator, courts have generally had little difficulty in finding a comparable factual analogy in the private sector for conduct in which the United States engages: "Although, as indicated above, courts have generally had little difficulty in finding sufficiently

analogous private conduct, there have been exceptions, primarily in cases involving "quasi-legislative" actions, such as administrative rulemaking, and in cases involving law enforcement officials, who, unlike private citizens, are required to make arrests in appropriate situations."  2 L. Jayson & R. Longstreth, Handling Federal Tort Claims § 9.08[1], at 9-219 (2011).  The Tenth Circuit has stated: "It is virtually axiomatic that the FTCA does not apply where the claimed negligence arises out of the failure of the United States to carry out a [federal] statutory duty in the conduct of its own affairs."  United States v. Agronics Inc., 164 F.3d 1343, 1345 (10th Cir. 1999).  It recognized that "[o]ther courts invoke the same rule by the shorthand expressions of immune 'quasi-legislative' or 'quasi-judicial' action."  United States v. Agronics Inc., 164 F.3d at 1345.

> Thus, for example, courts have rejected FTCA claims premised upon such administrative/regulatory acts or omissions as (1) the [Federal Aviation Administration's] failure to take enforcement action against an entity not complying with federal laws and rules; (2) the USDA's failure to prohibit the exportation of disease-exposed cattle; and (3) various agencies' noncompliance with proper rulemaking procedures.

United States v. Agronics Inc., 164 F.3d at 1346 (citations omitted)(finding no FTCA waiver for "the unauthorized division of regulatory jurisdiction between two administrative agencies").

The Court examined the exceptions to the FTCA's waiver of sovereign immunity in Coffey v. United States, 906 F. Supp. 2d 1114 (D.N.M. 2012)(Browning, J.).  In that case, a plaintiff brought a wrongful death and negligence action against the Bureau of Indian Affairs based on its decision to contract with a county detention center.  See 906 F. Supp. 2d at 1121. The United States argued against liability on the grounds that the detention center was an independent contractor, and that the United States' decision to contract with it fell within the FTCA's discretionary function exemption.  See 906 F. Supp. 2d at 1121.  The Court agreed on both points.  See 906 F. Supp. 2d at 1121.  It explained that the BIA's decision to contract with

the detention center was "a matter of the BIA's judgment and choice, which is susceptible to policy analysis," and thus protected under the discretionary function exemption.  906 F. Supp. 2d at 1157.   It added that the United States "is liable under the FTCA for the actions of its employees only," thereby prohibiting liability for the detention center's actions.  906 F. Supp. 2d at 1164.

## RELEVANT NEW MEXICO LAW REGARDING NEGLIGENCE

Generally, a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based on a standard of reasonable care, and the breach being a cause-in-fact and proximate cause[15] of the plaintiff's damages.  See Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 6, 73 P.3d 181, 186.   "In New Mexico, negligence encompasses the concepts of foreseeability of harm to the person injured and of a duty of care toward that person."  Ramirez v. Armstrong, 1983-NMSC-104, ¶ 8, 673 P.2d 822, 825, overruled on other grounds by Folz v. State, 1990-NMSC-075, ¶ 3, 797 P.2d 246, 249.   Generally, negligence is a question of fact for the jury.  See Schear v. Bd. of Cty. Comm'rs of Bernalillo Cty., 1984-NMSC-079, ¶ 4, 687 P.2d 728, 729.  "A finding of negligence, however, is dependent upon the existence of a duty on the part of the defendant."  Schear v. Bd. of Cty. Comm'rs of Bernalillo Cty., 1984-NMSC-079, ¶ 4, 687 P.2d at 729.  "Whether a duty exists is a question of law for the courts to decide."  Schear v. Bd. of Cty. Comm'rs of Bernalillo Cty., 1984-NMSC-079, ¶ 4, 687 P.2d at 729 (citation omitted).  Once courts recognize that a duty exists, that duty triggers "a legal obligation to conform to a certain standard of conduct to reduce the risk of harm to an individual or class of persons."  Baxter v. Noce, 1988-NMSC-024, ¶ 11, 752 P.2d 240, 243.

---

[15]The 2004 amendments to Uniform Jury Instruction 13-305 eliminated the word "proximate" within the instruction.  See Use Note, N.M. Rul. Amend. Civ. UJI 13-305.  The drafters added, however, that the change was "intended to make the instruction clearer to the jury and do[es] not signal any change in the law of proximate cause."  Editor's Notes, N.M. Rul. Amend. Civ. UJI 13-305.

New Mexico courts have stated that foreseeability of a plaintiff alone does not end the inquiry into whether the defendant owed a duty to the plaintiff.  See Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 7, 73 P.3d at 186.   The New Mexico courts have recognized that, "[u]ltimately, a duty exists only if the obligation of the defendant [is] one to which the law will give recognition and effect." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 9, 73 P.3d at 187 (internal quotation marks omitted).  To determine whether the defendant's obligation is one to which the law will give recognition and effect, courts consider legal precedent, statutes, and other principles of law.  See Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 9, 73 P.3d at 186.

"As a general rule, an individual has no duty to protect another from harm."  Grover v. Stechel, 2002-NMCA-049, ¶ 11, 143, 45 P.3d 80, 84 (Ct. App. 2002).  "[C]ertain relationships, however, that give rise to such a duty [include]: (1) those involving common carriers, innkeepers, possessors of land; and (2) those who voluntarily or by legal mandate take the custody of another so as to deprive the other of his normal opportunities for protection."  Grover v. Stechel, 2002-NMCA-049, ¶ 11, 45 P.3d at 84.  "[W]hen a person has a duty to protect and the third party's act is foreseeable, 'such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the [person who has a duty to protect] from being liable for harm caused thereby.'"  Reichert v. Atler, 1994-NMSC-056, ¶ 11, 626, 875 P.2d 379, 382 (1994).

"[T]he responsibility for determining whether the defendant has breached a duty owed to the plaintiff entails a determination of what a reasonably prudent person would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all the surrounding circumstances."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 33, 73 P.3d at 194.  "The finder of fact must determine whether Defendant breached the duty of ordinary care by considering what a reasonably prudent individual would foresee, what an

unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all surrounding circumstances of the present case . . . ."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 33, 73 P.3d at 195.

"A proximate cause of an injury is that which in a natural and continuous sequence [unbroken by an independent intervening cause] produces the injury, and without which the injury would not have occurred."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195.  "It need not be the only cause, nor the last nor nearest cause."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195.  "It is sufficient if it occurs with some other cause acting at the same time, which in combination with it, causes the injury."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195.

## ANALYSIS

The Court will grant in part and deny in part the United States' MTD.  The Court will apply the MTD across both the 2013 lawsuit, based on the Original Complaint, and the 2015 lawsuit, based on the Complaint.  The Court first concludes that there is a waiver of immunity under the FTCA against the United States, because private persons performing the same acts as Dr. Quintana and the unnamed pharmacist would be liable under New Mexico law.  It will thus deny the MTD as to the 2013 lawsuit.  Second, the Court declines to depart from its prior conclusions on the FTCA's notice requirements.  The Plaintiffs' April 2 Letter provided sufficient notice of their allegations against both Dr. Quintana and the unnamed pharmacist. The Plaintiffs' December 2 Letter to the VA was a separate notice of claim, despite its label. Because the Plaintiffs filed the Complaint more than six months after their Amended Complaint, however, the Court will grant the MTD with respect to the 2015 lawsuit.[16]

---

[16]The Court's decision to grant the MTD for the 2015 lawsuit makes no practical difference to the case because the same claims will proceed against the United States either way.

I.     **PRIVATE PERSONS PERFORMING THE SAME ACTS AS DR. QUINTANA AND THE UNNAMED PHARMACIST WOULD BE LIABLE UNDER NEW MEXICO LAW.**

The United States is liable "in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 2674.  Both Dr. Quintana and the unnamed pharmacist owed duties of care to Van Winkle under New Mexico law.  The Court thus concludes that the Plaintiffs have identified a private person analogue and that their claims under the FTCA may proceed.

A.     **DR. QUINTANA WOULD OWE A DUTY TO VAN WINKLE UNDER NEW MEXICO LAW.**

Dr. Quintana, a fellow, owed a duty to Van Winkle under New Mexico law.  New Mexico law on medical malpractice is murky, and neither party has cited a case directly on point.  The Court nonetheless concludes that the Supreme Court of New Mexico would recognize Dr. Quintana's duty to Van Winkle.

The Plaintiffs could approach this case under two possible theories.  First, they could advance a traditional state-law malpractice claim, which requires a physician-patient relationship.  See Salopek v. Friedman, 2013-NMCA-087, 308 P.3d 139, 144 (describing physicians' general duty to their patients, without mentioning custody or control).  This type of claim is premised on a doctor's well-established "general duty to provide competent care in treating a patient's medical condition." Provencio v. Wenrich, 2011-NMSC-036, ¶ 27, 261 P.3d 1089, 1095.  See N.M. Rul. Amend. Civ. UJI 13-1501.  Second, the Plaintiffs could adopt a special relationship theory, which requires that the defendant and victim's relationship "include the right or ability to control another's conduct." Thompson v. Potter, 2012-NMCA-014, ¶ 27, 268 P.3d at 65.  Plaintiffs often resort to "special relationship" theories when they must overcome "[t]he general rule" that "a person does not have a duty to act affirmatively to protect

- 42 -

another person from harm."  Estate of Eric S. Haar v. Ulwelling, 2007-NMCA-032, ¶ 14, 154 P.3d at 70.

The United States attempts to steer the Plaintiffs toward this second category by characterizing Dr. Quintana's duty as "a duty . . . to interfere with medical care provided by his supervisor."  MTD at 11-12.  As the Plaintiffs point out, Dr. Quintana's information would have aided, rather than interfered with, Dr. Wood's medical care.  See MTD Response at 4-5.  The Court conceives of the duty as Dr. Quintana's duty to his patient to report the positive test results for Staphylococcus aureus to the attending physician.  This theory allows for recovery absent a special relationship for three reasons.

First, Dr. Quintana had a physician-patient relationship with Van Winkle.  See Haar, 2007-NMCA-032, ¶ 34, 154 P.3d at 74 ("In a medical negligence case, there can be no breach of duty absent a physician-patient relationship, since duty flows from the existence of such a relationship.").  There is no statutory definition for a "physician-patient relationship" in New Mexico.  The regulations governing medical ethics in New Mexico define an "established physician-patient relationship" as

> a relationship between a physician and a patient that is for the purpose of maintaining the patient's well-being. At a minimum, this relationship is established by an interactive encounter between patient and physician involving an appropriate history and physical and/or mental status examination sufficient to make a diagnosis and to provide, prescribe or recommend treatment, with the informed consent from the patient and availability of the physician or coverage for the patient for appropriate follow-up care. A medical record must be generated by the encounter.

N.M. Admin. Code 16.10.8.7.  This narrow definition, however, does not set out the full scope of malpractice liability in New Mexico.  The only case that has cited the regulation was an optometrist's suit for the conversion of his patient files.  See Muncey v. Eyeglass World, LLC, 2012-NMCA-120, ¶ 14, 289 P.3d 1255, 1260.  Moreover, New Mexico courts have given the

- 43 -

statute a "broad definition of potential defendants."  Baer v. Regents of Univ. of California, 1994-NMCA-124, ¶ 14, 884 P.2d 841, 845.  A fellow, who is a licensed physician involved in patient care, has a physician-patient relationship with the patients whom he or she treats sufficient for legal malpractice purposes.

Second, the United States' cited cases are distinguishable.  Clarke v. Hoek, 174 Cal. App. 3d 208 (Ct. App. 1985), a California case, involved a physician proctor who observed a job applicant's surgical procedure "for the sole and express purpose" of evaluating his competence. 174 Cal. App. 3d at 211.  The Court of Appeal of California specifically noted that the proctors "are only required to *observe* the candidate for medical staff membership at work and report back to the credentials committee; they are not expected to supervise the physicians being proctored or to intervene in proctored surgeries."  Clarke v. Hoek, 174 Cal. App. 3d at 212 (emphasis in original).  The proctor/patient relationship is distinguishable from the fellow/patient relationship -- the proctor does not care for the patient in any meaningful sense, while patient care is the primary part of most medical fellowship programs.  Clarke v. Hoek thus provides negligible support for the Plaintiffs' arguments.

Buttersworth v. Swint is similarly unpersuasive.  In that 1936 case, a state hospital superintendent made an offhand statement that a hospital employee's physical condition would improve "if she would wear an abdominal support," but never actually examined her.  186 S.E. at 772.  The Court of Appeals of Georgia rejected the employee's suit for malpractice, concluding that there was no physician-patient relationship.  See 186 S.E. at 772.  It explained that "[m]erely because the defendant was a physician and knew of the condition of the plaintiff would not devolve upon him the duty of rendering to her medical care . . . for there is no rule of law that requires a physician to undertake the treatment of every patient who applies to him."  186 S.E. at

772.  See N. Am. Co. for Life & Health Ins. v. Berger, 648 F.2d 305, 306 (5th Cir. 1981)(distinguishing Buttersworth v. Swint and noting that it "is distinguishable from the instant situation because of the nature of the opinions rendered in each case. Dr. Swint made a casual remark. Dr. Berger filled out and signed appellant's certification forms with the intent for appellant to rely on his opinion.").   The court's holding in Buttersworth v. Swint does not indicate that a fellow cannot form a physician-patient relationship.   Moreover, the Court of Appeals of Georgia even described the "general rule" as "the physicians and surgeons of a hospital, public or private, enter into the relation of physician and patient with every patient brought into the hospital as soon as he is brought in."  186 S.E. at 772.

Rouse v. Pitt County Mem'l Hosp., Inc. is barely relevant here.  The plaintiff in that case sued the attending physicians responsible for supervising the resident physicians who actually delivered her child.  See 116 N.C. App. at 243, 447 S.E.2d at 507.  The Court of Appeals of North Carolina held that the supervising physicians had a duty to the plaintiff to "exercise reasonable care in supervising the residents."  116 N.C. App. at 245, 447 S.E.2d at 508.  The Court of Appeals of North Carolina did not rule out the possibility of a direct action against the residents -- the plaintiff may have had other reasons not to name them, such as an out-of-court settlement or the greater recoveries available from hospitals and experienced physicians.  Even if the Court of Appeals of North Carolina had ruled out suits against residents, the ruling would not necessarily apply to fellows, who are more senior, have significantly more training, and take on many additional responsibilities.

The United States correctly describes the facts of Haar, but reaches an incorrect conclusion.  See MTD at 14-15.  The decedent in Haar

> failed to attend two scheduled appointments with Defendant, then voluntarily
> hospitalized himself as an inpatient, where he consented to treatment from a new

> psychiatrist, then voluntarily submitted to outpatient treatment at the hospital by
> the same psychiatrist, and then voluntarily continued further treatment with Dr.
> Carey, and never called or returned to Defendant for any purpose.

2007-NMCA-032, ¶ 26, 154 P.3d at 73.  The physician "was not asked by anyone to become involved in any care related to Haar for the fifty-six days" between his last session and Haar's suicide.  2007-NMCA-032, ¶ 26, 154 P.3d at 73.  The Court of Appeals of New Mexico thus concluded that Haar had terminated the physician-patient relationship and rejected the plaintiff's arguments that the physician had a continuing duty to impose his recommendations on Haar's new physicians.  See 2007-NMCA-032, ¶ 28, 154 P.3d at 73.  In this matter, on the other hand, neither Dr. Quintana nor Van Winkle terminated the physician-patient relationship, Van Winkle did not seek treatment from other physicians, and Dr. Quintana was actively involved in Van Winkle's care shortly before his death.  See Complaint ¶¶ 8-9, at 3.  The connection between Dr. Quintana and Van Winkle's injuries is more direct in this case.  See Salopek v. Friedman, 2013-NMCA-087, ¶ 14, 308 P.3d at 145 ("Estate of Haar is inapplicable here because, in this case, the negligent act occurred prior to the termination of the doctor-patient relationship.").

The United States' citations to the Medical Malpractice Act, N.M. Stat. Ann. ¶¶ 41-5-1 to 5-29, are not dispositive.  In Lester ex rel. Mavrogenis v. Hall, 1998-NMSC-047, 970 P.2d 590, a patient who received a lithium prescription from a New Mexico physician caused a collision that injured the plaintiff.  See 1998-NMSC-047, ¶ 1, 970 P.2d at 591.  The Supreme Court of New Mexico declined to "extend physicians' duties to non-patients for prescription-involved situations."  1998-NMSC-047, ¶ 3, 970 P.2d at 591.  It cited the Medical Malpractice Act's damage caps, short statute of limitations, and review commission as evidence that it should leave "the expansion of providers' liability to third parties" to the Legislature.  1998-NMSC-047, ¶ 11, 970 P.2d at 593.  This case does not involve the expansion of liability to a non-patient and does

not implicate the policy concerns that the Supreme Court of New Mexico expressed in <u>Lester ex rel. Mavrogenis v. Hall</u>.

Third, the Court's review of litigation in the field establishes that state courts have prescribed separate standards of liability for residents and fellows.  <u>See</u> <u>Sullins v. Univ. Hosps. of Cleveland</u>, 2003-Ohio-398, ¶ 30 ("For doctors in training (interns, residents or fellows), the standard of care is that of a doctor of ordinary skill, care and diligence at the same stage of his training, under like or similar circumstances."); <u>Jenkins v. Clark</u>, 7 Ohio App. 3d 93, 101, 454 N.E.2d 541, 551 (1982)("[T]he medical care required [of all physicians] is that of reasonably careful physicians or hospital emergency room operators, not that of interns or residents."); <u>Centman v. Cobb</u>, 581 N.E.2d 1286, 1288 (Ind. Ct. App. 1991)("[A]n intern is a practitioner of medicine required to exercise the same standard of skill as a physician with an unlimited license to practice medicine."); <u>Pratt v. Stein</u>, 298 Pa. Super. 92, 157, 444 A.2d 674, 708 (1982)(holding resident to a specialist's standard of care to reflect "the reality, as borne out by the instant record, that the vast majority of the day-to-day treatment which a patient receives is rendered by a resident employed by the hospital"); <u>Gonzalez v. St. John Hosp. & Med. Ctr.</u>, 275 Mich. App. 290, 299, 739 N.W.2d 392, 397 (2007)(holding residents to specialist's standard of care);  <u>Lilly v. Brink</u>, 51 Va. Cir. 444 (2000).  <u>But see</u> <u>Alswanger v. Smego</u>, No. X05CV 920125294S, 1999 WL 259686, at *7 (Conn. Super. Ct. Apr. 21, 1999)(treating resident as attending physician's "borrowed servant").   The American Medical Association ("AMA") has tracked these developments.  <u>See</u> Lisa Panique, Are Surgery Residents Liable for Medical Error?, <u>The AMA Journal of Ethics: Virtual Mentor</u> (March 2003); Kristin E. Schleiter, When are Residents Treated as Doctors Under the Law?, <u>The AMA Journal of Ethics: Virtual Mentor</u> (November 2009).  These cases, which involve less qualified physicians, tend to show that fellows may be

liable for their failure to provide adequate care to patients even if they are in training or under a staff physician's supervision.  The Court thus concludes that New Mexico would, under the circumstances alleged, find that a fellow could be sued for malpractice.

There is a second basis for a suit against Dr. Quintana.  The United States maintains that he is its employee.  See Tr. at 48:10-12 (Keegan)("He is absolutely an employee of the VA. That is why the United States is the only proper defendant.").  So even if Dr. Quintana were not a physician, or did not have a physician-patient relationship with Van Winkle, he remains an employee of the hospital who can commit negligence.  Perhaps he could not be sued for medical malpractice, but he can be sued for negligence, just like nurses, janitors, and orderlies can be sued for negligence.[17]  See Baer v. Regents of Univ. of California, 1994-NMCA-124, ¶ 14, 884 P.2d at 845; Roberts v. Sw. Cmty. Health Servs., 1992-NMSC-042, ¶ 3, 837 P.2d at 443; Lopez

---

[17]The Court of Appeals of New Mexico noted in Haar that "[i]n a medical negligence case, there can be no breach of duty absent a physician-patient relationship, since duty flows from the existence of such a relationship."  2007-NMCA-032, ¶ 34, 154 P.3d at 74.  The Court does not believe that the Supreme Court of New Mexico would apply this rule across the entire malpractice field for two primary reasons.  First, an earlier opinion from the Court of Appeals of New Mexico questioned the rule's broad application.  See Baer v. Regents of Univ. of California, 1994-NMCA-124, ¶ 13, 884 P.2d at 845.  It explained the problem:

> Subsection (A) of [N.M. Stat. Ann. § 41-5-3] defines "health care provider" to include, among others, "a person, corporation, organization, facility or institution licensed or certified by this state to provide health care or professional services as a . . . hospital, outpatient health care facility, . . . nurse anesthetist or physician's assistant."  None of these listed providers are physicians, and therefore they cannot form a physician-patient relationship, yet the legislature apparently believed all faced potential medical malpractice liability.

1994-NMCA-124, ¶ 13, 884 P.2d at 845.  Applying the language in Haar would make it impossible to hold nurses liable for any form of medical malpractice.  Second, the Court sees no logical reason to prevent patients from suing physicians without a physician-patient relationship. For example, if a hospital employed a physician to supervise the sterilization of surgical instruments or the preparation of surgical sponges, he would not have a physician-patient relationship with the anonymous patients heading into the operating room.  These patients should be able to hold him liable for his negligence in carrying out his duties.

v. Sw. Cmty. Health Servs., 1992-NMCA-040, ¶ 4, 833 P.2d at 1186.   A fellow could be similarly liable under New Mexico law.

### B.   THE UNNAMED PHARMACIST OWED A DUTY TO VAN WINKLE UNDER NEW MEXICO LAW.

The unnamed pharmacist also owed a duty to Van Winkle under New Mexico law.  New Mexico allows plaintiffs to sue non-physicians for medical malpractice.  See Baer v. Regents of Univ. of California, 1994-NMCA-124, ¶ 14, 884 P.2d at 845 ("New Mexico courts recognize that a legal duty exists in medical malpractice actions against defendants other than physicians."); Roberts v. Sw. Cmty. Health Servs., 1992-NMSC-042, ¶ 3, 837 P.2d 442, 443 (evaluating claim against nurse for negligently failing to remove sponge after surgery); Lopez v. Sw. Cmty. Health Servs., 1992-NMCA-040, ¶ 4, 833 P.2d 1183, 1186 (discussing claim against nurses for delivering child prematurely).  A typical claim against a pharmacist would involve a failure to properly fill a prescription.  See Fernandez v. Walgreen Hastings Co., 1998-NMSC-039, ¶ 18, 968 P.2d 774, 780 (involving suit against pharmacist for negligently filling an infant's prescription).  The United States recognizes the typical case when it concedes that pharmacists "can absolutely commit malpractice, but only when acting within the scope of their job, which is to understand medications and their interactions."  Second Tr. at 52:10-13 (Keegan).

The Court concludes that the pharmacist may be liable in this case for two reasons.  First, this case is distinguishable from the facts in Thompson v. Potter.  In that case, a nursing facility contracted with a consulting pharmacist to provide pharmaceutical services to its patients.  See 2012-NMCA-014, ¶ 1, 268 P.3d at 60.  A physician prescribed a patient: (i) an as-needed dose of Ativan; and (ii) a daily dose of Ativan.  See Thompson v. Potter, 2012-NMCA-014, ¶ 20, 268 P.3d at 64.  When the physician called the nursing facility to discontinue the "as-needed" Ativan, the nurse incorrectly discontinued the daily Ativan.  2012-NMCA-014, ¶ 21, 268 P.3d at 64.  The

patient suffered a seizure and sued the consulting pharmacy, rather than the nurse, the physician, or the nursing facility. See 2012-NMCA-014, ¶ 3, 268 P.3d at 60. She argued that the pharmacist was liable, because he reviewed her medications on a monthly basis and "wrote her doctor a 'note to attending physician' asking whether efforts could be made to discontinue her as-needed orders for Ativan." Thompson v. Potter, 2012-NMCA-014, ¶ 22, 268 P.3d at 64.

The Court of Appeals of New Mexico rejected the plaintiff's argument. See 2012-NMCA-014, ¶ 23, 268 P.3d at 64. It divided its reasoning into separate sections: "duty," as common-law negligence defines the term, and "special relationship."[18] 2012-NMCA-014, ¶¶ 19, 27, 268 P.3d at 65. Its analysis of the general duty focused on the case's specific facts:

> New Mexico courts have not yet ruled on the existence or scope of a duty of consulting pharmacists to patients of a nursing facility. However, we need not

---

[18]The Court focuses on common-law negligence, although the Plaintiffs here could also argue that the unnamed pharmacist had a special relationship with Van Winkle. Language in Thomson v. Potter makes its application here uncertain. On one hand, the opinion focused on control and custody:

> The facts in this case fail to establish the control and custody elements necessary to establish a special relationship. A consultant pharmacist has neither the right nor ability to dispense or change prescriptions without a physician's order. *See* 16.19.11.8 NMAC(A)(2) (12/15/2002) (requiring that "[a]ll medications administered to patients shall be by direct order of a physician, or [a] licensed practitioner").

2012-NMCA-014, ¶ 28, 268 P.3d at 65. The unnamed pharmacist here likely needed a physician's order to dispense or change any of Van Winkle's prescriptions. On the other hand, Thompson v. Potter also noted that "[t]he special relationship case law in New Mexico typically involves situations where there is a supervisory or treatment relationship, or where there is direct custody and control over another." 2012-NMCA-014, ¶ 27, 268 P.3d at 65 (emphasis added). There are not enough facts in the Complaint for the Court to say that the unnamed pharmacist had a special relationship with Van Winkle. A pharmacist may not have control over the medicines; the doctor may order them. But the pharmacist may be in a treatment relationship. The facts will have to flesh out exactly what occurred on the rounds. In any case, the Court concludes that the Plaintiffs have a private person analogue against the unnamed pharmacist even absent a special relationship, although it is likely that a pharmacist who makes daily rounds with a physician has a special relationship with the patient.

reach that issue today because Plaintiff presented no evidence that Defendant had a duty or ability to control the nurse employed by Casa Arena when she made the transcription error or that Defendant had a duty or opportunity to detect the transcription error when it was made.   Plaintiff presented no evidence that Defendant had a duty to monitor patients outside of the monthly review. Defendant was required to be at Casa Arena once a month to do his monthly review, and the error was made after Defendant performed his monthly review, and before he returned the following month.   Further, Defendant was not informed of the change to Ms. Bennett's prescription as required by the pharmacy services contract, with the result that he was not able to take any appropriate corrective action.

2012-NMCA-014, ¶ 23, 268 P.3d at 64.

This case is distinguishable on almost every fact that the Court of Appeals of New Mexico mentioned.  The Plaintiffs allege that "[a] pharmacist or representative of the pharmacy department employed by the United States VA Medical Center accompanied Dr. Wood on her rounds of patients every day."  Complaint ¶ 7, at 2.  There is thus an allegation that the unnamed pharmacist "had a duty or ability to control" Van Winkle's prescriptions.  2012-NMCA-014, ¶ 23, 268 P.3d at 64.  The pharmacist in Thompson v. Potter had a duty to visit the clinic and review prescriptions on a monthly basis.  See 2012-NMCA-014, ¶ 23, 268 P.3d at 64.  The pharmacist here, on the other hand, accompanied the physicians on their daily rounds and likely reviewed specific patients' charts.  See Complaint ¶ 7, at 2.  The pharmacist in Thompson v. Potter had no reason to know of any physician's errors, as the "error was made after Defendant performed his monthly review, and before he returned the following month," and the facility never informed him of the change.  2012-NMCA-014, ¶ 23, 268 P.3d at 64.  The pharmacist here "should have known the results of the culture and that the drugs given to Mr. Van Winkle were not appropriate for his treatment because of the results of the culture."  Complaint ¶ 7, at 2.

Second, other jurisdictions have held pharmacists liable for prescribing contraindicated drugs even when a physician prescribes them.  See 78 Am. Jur. Trials 407 (Originally published in 2001)("Some jurisdictions have also imposed liability for the failure to be alert for clear errors

or mistakes in the prescription."); Riff v. Morgan Pharmacy, 353 Pa. Super. 21, 30, 508 A.2d 1247, 1252 (1986)("Morgan Pharmacy breached that duty by failing to warn the patient or notify the prescribing physician of the obvious inadequacies appearing on the face of the prescription which created a substantial risk of serious harm to the plaintiff."); Hooks SuperX, Inc. v. McLaughlin, 642 N.E.2d 514, 515 (Ind. 1994)(holding that pharmacist had a duty directly to the patient to question physician's over-frequent refill authorizations); Moore ex rel. Moore v. Mem'l Hosp. of Gulfport, 825 So. 2d 658, 665 (Miss. 2002)(Waller, J.)("An exception to the learned intermediary doctrine, as applied to pharmacists, exists where it was undisputed that a plaintiff had informed the pharmacy of health problems which contraindicated the use of the drug in question."); Rutherford v. Merck & Co., 428 F. Supp. 2d 842, 847 (S.D. Ill. 2006)(Murphy, J.)("Plaintiffs specifically have pleaded a well established exception to the learned intermediary doctrine for cases in which a pharmacy is aware of a patient's health history, yet dispenses to the patient a contraindicated drug.").[19]  In typical pharmacy cases, courts justify immunizing pharmacists from liability on the grounds that "[t]he foreseeability of injury to an individual consumer in the absence of any particular warning also varies greatly depending on the medical history and condition of the individual -- facts which we cannot reasonably expect the pharmacist to know."  Leesley v. West, 165 Ill. App. 3d 135, 142, 518 N.E.2d 758, 762 (1988).  This case is different, because the pharmacist in question may have been aware of Van Winkle's medical history and condition.  The Court cannot say, as a matter of law, that the unnamed pharmacist could not have known that his or her prescriptions would be ineffective against Van Winkle's infection.  Expert testimony may reveal that the unnamed pharmacist

---

[19]The Court has predicted that the Supreme Court of New Mexico would not adopt the learned-intermediary doctrine, which could cut off the unnamed pharmacist's liability.  See Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d 1174, 1215 (D.N.M. 2008)(Browning, J.).

should have known about the medication's prior uses.  For example, a reasonable pharmacist probably knows that an antibiotic will not be effective in treating a virus, but may not know the precise combination of anticoagulants best for a patient with complex medical problems.  In any case, given that the Plaintiffs have alleged that the unnamed pharmacist "should have known the results of the culture and that the drugs given to Mr. Van Winkle were not appropriate for his treatment because of the results of the culture," Complaint ¶ 7, at 2, there are allegations that the unnamed pharmacist should have known that his or her prescription would be ineffective.

The Court cannot soundly conclude, as a matter of law, that the unnamed pharmacist or representative of the pharmacy department owed no duty to Van Winkle.  The unique nature of this case, particularly the pharmacist's proximity to the patient and the prescribing physician, set it apart from cases in which a pharmacist mechanically fills a prescription.  The Court is insufficiently familiar with the role of a pharmacist who accompanies a hospital physician on his or her rounds.  Expert testimony and discovery will help the Court to make this determination at a later stage in the case.

## II.   THE PLAINTIFFS EXHAUSTED THEIR ADMINISTRATIVE REMEDIES FOR THEIR 2013 LAWSUIT, BUT NOT THEIR 2015 LAWSUIT.

The United States first argues that: (i) the Plaintiffs' April 2 Letter did not provide sufficient notice of their allegations against the unnamed pharmacist, see MTD at 17; (ii) the Plaintiffs' December 2 Letter was an invalid amendment rather than a separate notice of claim, see MTD at 19-20; (iii) that the Plaintiffs did not effectively appeal the agency's denial of their claim, see MTD at 20-21.  The Court dismissed these arguments in an earlier opinion.[20]  See October Opinion, 2015 WL 6393561 at **18-23.  The United States has not requested that the

---

[20]The United States' briefing in this matter came before the Court issued its October Opinion.  See Motion at 1; Reply at 1; October Opinion, 2015 WL 6393561, at *1.

Court reconsider its earlier rulings.

The United States also argues, however, that the Plaintiffs deemed their December 2 Letter denied by amending the Original Complaint to "include claims against the United States based upon the purported negligence of the pharmacists and Dr. Quintana on June 30, 2014." MTD at 21.  It notes that the Plaintiffs filed the Complaint more than six months later, making the Complaint untimely.  See MTD at 21.  The Court agrees with the United States on this point. The Plaintiffs amended their Original Complaint on June 30, 2014.  See Amended Complaint at 1.  They filed the present Complaint on March 4, 2015.  See Complaint at 1.  Because more than six months elapsed between these two filings, the Complaint is barred.  See 28 U.S.C. § 2401 ("A tort claim against the United States shall be forever barred unless . . . action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.").  The Court's conclusion makes no practical difference to this case, because the same claims will proceed against Dr. Quintana and the unnamed pharmacist under the Amended Complaint.  See Amended Complaint ¶¶ 7-8, at 2.

**IT IS ORDERED** that the requests in Defendant United States of America's Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim and Memorandum in Support, filed May 15, 2015 (Doc. 6 in Gallegos v. United States, No. CIV 15-0184 JB/KBM (D.N.M.)), are granted in part and denied in part.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Doug Perrin
The Perrin Law Firm
Santa Fe, New Mexico

      *Attorney for Plaintiffs*

Melissa A. Brown
Remo Gay
Brown & Gay, P.C.
Albuquerque, New Mexico

      *Attorneys for Defendants Maureen Wood, M.D. and Medical Doctor Associates, LLC*

Damon P. Martinez
  United States Attorney
Ruth Fuess Keegan
  Assistant United States Attorney
Albuquerque, New Mexico

      *Attorneys for Defendant United States of America*