# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

TERESSA JANETTE GALLEGOS,
Individually and as Personal Representative
of the ESTATE OF JOSEPH ORAN VAN
WINKLE, Deceased; and MARY ANN
VAN WINKLE,

      Plaintiffs,

vs.                                      No. CIV 13-1055 JB/KBM

MAUREEN WOOD, M.D.,
MEDICAL DOCTOR ASSOCIATES, LLC;
and the UNITED STATES OF AMERICA,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>[1]

**THIS MATTER** comes before the Court on (i) the Plaintiffs' Motion for Extension of

Deadlines to Identify Expert Witnesses, filed July 14, 2016 (Doc. 142)("Motion to Extend"); and (ii)

Defendant United States of America's Motion to Dismiss for Lack of Subject Matter Jurisdiction

Claims Based on a Pharmacists' [sic] Purported Failure to Follow VAMC Protocals [sic], filed

September 23, 2016 (Doc. 167)("Third MTD"). The Court held a hearing on January 25, 2017. The

primary issues are: (i) whether the Court, under rule 16(b) of the Federal Rules of Civil Procedure,

should extend the deadline for the Plaintiffs to designate testifying expert witnesses to August 3,

2016, and the deadline for the Defendants to designate such witnesses to September 6, 2016; and (ii)

---

[1]The Court earlier entered an Order, filed March 31, 2017 (Doc. 254), granting the Plaintiffs' Motion for Extension of Deadlines to Identify Expert Witnesses, filed July 14, 2016 (Doc. 142). The Court stated that it would, "at a later date, issue a Memorandum Opinion more fully detailing its rationale for this decision." Order at 1 n.1. This Memorandum Opinion and Order (i) details the Court's rationale for the earlier Order; and also (ii) disposes of Defendant United States of America's Motion to Dismiss for Lack of Subject Matter Jurisdiction Claims Based on a Pharmacists' Purported Failure to Follow VAMC Protocols, filed September 23, 2016 (Doc. 167).

whether the Court, pursuant to rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, should dismiss any negligence claim that Defendant Maureen Wood, M.D. may assert against Defendant United States of America based on an allegation that an outpatient pharmacist failed to follow internal Veterans Administration Medical Center ("VA" or "VAMC")[2] pharmacy protocols in filling prescriptions that Wood ordered for Joseph Oran Van Winkle[3] upon his discharge from the emergency department at the Raymond G. Murphy Veterans Affairs Medical Center in Albuquerque, New Mexico, on May 13, 2012. To resolve the second issue, the Court must determine: (i) whether Wood, as well as Plaintiffs Teressa Janette Gallegos and Mary Ann Van Winkle, have exhausted their administrative remedies as the Federal Tort Claims Act of 1946, 28 U.S.C. §§ 1346(b), 2671-2680 ("FTCA"), requires; and (ii) whether, if Wood and the Plaintiffs exhausted their administrative remedies, New Mexico law recognizes a negligence cause of action analogous to Wood's negligence claim such that the FTCA waives the United States' sovereign immunity from suit.

The Court concludes, first, that there is good cause under rule 16(b) to grant a brief two-week extension for the parties to designate testifying expert witnesses. Thus, the Court grants the Motion to Extend. Second, as for the Third MTD, the Court concludes that neither Wood nor the Plaintiffs have exhausted their administrative remedies under the FTCA for Wood's claim that an outpatient pharmacist failed to comply with internal VA protocols in filling prescriptions that Wood ordered for J. Van Winkle. Consequently, the FTCA does not waive the United States' sovereign immunity, and

---

[2]The parties, throughout their briefings, refer to the "VA" and to the "VAMC." The Court cannot discern, however, the distinction that the parties intend with these two terms. For clarity, the Court will use the more common "VA" in referring to the Albuquerque Veterans Affairs Medical Center and to that facility's protocols. Within quoted text, however, the Court will retain the parties' varying usage of "VA" and "VAMC."

[3]J. Van Winkle was involved in this dispute before his death on September 10, 2013. His daughter, Plaintiff Teressa Janette Gallegos, is now the personal representative for his estate.

the Court lacks subject-matter jurisdiction over the VA-protocol claim. Pursuant to rule 12(b)(1), therefore, the Court grants the Third MTD and dismisses the VA-protocol claim for lack of subject-matter jurisdiction. Because it lacks jurisdiction, the Court does not reach the issue whether there is a state-law cause-of-action analogue for Wood's negligence claim.

## FACTUAL BACKGROUND

The Court takes its facts from the Plaintiff's First Amended Complaint for Wrongful Death Damages due to Medical Malpractice, filed June 30, 2014 (Doc. 41)("2014 Complaint"), and the Letter from Doug Perrin to Department of Veteran Affairs Regarding Joseph Van Winkle and Ann Van Winkle (dated April 2, 2013), filed October 17, 2014 (Doc. 52-2)("April 2 Letter").[4] The Court accepts as true all non-conclusory factual statements in these sources.

### 1.    The Alleged Medical Malpractice.

On May 7, 2012, J. Van Winkle sought treatment for abdominal pain at the Albuquerque VA's emergency department. See 2014 Complaint ¶ 3, at 2. Wood, an internal medicine physician, diagnosed J. Van Winkle with septic shock[5] and admitted him to the hospital's intensive care unit. See 2014 Complaint ¶ 4, at 2. Wood's medical notes state that she administered two antibiotics intravenously; J. Van Winkle never received either treatment, however, and pharmacy records indicate that at least one of the drugs was never ordered. See 2014 Complaint ¶ 12, at 4; April 2 Letter at 1.

---

[4]The court draws on the April 2 Letter for its facts, because the 2014 Complaint omits essential background information, such as a description of the June 23, 2012, meeting between J. Van Winkle and Albuquerque VA officials.

[5]Sepsis occurs when chemicals released into the bloodstream to fight an infection trigger widespread inflammatory responses. Left untreated, sepsis can lead to septic shock, a form of severe sepsis that can cause extraordinarily low blood pressure, organ damage, and death. See Diseases and Conditions: Sepsis, Mayo Clinic (July 29, 2017), available at http://www.mayoclinic.org/diseases-conditions/sepsis/home/ovc-20169784.

On May 8, 2012, two of J. Van Winkle's blood cultures tested positive for staphylococcus aureus.[6] See 2014 Complaint ¶ 6, at 2. The laboratory report included a list of antibiotics that could effectively treat staphylococcus aureus. See 2014 Complaint ¶ 6, at 2. Wood concluded, however, that the laboratory results were "false positive[s]," and prescribed cefepime/maxipime[7] and cefazolin/ancef,[8] antibiotics which were not on the laboratory report's list and which are ineffective against staphylococcus aureus. See 2014 Complaint ¶ 6, at 2-3; April 2 letter at 2. According to her notes dated May 10, 2012, Wood intended to change the cefepime/maxipine prescription to clindamycin,[9] another antibiotic not listed in the laboratory report, but the switch "was never ordered nor administered." 2014 Complaint ¶ 7, at 3. Moreover, cefazolin/ancef was not administered until May 13, 2012, five days after Wood prescribed it. See 2014 Complaint ¶ 7, at 3. In any event, clindamycin and cefazolin/ancef are ineffective against staphylococcus aureus. See 2014 Complaint ¶ 7, at 3.

---

[6]Staphylococcus aureus, or "staph," is a common gram positive bacteria present in thirty percent of healthy individuals. While it is often harmless, it can lead to dangerous infections -- particularly in hospital settings and in immunocompromised patients. Serious complications from staph infections include septic shock. See Mayo Clinic, supra note 4.

[7]Cefepime is a cephalosporin antibiotic. Cefepime injections are used to treat bacterial infections throughout the body. See Drugs and Supplements: Cefepime (Injection Route), Mayo Clinic (March 1, 2017), available at http://www.mayoclinic.org/drugs-supplements/cefepime-injection-route/description/drg-20073408.

[8]Cefazolin, like cefepime, is a cephalosporin antibiotic. Cefazolin injections are used to treat bacterial infections throughout the body. See Drugs and Supplements: Cefazolin (Injection Route), Mayo Clinic (March 1, 2017), available at http://www.mayoclinic.org/drugs-supplements/cefazolin-injection-route/description/drg-20073267.

[9]Clindamycin is used to treat bacterial infections in patients who have an allergic reaction to penicillin. See Drugs and Supplements: Clindamycin (Oral Route), Mayo Clinic (March 1, 2017), available at http://www.mayoclinic.org/drugs-supplements/clindamycin-oral-route/description/drg-20110243.

Two other individuals were involved in J. Van Winkle's care.  See 2014 Complaint ¶¶ 8-9, at 3.  An unnamed Albuquerque VA pharmacist or representative of the pharmacy department (the "Unnamed Pharmacist") allegedly "accompanied Dr. Wood on her rounds of patients every day." 2014 Complaint ¶ 8, at 3.  Dr. Christopher Quintana, a physician serving as a postdoctoral fellow at the Albuquerque VA, assisted Wood in her treatment of J. Van Winkle.  See 2014 Complaint ¶ 9, at 3.  Quintana received notice from the laboratory that J. Van Winkle's urine, as well as his blood, had tested positive for staphylococcus aureus.  See 2014 Complaint ¶ 9, at 3.

The Albuquerque VA discharged J. Van Winkle from its intensive care unit on May 13, 2012. See 2014 Complaint ¶ 11, at 3.  Upon J. Van Winkle's discharge, Wood prescribed a five-day oral regimen of ciprofloxacin[10] and cephalexin/keflex.[11]  See April 2 Letter a 2.  Wood incorrectly noted in her discharge summary that J. Van Winkle's "shock resolved on the fourth day of the hospital course."  2014 Complaint ¶ 11, at 3.  J. Van Winkle's condition continued to deteriorate, however, and, on June 5, 2012, he was admitted to Artesia General Hospital in Artesia, New Mexico, with dehydration and continued infection.  See 2014 Complaint ¶ 13, at 4.  J. Van Winkle's treating physician at that hospital, Dr. Jorge Abalos, then ordered him to return to the Albuquerque VA.  See 2014 Complaint ¶ 13, at 4.

---

[10]Ciprofloxacin is a quinolone antibiotic which is used to treat bacterial infections throughout the body, such as urinary tract infections.  See Drugs and Supplements: Ciprofloxacin (Oral Route), Mayo Clinic (March 1, 2017), available at http://www.mayoclinic.org/drugs-supplements/ciprofloxacin-oral-route/description/drg-20072288.

[11]Cephalexin is a cephalosporin antibiotic which is used to treat bacterial infections throughout the body.  See Drugs and Supplements: Cephalexin (Oral Route), Mayo Clinic (March 1, 2017), available at http://www.mayoclinic.org/drugs-supplements/cephalexin-oral-route/description/drg-20073325.

On June 12, 2012, physicians at the Albuquerque VA diagnosed J. Van Winkle with severe right-sided infectious endocarditis.[12]  See 2014 Complaint ¶ 14, at 4.  The infection resulted in bacterial growth on one of J. Van Winkle's heart valves and severe damage to his circulatory system.  See 2014 Complaint ¶ 14, at 4.

On June 23, 2012, Albuquerque VA officials held a meeting with J. Van Winkle, his wife, and his daughter.  See 2014 Complaint ¶ 15, at 4; April 2 Letter at 2.  During the meeting, the Albuquerque VA informed the family that a panel reviewing J. Van Winkle's medical records had concluded that the oral antibiotics regimen that Woods prescribed was "not adequate or appropriate to treat [J. Van Winkle's] infection and that he should have been given intravenous antibiotics for four to six weeks."  2014 Complaint ¶ 15, at 4.  See April 2 Letter at 2.  The panel further found that the growth on Van Winkle's heart valve had resulted from Wood's failure to provide J. Van Winkle with the appropriate antibiotics.  See 2014 Complaint ¶ 15, at 4.

By the time the meeting took place between J. Van Winkle's family and Albuquerque VA officials, J. Van Winkle's medical situation was "very dire."  April 2 Letter at 2.  J. Van Winkle remained hospitalized at the Albuquerque VA until July 27, 2012.  See April 2 Letter at 2.  J. Van Winkle died on September 10, 2013.  See 2014 Complaint ¶ 16, at 4.  His daughter, Gallegos, is now the Personal Representative of his Estate.  See 2014 Complaint ¶ 16, at 4.

2.    **Administrative Correspondence.**

On April 2, 2013, the Plaintiffs mailed a "Tort Claim" letter to the Department of Veterans Affairs' Office of Regional Counsel.  See April 2 Letter at 1.  The letter describes J. Van Winkle's

---

[12]Endocarditis is an infection of the heart's inner lining that occurs when bacteria from other parts of the body enter the bloodstream and settle in the heart.  Endocarditis can damage or destroy heart valves and lead to life-threatening complications.  See Diseases and Conditions: Endocarditis, Mayo Clinic (July 15, 2017), available at http://www.mayoclinic.org/diseases-conditions/endocarditis/home/ovc-20338069.

treatment at the Albuquerque VA, and the nature and extent of his injury, and includes a demand for $600,000.00.  See April 2 Letter at 1-3.  The letter focuses on Wood's conduct, averring that "[w]hat should have been treated simply and effectively turned into a very complex, dangerous situation, as a result of the negligence of Dr. Wood in misdiagnosis[.]"  April 2 Letter at 3.  The letter also makes one reference to unidentified "multiple physicians who followed Mr. Van Winkle."  April 2 Letter at 2.  The letter uses passive voice, however, to avoid attributing actions to specific individuals.  See April 2 Letter at 2-3 ("Zosyn was never ordered . . . ."); id. ("Van Winkle was discharged . . . ."); id. ("Upon discharge, Mr. Van Winkle was given . . . .").  Finally, the letter includes a lengthy list of "witnesses," including J. Van Winkle's family and over one hundred medical providers.  See April 2 letter at 4.

The VA's Office of Regional Counsel replied to this initial claim in a letter dated June 19, 2013.  See Letter from Melinda Frick to Doug Perrin Regarding Administrative Tort Claim (dated June 19, 2013), filed October 17, 2014 (Doc. 52-3)("First VA Letter").  The letter disputes that J. Van Winkle "suffered injury as a result of multiple acts of negligence by . . . Wood," arguing that Wood is not a "Government employee" liable under the FTCA, but rather an "independent contract physician" and an employee of a separate company, Medical Associates.  First VA Letter at 1.  The letter then asserts that the VA investigated whether J. Van Winkle "received good care from his other VA-employed providers," and concluded that "there was nothing VA employees acting in the course and scope of their employment . . . did or failed to do that caused any injury to Mr. Van Winkle."  First VA Letter at 1-2.

The Plaintiffs[13] replied to the First VA Letter on December 2, 2013. See Letter from Doug Perrin to Bonita Ortiz Regarding Administrative Tort Claim (dated December 2, 2013), filed October 17, 2014 (Doc. 52-4)("December 2 Letter"). In the letter, the Plaintiffs explain that, after mailing the April 2 Letter, they discovered "that a pharmacist or representative of the pharmacy department at the VA Hospital in Albuquerque accompanies physicians on their rounds of patients everyday [sic]." December 2 Letter at 1. The letter surmises from this discovery "that a pharmacist should . . . have been with Dr. Wood and other treating physicians when Mr. Van Winkle was being seen in rounds in each day"; that the pharmacist "should have known that the drugs being given to Mr. Van Winkle did not properly 'match up' with his condition"; that "the pharmacist should have known the results of the culture"; and that, as a result, the pharmacist "should have known that Mr. Van Winkle was receiving the wrong drugs for his condition." December 2 Letter at 1. The letter concludes that the Unnamed Pharmacist's failure to warn the treating physicians about these problems lengthened the time required for a proper diagnosis, thereby allowing J. Van Winkle's condition to worsen. See December 2 Letter at 1.

The Plaintiffs followed with a one-sentence letter on December 9, 2013, stating that the December 2 Letter "should be regarded as and is intended as an amendment to" the April 2 Letter. Letter from Doug Perrin to Bonita Ortiz Regarding Administrative Tort Claim (dated December 9, 2013) at 1, filed October 17, 2014 (Doc. 52-5). The VA's Office of Regional Counsel promptly replied: "There is no provision to amend a tort claim after this office has adjudicated the claim and issued a final decision." Letter from Benita Ortiz to Doug Perrin Regarding Administrative Tort Claim (dated December 9, 2013) at 1, filed October 17, 2014 (Doc. 52-6).

---

[13]Because J. Van Winkle died on September 10, 2013, his daughter, Gallegos, submitted subsequent letters as the personal representative of his estate.

The next day, on December 10, 2013, the Plaintiffs mailed a letter requesting that the VA's Office of Regional Counsel reconsider its denial of their tort claim. <u>See</u> Letter from Doug Perrin to Department of Veterans Affairs Regarding Administrative Tort Claim (dated December 10, 2013), filed October 17, 2014 (Doc. 52-7)("December 10 Letter"). The Plaintiffs contend that: (i) the VA failed to provide documentation that Wood is not its employee and that, regardless, Wood might qualify as an employee under the functional test articulated in <u>Woodruff v. Covington</u>, 389 F.3d 1117 (10th Cir. 2004); and (ii) the pharmacy employees failed to exercise ordinary care or meet their professional obligations in the performance of their duties. <u>See</u> December 10 Letter at 1.

The Plaintiffs submitted a final letter on April 23, 2014. <u>See</u> Letter from Doug Perrin to Department of Veterans Affairs Regarding Estate of Joseph Oran Van Winkle, Deceased (dated April 23, 2014), filed October 17, 2014 (Doc. 52-8)("Final Letter"). The Final Letter restates the same factual allegations as the Plaintiffs' earlier letters, with one exception: it alleges that Quintana, who assisted Wood "in the care and treatment of Mr. Van Winkle," had notice of a positive urine test result for staphylococcus aureus but failed to convey that information to Wood. Final Letter at 1.

## PROCEDURAL BACKGROUND

The Plaintiffs commenced this action on September 25, 2013, in the First Judicial District Court, County of Santa Fe, New Mexico. <u>See</u> Plaintiffs' Original Complaint for Wrongful Death Damages Due to Medical Malpractice, filed in Federal Court November 4, 2013 (Doc. 10-1)("2013 Complaint"). The 2013 Complaint asserts two causes of action against two Defendants: (i) a negligence claim against Wood, <u>see</u> 2013 Complaint ¶¶ 14-15, at 4; and (ii) a negligence claim against Medical Doctor Associates, LLC ("Medical Associates"), based on a theory of respondeat superior, <u>see</u> 2013 Complaint ¶¶ 16-17, at 4-5. On November 4, 2013, Wood and Medical Associates removed the case to federal district court pursuant to 28 U.S.C. §§ 1332(a) and 1441(a).

See Defendants Maureen Wood, M.D. and Medical Doctor Associates, LLC's Notice of Removal, filed November 4, 2013 (Doc. 10).

The Plaintiffs filed an amended Complaint on June 30, 2014, adding the United States as a Defendant. See 2014 Complaint at 1. The 2014 Complaint asserts three causes of action: (i) a negligence claim against Wood for "failing to properly diagnose" J. Van Winkle, "failing to review the chart and recognize and properly treat the staph aureus infection," and "discharging Mr. Van Winkle prematurely, and without sufficient proper antibiotic coverage," 2014 Complaint ¶¶ 17-18, at 5; (ii) a negligence claim, based on a theory of respondeat superior, against Medical Associates for its "failure to properly and adequately investigate Dr. Wood's credentials and abilities, monitor her activities and supervise her," 2014 Complaint ¶¶ 19-20, at 5; and (iii) a negligence claim, based on a theory of respondeat superior, against the United States for its agents' "failure to recognize the wrong medications being given and their failure to notify Dr. Wood of the positive culture and drugs to which the staph aureus was susceptible," 2014 Complaint ¶¶ 21-22, at 5. The 2014 Complaint alleges that Quintana and an Unnamed Pharmacist are the United States' agents. See 2014 Complaint ¶¶ 8-10. The 2014 Complaint seeks damages for J. Van Winkle's pain and suffering, physical impairment, disfigurement, medical expenses, and mental anguish. See 2014 Complaint ¶ 24, at 6. Moreover, M. Van Winkle seeks damages for mental anguish and loss of consortium, while Gallegos seeks damages for loss of consortium, loss of her father's "society and guidance," and wrongful death. 2014 Complaint ¶ 24, at 6.

   1.      **The First Motion to Dismiss**.

The United States filed a motion to dismiss the 2014 Complaint on October 17, 2014. The Court will discuss the United States' motion and its responsive briefings. The Court will then discuss the hearing that it held on the motion on December 18, 2014.

a.      **The First MTD.**

The United States moved to dismiss the 2014 Complaint on October 17, 2014, asserting that the Court lacks subject-matter jurisdiction, because the Plaintiffs have failed to exhaust their administrative remedies as § 2675 of the FTCA requires.  See Motion to Dismiss for Lack of Subject Matter Jurisdiction at 1, filed October 17, 2014 (Doc. 52)("First MTD").  The United States explains that the FTCA waives its sovereign immunity in limited circumstances, and that, before filing suit, a claimant must "file[] an administrative claim with the appropriate agency . . . within two years from the time the claim accrues."  First MTD at 5 (citing 28 U.S.C. § 2675; D'Addabbo v. United States, 316 F. App'x 722, 724 (10th Cir. 2008)(unpublished)).  The United States asserts that "the claimant must wait either until the administrative agency finally denies the claim or until at least six months have passed after the claim was filed."  First MTD at 5 (citing 28 U.S.C. § 2675).

Here, the United States says, the April 2 Letter does not exhaust the Plaintiffs' administrative remedies, because it does not notify the VA of the claims that the 2014 Complaint asserts against Quintana and an Unnamed Pharmacist.  See First MTD at 6, 9-11.  Next, the United States contends that, although the Final Letter provides notice of the Plaintiffs' claim against Quintana, it does not exhaust the Plaintiffs' administrative remedies, because (i) the VA has not finally decided the claim; and (ii) the Plaintiffs filed the 2013 Complaint and the 2014 Complaint within six months of mailing the letter.  See First MTD at 6, 11-12.  The United States argues that, similarly, Gallegos' claims are premature, because she did not provide notice of any claims until the Final Letter, and (i) the VA has not made a decision as to the Final Letter; and (ii) six months have not elapsed since the Final Letter's submission.  See First MTD at 12.  Last, the United States contends that the Plaintiffs' allegations against the Unnamed Pharmacist are barred, because the Plaintiffs never filed a notice of

claim as to the Unnamed Pharmacist and because two years have elapsed since the events giving rise to this litigation.  See First MTD at 12.

### b.      The First MTD Wood/MDA Response.

Wood and Medical Associates filed a response to the First MTD on October 31, 2014.  See Response of Defendants Maureen Wood, M.D., and Medical Doctor Associates, LLC, to Motion to Dismiss for Lack of Subject Matter Jurisdiction [Doc. 52] Filed by Defendant the United States of America, and Application for Relief Pursuant to Fed. R. Civ. P. 56(d), filed October 31, 2014 (Doc. 55)("First MTD Wood/MDA Response").  Wood and Medical Associates concede that they would ordinarily be "hard-pressed to demonstrate standing" to oppose the First MTD, but contend that, because the First MTD "attempts to establish certain facts as true," they feel compelled to "oppose the entry of what might well otherwise amount to partial summary judgment."  First MTD Wood/MDA Response at 2-3.  Turning to substance, they assert that the Court may have subject-matter jurisdiction, because, under a "functional test," Wood may be a VA employee.  First MTD Wood/MDA Response at 4 (citing United States v. Orleans, 425 U.S. 807 (1976); Woodruff v. Covington, 389 F.3d 117 (10th Cir. 2004)).  Accordingly, they request discovery regarding the VA's treatment protocols, personnel policies, and other information pertinent to the functional test's application.  See First MTD Wood/MDA Response at 7.

### c.      The First MTD Plaintiffs' Response.

The Plaintiffs responded to the First MTD on November 7, 2014.  See Plaintiffs' Response to Defendant United States of America's Motion to Dismiss for Lack of Subject Matter Jurisdiction, filed November 7, 2014 (Doc. 57)("First MTD Plaintiffs' Response").  The Plaintiffs first argue that they provided sufficient notice regarding their allegations against the Unnamed Pharmacist in the December 2 Letter.  See First MTD Plaintiffs' Response at 2-3.  The Plaintiffs assert that that letter

constitutes a new notice of claim, rather than an amendment or supplement to the April 2 Letter.  See First MTD Plaintiffs' Response at 2-3 (admitting that they "called [the letter] the wrong thing (an amendment)," but contending that "that should not change the substance").  Finally, they note that the VA denied their claim on December 9, 2013, and that they requested reconsideration the next day.  See First MTD Plaintiffs' Response at 2-3.

The Plaintiffs do not advance a similar argument regarding their allegations against Quintana.  See First MTD Plaintiffs' Response at 1-2.  They allow that they gave notice of their claims against him on April 23, 2014, and that they prematurely filed suit on June 30, 2014, before the FTCA's six-month waiting period had elapsed.  See First MTD Plaintiffs' Response at 4-5.  They state, however, that, because the six-month window has now expired, the Court should allow them to amend their 2014 Complaint and that any dismissal should be without prejudice to refiling.  See First MTD Plaintiffs' Response at 2.

### d.      The First MTD Reply.

The United States replied to the Plaintiffs and to Wood and Medical Associates on November 20, 2014.  See Reply to Responses of Defendants Maureen Wood, M.D. and Medical Doctor Associates, LLC and to Plaintiffs' Response to Motion to Dismiss for Lack of Subject Matter Jurisdiction, filed November 20, 2014 (Doc. 60)("First MTD Reply").  The United States argues that Wood and Medical Associates lack standing to oppose the First MTD, noting that they have not asserted any cross-claims and that they have no legal interest which a decision on the First MTD would affect.  See First MTD Reply at 1-2.  Next, they contend that Wood's employment status is irrelevant to the First MTD, because the Plaintiffs assert claims against the United States based on Quintana's and an Unnamed Pharmacist's actions and not on Wood's actions.  See First MTD Reply

at 3.  According to the United States, the issue is "whether Plaintiffs exhausted their administrative remedies" and not whether the United States is liable.  First MTD Reply at 3.

The United States then addresses all possible notices of claims against it.  <u>See</u> First MTD Reply at 4-5.  First, the United States argues that the April 2 Letter "did not provide the Agency with notice of the claims raised in the [2014] Complaint," and that, accordingly, it had no "opportunity to investigate and possibly settle the claim" before the litigation commenced.  First MTD Reply at 4.  Second, the United States argues that the December 2 Letter is not a new or independent notice of claim, noting that the Plaintiffs explicitly labeled the letter "as a 'supplement' to the notice of claim dated April 2, 2013, and later referenced it as an 'amendment.'"  First MTD Reply at 4.  Third, the United States contends that, even if the December 2 Letter is a new notice of claim, (i) the VA has not issued a denial; and (ii) even if the VA has issued a denial, the Plaintiffs request that the VA reconsider the wrong claim in their December 10 Letter.  <u>See</u> First MTD Reply at 5.  In the United States' view, the VA "alerted Plaintiffs that the supplement or amendment to the December 2, 2013 notice of claim had no effect and took no further action."  First MTD Reply at 5.  The United States maintains, however, that, to the extent the Plaintiffs interpret the message as a denial, they failed to seek reconsideration within six months as 28 U.S.C. § 2401(b) requires.  <u>See</u> First MTD Reply at 5.  The United States admits that the December 10 Letter requests reconsideration, but argues that the letter "specifically stated that it was requesting reconsideration of the claim the VA had denied on June 19, 2013."  First MTD Reply at 5-6.  Finally, the United States contends that amendments cannot cure the Plaintiffs' failure to exhaust their administrative remedies for their claims against Quintana.  <u>See</u> First MTD Reply at 6-7.

e.    **The First MTD Hearing**.

The Court held a hearing on the First MTD on December 18, 2014.  See Transcript of Motion Hearing (taken December 18, 2014)("2014 Tr.").[14]  The Court queried whether the parties are "just quibbling over the heading" on the December 2 Letter.  2014 Tr. at 6:11-12 (Court).  In response, the United States maintained that the Plaintiffs failed to request that the VA reconsider the December 2 Letter.  See 2014 Tr. at 6:13-15 (Keegan).  The Plaintiffs demurred, allowing that they might have "mess[ed] up a two-car parade," but asserting that their errors are not fatal to the suit.  2014 Tr. at 11:1-6 (Perrin).  The Plaintiffs posited that the United States had sufficient information about their allegations against an Unnamed Pharmacist to investigate the underlying facts by December 2, 2013.  See 2014 Tr. at 11:6-13 (Perrin).  The Plaintiffs contended, moreover, that, even if they failed to give proper notice as to their allegations against Quintana, the Court should not dismiss the case, because (i) the Court has diversity jurisdiction over Wood; and (ii) as a practical matter, any separate lawsuit would only be consolidated into the present case.  See 2014 Tr. at 12:17-13:17 (Perrin).

Wood and Medical Associates then argued.  See 2014 Tr. at 14:2 (Gay).  They admitted that they are unsure whether they have standing to discuss jurisdiction, see 2014 Tr. at 14:2-6 (Gay), but justified their opposition to the First MTD by characterizing it as a motion for summary judgment, see 2014 Tr. at 20:24-21:3 (Gay).  Turning to substance, they noted that the Plaintiffs, in a lengthy list attached to the April 2 Letter, mentioned Quintana and a possible responsible pharmacist.  See 2014 Tr. at 14:6-15:9 (Gay).  They added that the United States' First VA Letter states that the VA "wanted to be sure that Mr. Van Winkle received good care from his other VA providers."  2014 Tr.

---

[14]The Court's citations to the hearings' transcripts refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

at 15:13-16:9 (Gay). They concluded that, "[c]learly, the VA looked at the entire case . . . . This is a denial of the claim as to all VA employees." 2014 Tr. at 16:10-14 (Gay).

In rejoinder, the United States explained that the VA reviewed J. Van Winkle's medical records, but did not discuss them with Quintana or the Unnamed Pharmacist, because "they were not the doctors or responsible medical providers of Mr. Van Winkle." 2014 Tr. at 25:9-18 (Keegan). The United States also disputed that the list appended to the April 2 Letter included Quintana. See 2014 Tr. at 25:21-27:5 (Keegan)(referencing Ham v. United States, 2008 WL 818197, at *4 (W.D. Pa. 2008)(McVerry, J.)). Finally, the United States reiterated the argument from its briefing that Wood's employment status is irrelevant, because it is "not a claim against the United States." 2014 Tr. at 32:10-16 (Keegan).

## 2.    The 2015 Litigation, the Second Motion to Dismiss, and the Consolidation.

The Plaintiffs commenced a separate action against the United States in federal district court on March 4, 2015. See Plaintiffs' Original Complaint for Wrongful Death Damages Due to Medical Malpractice at 1, filed March 4, 2015 (Doc. 1 in Gallegos v. United States, No. CIV 15-0184 JB/KBM)("2015 Complaint"). The 2015 Complaint largely repeats the 2013 Complaint's and 2014 Complaint's factual accounts, but focuses on the Plaintiffs' allegations against Quintana and the Unnamed Pharmacist. See 2015 Complaint ¶¶ 16-18, at 4. The United States moved to dismiss this second action on May 15, 2015. See Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim and Memorandum in Support at 1, filed May 15, 2015 (Doc. 6 in Gallegos v. United States, No. CIV 15-0184 JB/KBM)("Second MTD")).

### a.    The Second MTD.

The United States' Second MTD advances two primary arguments: (i) that the Plaintiffs fail to state a claim under circumstances in which a private person would be liable, i.e., that there is no

"private person" analogue for the Plaintiffs' claims; and (ii) that the Plaintiffs have not exhausted

their administrative remedies, because they provided insufficient notice of their allegations against

Quintana and the Unnamed Pharmacist. Second MTD at 8. Regarding the first argument, the United

States explains that the FTCA's limited grant of subject-matter jurisdiction hinges on "whether a

private person could be subject to state law liability under similar circumstances." Second MTD at

10 (citing United States v. Olson, 546 U.S. 43, 44 (2005)). Here, the United States contends, the

Court lacks subject-matter jurisdiction, because "New Mexico does not recognize a duty of care of a

private person under analogous circumstances." Second MTD at 11. See id. at 11-12 (defining the

relevant duty as an individual's duty "to interfere with medical care provided by his supervisor").

The United States posits, moreover, that other states have declined to impose a duty under similar

circumstances. See Second MTD at 12-13 (citing, e.g., Buttersworth v. Swint, 186 S.E. 770, 772

(Ga. 1936)). The United States elaborates that the 2015 Complaint does not allege that Quintana and

an Unnamed Pharmacist "assumed the care of Mr. Van Winkle," or that they "had the right or ability

to control either Dr. Wood or Mr. Van Winkle." Second MTD at 13. The United States also cites

public policy arguments, including the New Mexico Legislature's limitations on malpractice

liability. See Second MTD at 13-14.

With respect to the notice issue, the United States advances largely the same arguments as its

First MTD. Compare First MTD at 10-12, with Second MTD at 16-21. The United States reiterates

that: (i) the April 2 Letter does not provide proper notice, because it did not mention any pharmacist;

(ii) the December 2 Letter neither amends the April 2 Letter nor serves as a new claim; and (iii) the

Plaintiffs failed to request reconsideration of the December 2 Letter or file suit within six months.

See Second MTD at 16-21. The United States also adds that the Plaintiffs' decision to amend the

2013 Complaint in the initial litigation effectively rendered their December 2 Letter denied. See

Second MTD at 21.  Finally, the United States argues that this suit, "filed more than six months after Plaintiffs deemed the agencies' action (or inaction) as a denial, is untimely."  Second MTD at 21.

### b.    The Consolidation.

The 2015 Complaint effectively created two parallel proceedings within the District of New Mexico based on the same facts.  Compare 2014 Complaint at 1-7, with 2015 Complaint at 1-5.  The Plaintiffs moved to consolidate the two proceedings on May 22, 2015.  See Plaintiffs' Motion to Consolidate, filed May 22, 2015 (Doc. 8 in Gallegos v. United States, No. CIV 15-0184 JB/KBM).  The Court granted the request on June 16, 2015, and combined the two proceedings.  See Order on Plaintiffs' Motion to Consolidate [Doc. 8], filed June 16, 2015 (Doc. 11 in Gallegos v. United States, No. CIV 15-0184 JB/KBM).

### c.    The Second MTD Response.

The Plaintiffs responded to the Second MTD on June 30, 2015.  See Plaintiffs' Response to Defendant United States of America's Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim, filed June 30, 2015 (Doc. 68)("Second MTD Response").  The Plaintiffs explain that they filed the 2015 Complaint in response to the United States' argument that joinder was premature, "to remove any doubt as to the appropriateness of the joinder and the timing of it."  Second MTD Response at 4.  The Plaintiffs aver that, "[a]pparently, the position of the United States is that the only person working at the VA Medical Center who owed a duty to Mr. Van Winkle was the physician who was not an employee of the United States."  Second MTD Response at 4.  The Plaintiffs state that this position is "preposterous," Second MTD Response at 4, and advance several arguments regarding Quintana's and the Unnamed Pharmacist's duties, see Second MTD Response at 5-7.

First, the Plaintiffs aver that Quintana had a duty to "provid[e] information about the positive cultures to Dr. Wood," which would have "helped [Wood], and helped the patient." Second MTD Response at 5. The Plaintiffs add that doctors in New Mexico have a "duty to 'possess and apply the knowledge and to use the skill and care ordinarily used by reasonably well-qualified doctors . . .' in treating, making a diagnosis of, or caring for a patient." Second MTD Response at 5 (quoting N.M. Rul. Amend. Civ. UJI 13-1101). This duty, the Plaintiffs assert, applies regardless whether Quintana was subordinate to Wood. See Second MTD Response at 5. The Plaintiffs apply a similar analysis to the Unnamed Pharmacist's duties to J. Van Winkle, arguing (i) that the Unnamed Pharmacist "possessed information which Dr. Wood did not have" about J. Van Winkle's condition; (ii) that the Unnamed Pharmacist "knew or should have known that Mr. Van Winkle was receiving the wrong drugs for his condition"; and (iii) that "disclosure from the pharmacist [of] what he or she knew" could have "improved Dr. Wood's treatment." Second MTD Response at 6.

The Plaintiffs then contend that they have complied with the FTCA's notice requirements. See Second MTD Response at 7-8. The Plaintiffs repeat their earlier arguments that the December 2 Letter provides the United States with sufficient notice of their claims. See Second MTD Response at 7. The Plaintiffs also note that their claim against the Unnamed Pharmacist "was the subject of a request for reconsideration filed on December 10, 2013." Second MTD Response at 8.

### d.    **The Second MTD Reply.**

The United States replied on July 16, 2015. See Reply in Support of Motion to Dismiss for Lack of Subject Matter Jurisdiction, filed July 16, 2015 (Doc. 12 in Gallegos v. United States, No. CIV 15-0184 JB/KBM)("Second MTD Reply"). The United States clarifies that it seeks dismissal on two separate grounds, each under a different provision of the Federal Rules of Civil Procedure. See Second MTD Reply at 3-4. Its private-person-analogue argument, the United States says, relies

on rule 12(b)(6), and thus draws exclusively from the 2015 Complaint.  See Second MTD Reply at 3-4.  The United States notes, however, that its notice argument "is not intertwined with the merits of the suit" and thus relies on rule 12(b)(1).  Second MTD Reply at 4.

Addressing first the private-person-analogue argument, the United States asserts that, absent a physician-patient relationship, a doctor is "liable for injuries by parties with known 'dangerous propensities' if the doctor exerts control over the patient[.]"  Second MTD Reply at 5.  The United States adds that "a doctor has a duty to warn of specific threats by the doctor's patient, and a doctor may be held liable for administering powerful drugs in his office that result in impairment to the patient."  Second MTD Reply at 5 (citing Brown v. Kellogg, 2015-NMCA-006, ¶ 8, 340 P.3d 1274, 1276).  Here, the United States argues, the Court should not impose a new obligation on doctors to "inform the patient's doctor of information that is readily available in the patient's chart."  Second MTD Reply at 4.  The United States also disputes that J. Van Winkle was Quintana's patient, and notes that Quintana "had neither the right nor the ability to control Dr. Wood's conduct."  Second MTD Reply at 6-7.  As for the Unnamed Pharmacist, the United States asserts that New Mexico courts have never recognized a pharmacist's duty to intervene on a patient's behalf.  See Second MTD Reply at 7.

Turning to the notice issue, the United States largely repeats the arguments from its earlier briefings.  See Second MTD Reply at 8-9.  The United States contends that, even assuming that the VA denied the December 2 Letter, the Plaintiffs failed to seek reconsideration of that denial or to file suit within six months.  See Second MTD Reply at 9 (citing 28 U.S.C. § 2401(b)).

3.      **The Court's First MTD Memorandum Opinion and Order.**

The Court issued a Memorandum Opinion disposing of the First MTD on October 1, 2015.  See Gallegos v. Wood, No. CIV 13-1055 JB/KBM, 2015 WL 6393561 (D.N.M. Oct. 1, 2015)("First

MTD Opinion"). The Court held, in relevant part, that: (i) the April 2 Letter gives sufficient notice of the Plaintiffs' allegations against both Quintana and the Unnamed Pharmacist; and (ii) despite the label, the Plaintiffs' December 2 Letter to the VA constitutes a separate notice of claim. See First MTD Opinion, 2015 WL 6393561, at *18. Regarding the first issue, the Court noted:

> Courts generally disregard the labels attached to particular pieces of a plaintiff's notice of claim. In Dynamic Image Technologies, Inc. v. United States, [221 F.3d 34 (1st Cir. 2000),] for example, the First Circuit examined the plaintiff's allegations "regardless of the labels employed in the amended complaint." 221 F.3d at 40. This rule is consistent with the fact that "Congress did not intend to shield the federal fisc behind an impenetrable thicket of lawyerly technicalities." 221 F.3d at 40.

First MTD Opinion, 2015 WL 6393561, at *22. As for the second issue, the Court concluded that "[t]he underlying purpose of the notice requirement has been more than satisfied here -- the VA was well-aware of the Plaintiffs' argument against the unnamed pharmacist as early as December 2, 2013." First MTD Opinion, 2015 WL 6393561, at *23 (relying on Williams v. United States, 932 F. Supp. 357, 361 (D.D.C. 1996)(Lamberth, J.)(holding that "[i]t is only necessary that the agency be put on notice of the injury so that it may begin its own investigation of the matter")).

### 4.    The Second MTD Hearing.

The Court held a hearing on the Second MTD on October 1, 2015. See Transcript of Motion Hearing (taken October 1, 2015)("2015 Tr."). The Court opened the hearing by noting that its First MTD Opinion largely resolves the United States' notice arguments. See 2015 Tr. at 2:15-19 (Court). The Court thus focused the parties' argument on the private-person-analogue issue, noting that it is inclined to find that New Mexico recognizes a duty applicable to at least the Unnamed Pharmacist. See 2015 Tr. at 2:19-23 (Court).

The United States then argued, averring that "there is no relationship between the pharmacist, or for that matter Dr. Quintana, [and] the patient." 2015 Tr. at 6:21-23 (Keegan). The United States asserted, moreover, that the Court should resolve any doubts over unsettled law against jurisdiction

and should avoid predicting how the Supreme Court of New Mexico would react to the situation. See 2015 Tr. at 7:22-8:22 (Court, Keegan). Although the United States agreed that "every doctor is responsible for the care that they [sic] provide to a patient," it argued that neither Quintana nor the Unnamed Pharmacist had an obligation to prevent Wood's negligence. 2015 Tr. at 11:18-12:2 (Keegan). The United States also remarked that the Plaintiffs "never requested Dr. Quintana or this pharmacist to provide care," that those individuals "never agreed to provide that care to Mr. Van Winkle," and that the Plaintiffs "don't allege that either Dr. Quintana or the pharmacist had any control over Dr. Wood." 2015 Tr. at 15:24-16:4 (Keegan).

In rejoinder, the Plaintiffs contended that the Unnamed Pharmacist was present with Wood, and knew or should have known that Wood's prescriptions were incorrect. See 2015 Tr. at 18:2-19:22 (Court, Perrin). The Plaintiffs also argued that Quintana and the Unnamed Pharmacist are "representatives and agents" for the hospital, which has "unquestioned" liability. 2015 Tr. at 21:19-22:4 (Perrin). The Court queried whether a medical fellow, such as Quintana, is really a physician, noting that judicial law clerks, for example, are trainees and cannot easily commit malpractice. See 2015 Tr. at 23:12-22 (Court). The Plaintiffs answered that Wood's patients would be Quintana's patients as well, but that Quintana was likely a University of New Mexico employee. See 2015 Tr. at 24:19-25:21 (Court, Perrin).

The Court then invited argument from Wood and Medical Associates on the Second MTD. See 2015 Tr. at 25:24-26:5 (Court). They opened by framing Quintana's duty as the "obligation to pass on information" about J. Van Winkle's laboratory test results. 2015 Tr. at 28:18-23 (Gay). They asserted that Quintana has this duty, in part, because he is a "physician, fully trained and licensed, who is undertaking subspecialty training." 2015 Tr. at 29:3-7 (Gay). They also contended that Quintana and the Unnamed Pharmacist had independent obligations to report Wood's error "up

the chain of command." 2015 Tr. at 29:19-31:16 (Gay). Last, they argued that Quintana is federal employee, see 2015 Tr. at 36:19-23 (Gay), and that, regardless, he would be liable under the New Mexico Tort Claims Act as a University of New Mexico employee and should thus be liable under the FTCA, see 2015 Tr. at 43:17-44:16 (Gay).

In reply, the United States contended that Quintana "is absolutely an employee of the VA," which is "why the United States is the only proper defendant." 2015 Tr. at 48:10-12 (Keegan). The United States emphasized that Quintana was never assigned to J. Van Winkle, despite that he had his own patients, see 2015 Tr. at 48:23-49:4 (Keegan), and that Quintana had no authority to tell Wood how to practice medicine, see 2015 Tr. at 50:15-20 (Keegan). The United States added that pharmacists are "not responsible for diagnosing a patient and knowing what the proper medication is for that diagnosis." 2015 Tr. at 51:16-20 (Keegan). The United States allowed that pharmacists "can absolutely commit malpractice, but only when acting within the scope of their job, which is to understand medications and their interactions." 2015 Tr. at 52:10-13 (Keegan).

The Court then summarized its view of the case. See 2015 Tr. at 53:2-54:15 (Court). The Court reiterated its inclination to deny the Second MTD based on its opinion of Quintana's and the Unnamed Pharmacist's duties. See 2015 Tr. at 53:25 (Court). The Court posited that its resolution of the Second MTD should apply across both consolidated cases. See 2015 Tr. at 54:12-15 (Court). In response to this suggestion, Wood and Medical Associates contended that collateral estoppel should dispose of the United States' notice arguments, but the United States reiterated that it had not abandoned those arguments. See 2015 Tr. at 54:18-55:11 (Court, Gay, Keegan).

**5.** **The Court's Second MTD Memorandum Opinion and Order and Final Judgment as to the 2015 Lawsuit.**

The Court issued a memorandum opinion granting in part and denying in part the Second MTD on October 1, 2015. See Gallegos v. Wood, No. CIV 13-1055 JB/KBM, No. CIV 15-0184

JB/KBM, 2016 WL 1426554 (D.N.M. March 31, 2016)("Second MTD Opinion").  At the outset, the Court noted that it would apply the Second MTD across both the 2013 lawsuit, based on the original 2013 Complaint, and the 2015 lawsuit, based on the 2015 Complaint.  See Second MTD Opinion, 2016 WL 1426554, at *22.  The Court then held that the FTCA waives the United States' sovereign immunity from suit, because private persons performing the same acts as Quintana and the Unnamed Pharmacist would be liable under New Mexico law.  See Second MTD Opinion, 2016 WL 1426554, at *22-28.  The Court, therefore, denied the Second MTD as to the 2013 lawsuit.  See Second MTD Opinion, 2016 WL 1426554, at *22-28.

Next, the Court maintained its prior conclusions from the First MTD Opinion as to the FTCA's notice requirements.  See Second MTD Opinion, 2016 WL 1426554, at *22, 28.  The Court thus maintained that the April 2 Letter provides sufficient notice of the Plaintiffs' allegations against both Quintana and an Unnamed Pharmacist, and that the December 2 Letter to the VA, despite its label, constitutes a separate notice of claim.  See Second MTD Opinion, 2016 WL 1426554, at *22, 28.  Nevertheless, because the Plaintiffs filed the 2015 Complaint more than six months after the 2014 Complaint, the Court granted the Second MTD with respect to the 2015 lawsuit.  See Second MTD Opinion, 2016 WL 1426554, at *28 (citing 28 U.S.C. § 2401 ("A tort claim against the United States shall be forever barred unless . . . action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.")).  The Court noted, however, that this this conclusion "makes no practical difference to this case, because the same claims will proceed against Dr. Quintana and the unnamed pharmacist under the [2014] Complaint."  Second MTD Opinion, 2016 WL 1426554, at *28.

On March 31, 2016, because the Court granted the Second MTD as to the 2015 lawsuit, the Court entered final judgment and dismissed that action without prejudice. <u>See</u> Final Judgment at 1-2, filed March 31, 2016 (Doc. 115).

6.      **<u>The Motion to Extend Deadlines for Identification of Expert Witnesses</u>.**

On July 14, 2016, the Plaintiffs moved to extend by two weeks the deadlines for the parties to identify expert witnesses. <u>See</u> Motion to Extend at 1. The Court reviews the Motion to Extend and its responsive briefings in turn.

a.      **<u>The Motion to Extend</u>.**

The Motion to Extend notes that the Plaintiffs are scheduled to identify testifying expert witnesses on or before July 20, 2016, and that the Defendants are scheduled to identify their testifying expert witnesses on or before August 22, 2016. <u>See</u> Motion to Extend at 1 (citing Second Scheduling Order at 2, filed January 21, 2016 (Doc. 87)("Second Scheduling Order")). According to the Plaintiffs, the "parties have not been able to take all necessary depositions at this point because of conflicts in schedules, disagreements on discovery, and continued production of medical records." Motion to Extend at 1. The Plaintiffs thus request that the Court extend the deadlines for testifying expert witnesses "for the proper and complete presentation of the merits of this case to provide some brief additional time for experts to review the enormous quantity of records in this case." Motion to Extend at 1. Specifically, the Plaintiffs request that the Court extend the Plaintiffs' deadline by two weeks to August 3, 2016, and the Defendants' deadline by two weeks to September 6, 2016. <u>See</u> Motion to Extend at 2. Wood and Medical Associates concur with the Motion to Extend. <u>See</u> Motion to Extend at 2.

b.      **<u>The Motion to Extend Response</u>.**

The United States responded to the Motion to Extend on July 18, 2016. <u>See</u> Response to Plaintiff's [sic] Motion for Extension of Deadlines to Identify Expert Witnesses at 1, filed July 18,

2016 (Doc. 143)("Motion to Extend Response").  The United States asserts that the Plaintiffs have

"failed to show good cause (or even a candid reason)" for the requested deadline extensions.  Motion

to Extend Response at 1.  To provide context for its opposition to the Motion to Extend, the United

States observes that this action has been pending since October 28, 2013, and that, "[d]espite the

unusually long period of time that Plaintiffs had to identify their expert," the Plaintiffs requested on

July 7, 2016, that the parties agree to a two-week extension to "disclose a cardiologist, presumably to

address causation."  Motion to Extend Response at 2-3 (citing Email Exchange between Doug Perrin

and Ruth F. Keegan Regarding Deadline Extension at 1 (dated July 7, 2016), filed July 18, 2016

(Doc. 143-3)).  The United States indicates that, although it did not initially object to the Plaintiffs'

request, it now opposes the Motion to Extend, which "appears to cast blame on the United States . . .

for the Plaintiffs' failure, after three years, to timely identify an expert witness."  Motion to Extend

Response at 3 (relying on the Motion to Extend's allegation that an extension is necessary, because

the parties were unable "to take necessary depositions at this point because of conflicts in schedules

and disagreements on discovery").

Turning to its legal argument, the United States contends that a scheduling order may be

modified under rule 16(b)(4) of the Federal Rules of Civil Procedure "only for good cause and with

the judge's consent."  Motion to Extend Response at 3.  Here, the United States avers, the Plaintiffs'

"only explanation" for their request to modify is "conflicts in schedules, disagreements on discovery,

and continued production of medical records."  Motion to Extend Response at 3.  The United States

disputes these assertions, arguing that "it has provided all medical records to the parties"; that "the

only discovery dispute that the United States had with Plaintiffs was over *plaintiffs' failure* to

properly respond to discovery"; and that the only requested deposition that has not yet been taken is

Quintana's, a "critical care fellow" who "could not have played the slightest role in Plaintiffs' need

for an extension of time," because the Plaintiffs request additional time to "name a cardiologist expert." Motion to Extend Response at 3-4 (emphasis in original). In light of this evidence, the United States concludes that the Plaintiffs have failed to show good cause to modify the Second Scheduling Order. See Motion to Extend Response at 3.

### c. The Motion to Extend Reply.

The Plaintiffs replied on August 1, 2016. See Plaintiffs' Reply to Defendant United States of America's Response to Motion for Extension of Deadlines to Identify Expert Witnesses at 1, filed August 1, 2016 (Doc. 145)("Motion to Extend Reply"). The Plaintiffs posit that "[t]he United States changes its position," because it initially "made it clear that [it] does not oppose the extension." Motion to Extend Reply at 1 (relying on Email Exchange between Doug Perrin and Ruth F. Keegan Regarding Deadline Extension at 1-8 (dated July 7, 13, and 14, 2016), filed August 1, 2016 (Doc. 145-1)("Extension Emails")). The Plaintiffs dispute that the Motion to Extend "blame[s] anybody []or attempt[s] to assess fault -- it simply stated a fact that discovery has been delayed." Motion to Extend Reply at 1 (alterations added). The Plaintiffs also note that the other Defendants agree to the extension; that the United States has "no substantive objection to the extension"; and that the extension is necessary for the "Plaintiffs' expert to review documents which were only produced within the last month." Motion to Extend Reply at 2.

### 7. Wood's Outpatient Pharmacist Claim.

Wood asserts comparative negligence as an affirmative defense. See Answer of Maureen Wood, M.D., to Plaintiffs' First Amended Complaint for Wrongful Death Damages Due to Medical Negligence at 9, filed July 14, 2014 (Doc. 46)("If Dr. Wood is determined to have been negligent, . . . [then] such negligence must be compared to the negligence of all others contributing to fault and/or causation, thereby barring or reducing any recovery from Dr. Wood."). Wood elaborated on this

defense during her deposition of the Plaintiffs' expert, Dr. Mark Looney. See Deposition of Mark R. Looney, M.D. at 6-8 (taken May 27, 2016), filed September 23, 2016 (Doc. 167)("Looney Depo."). During the deposition, Wood suggested that VA protocol "place[s] an absolute burden on the pharmacy to know whether the drug is appropriate for the diagnosis." Looney Depo. at 108:9-11 (Gay). Attendant to this burden, Wood said, is a pharmacist's duty to "check the[] drugs as ordered and determined that the right thing is being given[.]" Looney Depo. at 116:13-16 (Gay). Wood thus suggested that, in this case, VA protocol imposes a duty on the pharmacist to "pick up the phone and say 'Dr. Wood, did you know this guy's got two out of two positive for staph aureus?'" Looney Depo. at 115:1-3 (Gay).

Following the Looney Depo., the United States moved the Court to enter several protective orders barring depositions of VA pharmacists. See Motion to [sic] for Protective Order that the Deposition of Maximillian Jahng, PharmD Not be Taken, filed August 11, 2016 (Doc. 149)("Jahng Motion"); Motion to [sic] for Protective Order that the Deposition of Stephen Adams, PharmD not be Taken, filed August 18, 2016 (Doc. 153)("Adams Motion"). According to the United States, Wood is "desperately looking for someone at the VA to blame for her own medical negligence" and is "engaging 'in a fishing expedition in the hope of supporting her claim.'" Adams Motion at 5 (quoting Cabot v. Wal-Mart Stores, Inc., 2012 WL 592874, at *8 (D.N.M. 2012)(Browning, J.)). The United States notes that Wood intends to ask the pharmacists questions about "how out-patient prescriptions were filled at the VA under circumstances where the patient is being discharged from the hospital," and that Wood "seeks pharmacy policies and procedures at the Albuquerque VAMC regarding the same." Jahng Motion at 2. In the United States' view, the pharmacists' testimony is irrelevant, because there is no evidence that they were involved in J. Van Winkle's care at the

Albuquerque VA and because they were not present on the day that Wood discharged J. Van Winkle.  See Jahng Motion at 2; Adams Motion at 5-6.

In opposing the United States' motions for protective orders, Wood argues that determining VA pharmacists' compliance with internal protocols is important to establish the distribution of fault.  See Response of Defendants Medical Doctor Associates, LLC, and Maureen Wood, M.D. to Motion [Doc. 149] for Protective Order filed by the United States of America Seeking an Order of Court that the Deposition of Maximillian Jahng, PharmD, Not be Taken at 8, filed August 28, 2016 (Doc. 157)("Jahng Motion Response"); Response of Defendants Medical Doctor Associates, LLC, and Maureen Wood, M.D., to Motion [Doc. 153] for Protective Order Filed by the United States of America Seeking an Order of Court that the Deposition of Stephen Adams, PharmD, Not be Taken at 7, filed September 2, 2016 (Doc. 160)("Adams Motion Response").  Wood argues that, despite the United States' assertion to the contrary, "VAMC pharmacists were on duty [on weekends] and still responsible for verifying medication orders at the VAMC '24/7[.]'"  Jahng Motion Response at 8; Adams Motion Response at 6.  Wood suggests that "[i]t will be interesting to see what role" VA pharmacists had "in preparing, reviewing, or updating" VA pharmacy protocols.  Adams Motion Response at 7.  Wood speculates that, if the pharmacists "claim[] at deposition to have no knowledge of . . . VAMC pharmacy protocols, such lack of knowledge will be relevant to proving the VAMC's level of commitment to quality patient care and staff adherence to the VAMC's own protocols, procedures and guidelines."  Jahng Motion Response at 8.  Alternatively, Wood contends that, if the pharmacists "admit at deposition to knowledge about VAMC protocols, procedures and guidelines . . . , such an admission . . . will provide powerful evidence of the VAMC's negligence for failure to adhere to [its protocols]."  Jahng Motion Response at 8-9.

**8.       The Third Motion to Dismiss.**

In light of Wood's developing theory that an outpatient pharmacist failed to comply with VA pharmacy protocols, the United States filed a motion to dismiss such a theory on September 23, 2016.  See Third MTD at 1.  The United States acknowledges that the Plaintiffs "have made no claim that the United States was negligent in accurately filling the out-patient prescriptions ordered by Defendant Wood" and that "Wood has not asserted any cross-claims against the United States . . . ."  Third MTD at 3 n.1.  Thus, the United States notes, "it is questionable whether there even exists a pending claim against the United States based on the actions of the pharmacist in filling Mr. Van Winkle's out-patient prescription."  Third MTD at 3 n.1.  Nevertheless, the United States justifies the Third MTD on the basis that the VA-protocol theory is "a major focus of Defendant Wood's discovery[.]"  Third MTD at 3 n.1.  The Court discusses the Third MTD and its responsive briefings in turn.

**a.       The Third MTD.**

The United States moves to dismiss "any claim against the United States based upon an allegation that . . . an outpatient pharmacist failed to comply with a VAMC pharmacy protocol in filling prescriptions Defendant Wood ordered for Mr. Van Winkle upon discharge."  Third MTD at 1 (citing Motion for Protective Order Response at 8).  The United States avers that Wood is "pursuing through discovery" this theory of liability and argues that the Court "lacks subject matter jurisdiction because the United States was never notified of any such claim, and because there is no private party analogue for such a claim."  Third MTD at 1.  Consequently, similar to its First MTD and Second MTD, the United States seeks dismissal, because (i) neither the Plaintiffs nor Wood have exhausted their administrative remedies under the FTCA; and (ii) there is no state law cause-of-action analogue for the outpatient-pharmacist negligence claim.  See Third MTD at 1.

Regarding exhaustion, the United States contends that the FTCA requires, as a "prerequisite to filing suit against the government, pre-suit administrative steps" including (i) presentment of the claim to the "appropriate Federal agency"; and (ii) that the agency finally deny the claim in writing. Third MTD at 9 (citing 28 U.S.C. § 2675). The United States avers that the "exhaustion requirement is jurisdictional and cannot be waived." Third MTD at 9 (citing Lopez v. United States, 823 F.3d 970, 976 (10th Cir. 2016)). As for the administrative claim, the United States contends that it "must contain sufficient details to give due notice to the agency that it should investigate the possibility of particular conduct." Third MTD at 9 (citing Estate of Trentadue v. United States, 397 F.3d 840, 852 (10th Cir. 2005)). Here, the United States asserts, the "Plaintiffs' notices of claims focused on the care provided to Mr. Van Winkle when hospitalized at the Albuquerque VAMC," but "never stated nor implied that the Albuquerque VAMC was negligent in filling Mr. Van Winkle's prescription," nor "was such a claim considered by Albuquerque VAMC when investigating Plaintiffs' claims." Third MTD at 11 (footnote omitted). The United States argues that "[a]llowing this new claim to go forward would undermine the very purpose of the notice requirement -- to afford the government a 'fair opportunity to investigate and possibly settle the claim before the parties must assume the burden of costly and time-consuming litigation.'" Third MTD at 11 (quoting McNeil v. United States, 508 U.S. 106, 111-12 (1993)). The United States asserts, moreover, that "the scope of FTCA litigation cannot be expanded by adding claims not included in the administrative claim." Third MTD at 11 (citing Deloria v. Veterans Admin., 927 F.2d 1009, 1011 (7th Cir. 1991)).

The United States then discusses the Court's First MTD Opinion. See Third MTD at 12-13. The United States notes that the Court held that the April 2 Letter provides sufficient notice that (i) the Unnamed Pharmacist should have known both the results of J. Van Winkle's laboratory tests and that Wood's prescriptions were inappropriate; and (ii) Quintana knew about the test results but failed

to inform Wood about those results. See Third MTD at 12 (citing First MTD Opinion, 2015 WL 6393561, at *20). The United States emphasizes the Court's conclusion that the claims arising out of Quintana's failure to notify Wood of the test results, along with another doctor's failure to notify Wood that her prescriptions were ineffective, "'involved three individuals who participated in a single incident,'" and that, accordingly, the April 2 Letter "'led the VA to investigate the entire incident.'" Third MTD at 12 (quoting First MTD Opinion, 2015 WL 6393561, at *21). The United States contrasts this reasoning with Wood's claim "that a pharmacist, who is alleged to have only filled an outpatient prescription for Mr. Van Winkle, which was picked up at the pharmacy window once Mr. Van Winkle was discharged from the hospital, was purportedly negligent for a violation of a VAMC pharmacy protocol." Third MTD at 13. The United States contends that "Wood does not claim that this pharmacist attended rounds with her or otherwise participated in care provided to Mr. Van Winkle," and that Wood also does not "claim that this same pharmacist actually knew anything about Mr. Van Winkle's condition beyond that indicated on Defendant Wood's prescription orders." Third MTD at 13-14. The United States argues that, rather, after "Wood ordered the medication and discharged Mr. Van Winkle from the hospital, the pharmacist filled the prescription." Third MTD at 14. In the United States' view, "[t]his was a separate incident for which the VA was never provided a notice of claim and the VA never investigated." Third MTD at 14. The United States concludes that, "[s]ince Plaintiffs (and/or Defendants) failed to give the United States notice of this latest claim, it should be dismissed." Third MTD at 15.

Turning to the private-person-analogue issue, the United States argues that it "has not waived sovereign immunity for claims based on [a] violation of government rules or regulations." Third MTD at 15 (alteration added)(title case omitted). The United States explains that its "liability is coextensive with that of private individuals under the respective States' law," and that, as a result, "it

is axiomatic that 'the violation of a federal regulation in and of itself is not a basis for liability under the FTCA.'" Third MTD at 15-16 (brackets omitted)(quoting Pappas v. United States, 617 F. App'x 879, 881 (10th Cir. 2015)(unpublished), cert. denied, 136 S. Ct. 595 (2015)). The United States argues, moreover, that "[a]n agency's internal policy does not, by itself, give rise to state law tort duties." Third MTD at 16 (citing Klepper v. City of Milford, 825 F.2d 1440 (10th Cir. 1987); United States v. Agronics, Inc., 164 F.3d 1343 (10th Cir. 1999)). Finally, the United States contends that

> New Mexico has not adopted VAMC pharmacy protocols as setting forth the duty of care in New Mexico, nor has it recognized a legal duty on the part of a pharmacist to, in addition to accurately filling the prescription, (1) undertake a review [of] a patient's medical records to ascertain for what condition the medication is being prescribed; (2) determine if the diagnosis was correct; or (3) determine whether the medication prescribed is appropriate for the correct diagnosis.

Third MTD at 16.

The United States then notes that the Court's Second MTD Opinion "clarifies a pharmacist's duty of care in New Mexico." Third MTD at 16. The United States notes that the Court held that the 2014 Complaint stated a claim for which a private person could be held liable by alleging that "a pharmacist attended daily rounds, 'likely reviewed specific patients' charts,' and 'should have known the results of the culture and that the drugs given to Mr. Van Winkle were not appropriate for his treatment because of the results of the culture.'" Third MTD at 16-17 (quoting Second MTD Opinion, 2016 WL 1426554, at *27). According to the United States, "[t]he Court focused on one important allegation -- the pharmacist was alleged to have knowledge of Mr. Van Winkle's medical history and condition." Third MTD at 16-17 (citing Second MTD Opinion, 2016 WL 1426554, at *27). The United States asserts that this allegation, however, "is missing in Defendants' new theory of recovery." Third MTD at 17. The United States notes that the Court stated in its Second MTD Opinion that "New Mexico courts have not recognized a duty of a pharmacist beyond the duty to

accurately fill a prescription," Third MTD at 17 (citing Second MTD Opinion, 2016 WL 1426554, at *27), and that the Court has previously expressed doubt that the Supreme Court of New Mexico would "adopt the doctrine of learned-intermediary, as adopted in other states that have recognized an expanded duty of care for pharmacists," Third MTD at 17 (citing <u>Rimbert v. Eli Lilly & Co.</u>, 577 F. Supp. 2d 1174, 1214 (D.N.M. 2008)(Browning, J.)). The United States thus concludes that "[t]he inquiry should end there and compels dismissal of Defendants' new claim." Third MTD at 17. The United States adds that it "is unaware of any state that imposes a duty on a pharmacist to look past what is written on the face of the prescription, what a reasonable pharmacist should know about the medication being prescribed, and what the pharmacist actually knows about a patient." Third MTD at 17-18 (citing Second MTD Opinion, 2016 WL 1426554, at *27). Accordingly, the United States argues that the Court lacks subject-matter jurisdiction. <u>See</u> Third MTD at 18.

> **b.    The Third MTD Response.**

The Plaintiffs, Wood, and Medical Associates jointly responded to the Third MTD on November 4, 2016. <u>See</u> Joint Response of Plaintiffs and Defendants Maureen Wood, M.D., and Medical Doctor Associates, LLC, to Motion to Dismiss for Lack of Subject Matter Jurisdiction Claims based on a Pharmacists' [sic] Purported Failure to Follow VAMC Protocals [*sic.*] [Doc. 167] Filed by Defendant United States of America, and Application for Relief Pursuant to Fed. R. Civ. P. 12(b)(1) and 56(d), filed November 4, 2016 (Doc. 188)("Third MTD Response"). The Third MTD Response primarily opposes the United States' exhaustion and private-person-analogue arguments based on "the lackluster production of medical records by the VAMC to Plaintiffs before the period for service of a Tort Claims Notice expired and the USA's persistent reluctance to produce material responsive to discovery requests since litigation started." Third MTD Response at 3. The Third MTD cites ongoing discovery disputes "regarding medical records, protocols, names of individuals

interviewed as part of the peer review process, and names of experts with whom the United States consulted in denying Plaintiffs' Tort Claims Notices." Third MTD Response at 4.

The Third MTD Response contends, first, that the United States only "produced the records pertinent to the pharmacy's having dispensed the oral antibiotics to Mr. Van Winkle [] long after the limitations period attendant to Plaintiffs' and these Defendants' respective claims expired." Third MTD Response at 5. The Third MTD Response thus argues that the United States "cannot in good faith claim failure to exhaust administrative remedies when the USA's client waited until long after the deadline for a Tort Claims Notice expired to supply . . . the records necessary to discover the outpatient pharmacy's involvement in Mr. Van Winkle's care" and to supply "the records necessary to discover the identity of t[he] outpatient pharmacist who verified Mr. Van Winkle's prescription order upon his May 13, 2012 discharge, filled the prescription, and dispensed the prescriptions to Mr. Van Winkle." Third MTD Response at 5-6. The Third MTD Response explains that the United States attaches to the Third MTD pharmacy records printed on August 19, 2016, which reference a pharmacist named Amber Ramnarace-McKinley. See Third MTD Response at 6. The Third MTD Response asserts that the only reference to this pharmacist in records produced before August 19, 2016, "is a January 1[6], 2009 'Progress Note' bearing Amber Ramnarace-McKinley's electronic signature and the designation 'outpatient pharmacist.'" Third MTD Response at 6 (citing Progress Notes at 1 (dated January 16, 2009), filed November 4, 2016 (Doc. 188-2)).

The Third MTD Response then notes that, when they mailed the VA their initial notices of claims, the Plaintiffs "reviewed all the medical records the Van Winkles received from the VA and produced from those records a list of providers who it appeared had provided care to Mr. Van Winkle from the date of his May 7, 2012 hospitalization through his complete discharge on May 13, 2012." Third MTD Response at 7 (citing Declaration of Doug Perrin (executed November 4, 2016),

filed November 4, 2016 (Doc. 188-3)). The Third MTD Response notes that the list of providers includes a registered nurse named Rebecca Moralez, "who wrote a May 13, 2012 progress note that reads '1330 pt sitting in w/c [wheelchair] taken to 1st floor for prescription to be filled. Family with patient and taking pt home.'" Third MTD Response at 7 (alteration in original)(quoting Progress Notes at 1 (dated May 13, 2012), filed November 4, 2016 (Doc. 188-4)). The Third MTD Response argues that this progress note is significant, because the United States "maintain[s] that the VAMC's outpatient pharmacy was closed on weekends, including the date of Mr. Van Winkle's Sunday, May 13, 2012 discharge," meaning that the inpatient pharmacy necessarily would have filled J. Van Winkle's prescription on that date. Third MTD Response at 7-8. The Third MTD Response thus extrapolates that it is reasonable for the Plaintiffs, Wood, and Medical Associates to "guess[] that the inpatient pharmacy would have filled Mr. Van Winkle's May 13, 2012 discharge prescriptions[.]" Third MTD Response at 7-8. The Third MTD Response asserts, however, that the United States "recently revealed that it is in the process of reviewing additional materials that it thinks may prove relevant to the operation of the VAMC's pharmacy," and that the Plaintiffs, Wood, and Medical Associates have requested that the United States produce those materials so that they can conduct their own review. Third MTD Response at 9-10.

Next, the Third MTD Response asserts that the "[m]aterials produced thus far regarding staffing of the VAMC's pharmacy make clear that the Pharmacy Service includes all components of the pharmacy," and that "[n]one of the 'Staffing' materials distinguish between a staff pharmacist's role as an inpatient or as an outpatient pharmacist and all pharmacists clearly fall under the ambit of a unified Pharmacy Service." Third MTD Response at 10 (emphasis in original)(citing VA Handbook 5005/36 (dated August 16, 2010), filed November 4, 2016 (Doc. 188-10)). Further, the Third MTD Response asserts, "the outpatient and inpatient pharmacies are both contained on the

First Floor of Building 41 at the VAMC in Albuquerque, and . . . share an open floor plan." Third MTD Response at 10. The Third MTD Response adds that the "pharmacy from May 7, 2012 through the moment Mr. Van Winkle left the premises on May 13, 2012 served as a hospital pharmacy." Third MTD Response at 10. The Third MTD Response thus reasons that, "presumably, all pharmacists working in the VAMC's hospital's pharmacy had full access to Mr. Van Winkle's VAMC medical records, including lab culture results." Third MTD Response at 10.

The Third MTD Response then reviews the Plaintiffs' various notices of claims. See Third MTD Response at 10-12. The Third MTD Response emphasizes that, at the time they drafted the notices, the Plaintiffs "had no way of knowing that the oral antibiotics that Dr. Wood prescribed for Mr. Van Winkle were . . . verified by an outpatient pharmacist, filled in the outpatient pharmacy, and dispensed by Amber Ramnarace-McKinley through the outpatient pharmacy . . . ." Third MTD Response at 12. In short, the Third MTD Response contends, "until the USA on August 19, 2016 produced the record of the outpatient pharmacist Amber Ramnarace-McKinley having filled the May 13, 2012 discharge prescriptions," neither the Plaintiffs, Wood, or Medical Associates "could have known that the outpatient pharmacy was specifically at play." Third MTD Response at 12. In any case, the Third MTD Response asserts, "the Plaintiffs' Tort Claims Notices and related letters sufficiently advised the USA that the areas of potential liability involved the diagnoses and treatments given or prescribed for Mr. Van Winkle . . . ." Third MTD Response at 13 (internal citations omitted). Specifically, the Third MTD Response reasons that the Plaintiffs' notices were sufficient for the United States

> to review all of Mr. Van Winkle's medical records, conclude that an inadequate and inappropriate antibiotic [w]as prescribed to Mr. Van Winkle and filled by its own in-hospital pharmacy, and to commiserate [sic] with at least one and possibly more groups of experts to figure out how such poor care befell Mr. Van Winkle.

Third MTD Response at 13.  At a minimum, the Third MTD Response argues, the United States "knew that a physician working at the VAMC wrote a prescription and that the VAMC's outpatient pharmacy dispensed the medication to Mr. Van Winkle."  Third MTD Response at 13.  See id. at 14 (asserting that the "USA has known all along, but never disclosed, that an outpatient pharmacist filled the prescription").

Turning to the United States' argument that internal policies do not give rise to tort liability, the Third MTD Response observes that the New Mexico Administrative Code sets forth the state's standard of care for pharmacists, see Third MTD Response at 16-17 (citing NMAC 16.19.7.13), and contends that this standard "largely mirror[s] the VAMC's previously produced pharmacy protocols and regulations," Third MTD Response at 17 (citing NMAC 16.19.4.16(D)(1-2); New Mexico VA Health Care System, Medication Orders Policy at 1 (dated November 23, 2009), filed August 28, 2016 (Doc. 157-3)).  The Third MTD Response avers, however, that "none of the USA's witnesses" appear to have "ever seen the VA protocols specific to the pharmacy that seem so similar to the New Mexico Board of Pharmacy Regulations pr[e]scribing the standard of care for pharmacists in New Mexico."  Third MTD Response at 17-18.

The Third MTD Response then asserts that the Third MTD is premature, because additional discovery is necessary.  See Third MTD Response at 18.  The Third MTD Response asserts that the Plaintiffs, Wood, and Medical Associates "require time to conduct discovery into the cause of the extreme delay in the USA's disclosing the involvement of both the outpatient pharmacy and Amber Ramnarace-McKinley attendant to Mr. Van Winkle's discharge prescriptions."  Third MTD Response at 18.  The Third MTD Response also says that time is needed "to conduct discovery into the tortious liability of a New Mexico Board of Pharmacy licensed pharmacist designated as a Registered Pharmacist for the pharmacist's failure to comply with VAMC protocols and with

regulations promulgated for licensed pharmacists by the New Mexico Board of Pharmacy." Third MTD Response at 18. According to the Third MTD Response, these requests are "reasonably contemplated" to include several depositions, including that of Ramnarace-McKinley. Third MTD Response at 18.

### c.   The Third MTD Reply.

The United States filed a reply on December 5, 2016. See The United States of America's Reply in Support of its Motion to Dismiss for Lack of Subject Matter Jurisdiction as to VAMC Pharmacy Protocol Claim (Doc. 167), filed December 5, 2016 (Doc. 208)("Third MTD Reply"). The United States begins by noting that the Third MTD Response concedes that: (i) the Plaintiffs' notices of claims "do not allege that a VAMC pharmacist who did nothing more than fill Mr. Van Winkle's prescription upon discharge was negligent," Third MTD Reply at 1-2 (citing Third MTD response at 10-12); (ii) the Plaintiffs' "December 2013 Administrative Claim notice letters are directed to allegations that a VAMC pharmacist attended rounds with Dr. Wood every day," Third MTD Reply at 2 (citing Third MTD Response at 11); and (iii) Wood and Medical Associates "did not file an Administrative Claim against the United States relating to the care provided to Mr. Van Winkle," Third MTD Reply at 2 (citing Third MTD at 3 n.1). The United States then advances four primary arguments.

First, the United States contends that, "[i]nstead of explaining how Plaintiffs' Administrative Claim letters give notice of a claim that a pharmacist . . . was purportedly negligent, Plaintiffs and Defendants devote the bulk of their responsive brief to arguments about discovery." Third MTD Reply at 2. According to the United States, discovery is "irrelevant" to subject-matter jurisdiction under controlling United States Court of Appeals for the Tenth Circuit precedent. Third MTD Reply at 2. See id. at 3-4 (relying on Lopez v. United States, 823 F.3d at 977, for the proposition that

discovery is "irrelevant").  The United States asserts that the "discovery arguments raised in the [Third MTD] Response have no bearing on whether Plaintiffs provided adequate notice of the VAMC pharmacy protocol claim."  Third MTD Reply at 4 (citing Lopez v. United States, 823 F.3d at 977 ("[S]imply because an agency is in possession of information relevant to a claim does not mean that the agency is aware of the claim itself."))).  Accordingly, the United States argues, "[i]t is 'irrelevant' that Dr. Wood now seeks more discovery, e.g., regarding the VAMC protocols and 'outpatient' pharmacy operations."  Third MTD Reply at 4.  The United States adds that the Third MTD Response "cite[s] no Tenth Circuit or District of New Mexico authorities in support of [its] scattershot discovery arguments."  Third MTD Reply at 4 (emphasis omitted).  Further, the United States contends, J. Van Winkle and his family "obtained the discharge prescriptions on May 13, 2012, so they had first-hand information regarding the surrounding facts and circumstances."  Third MTD Reply at 4-5.  The United States accordingly reasons that the Plaintiffs "had sufficient information in mid-2012 to provide adequate notice to the agency regarding the discharge medication issue."  Third MTD Reply at 5.

Second, the United States argues that the Plaintiffs' notices of claims "do not give notice of the VAMC pharmacy protocol claim."  Third MTD Reply at 5.  The United States contends that the Plaintiffs' notices are predicated on Wood's actions during J. Van Winkle's hospitalization and not on "a pharmacist's purported non-compliance with a VAMC protocol[.]"  Third MTD Reply at 6.  Consequently, the United States argues, the Plaintiffs "did not give notice regarding the 'facts and circumstances' regarding the VAMC pharmacy protocol claim," Third MTD Reply at 7 (quoting Staggs v. United States ex rel. HHS, 425 F.3d 881, 884 (10th Cir. 2005)), nor did "they provide 'all the information that the VA needed to be on notice of the potential theories' regarding the alleged failure to comply with VAMC protocols," Third MTD Reply at 8 (quoting First MTD Opinion, 2015

WL 6393561, at *58 (citation omitted)). The United States stresses the temporal difference between the claims that the Plaintiffs initially noticed and the VA-protocol claim, arguing that, whereas the notices "are directed to the treatment of Mr. Van Winkle during hospitalization," the VA claim "arises from [] VAMC conduct after Dr. Wood discharged Mr. Van Winkle[.]" Third MTD Reply at 8 (title case omitted). The United States posits, therefore, that the claim arises from "a distinct stage in the medical treatment." Third MTD Reply at 8 (citing Benally v. United States, 2016 WL 3200125, at *3 (D.N.M. 2016)(Vazquez, J.)).

Third, the United States argues that the Court does not have subject-matter jurisdiction over the VA-protocol claim, because a private person would not be liable for the claim under New Mexico law. See Third MTD Reply at 9. The United States emphasizes that the Third MTD Response "cite[s] one VAMC protocol that allegedly relates to the New Mexico standard of care" and which is similar to provisions of the New Mexico Administrative Code. Third MTD Reply at 9 (emphasis in original). In the United States' view, such "generic citations to the New Mexico Administrative Code do not demonstrate that under state law, a private person would be 'held liable' under 'like circumstances.'" Third MTD Reply at 9-10 (citing 28 U.S.C. § 2674; Pappas v. United States, 617 F. App'x at 881). The United States notes that the Court, in its Second MTD Opinion, stated that "New Mexico courts have not recognized a general duty of a pharmacist beyond the duty to accurately fill a prescription." Third MTD Reply at 10 (citing Second MTD Opinion, 2016 WL 1426554, at *27-28). The United States also notes that, "under New Mexico law, a violation of the pharmacy regulations does not necessarily give rise to tort liability." Third MTD Reply at 10 (citing Thompson v. Potter, 2012-NMCA-014, 268 P.3d 57). Thus, the United States argues, "the New Mexico provisions cited in the Joint Response are not specific enough to give rise to liability under the same circumstances." Third MTD Reply at 10.

Last, the United States contends that Wood and Medical Associates "do not claim they filed an Administrative Claim, or that they have a cross-claim against the United States." Third MTD Reply at 11. The United States asserts that, "under the Federal Tort Claims Act, filing an administrative claim is a prerequisite to an affirmative claim against the United States." Third MTD Reply at 11 (citing 28 U.S.C. § 2675; Estate of Trentadue v. United States, 397 F.3d at 852). Thus, the United States asserts, because the "Defendants concede that they did not file such a claim," they "cannot pursue an affirmative claim against the United States." Third MTD Reply at 11.

**9.      The Motions for Summary Judgment.**

After filing the Third MTD, the United States filed two motions for summary judgment. See Motion for Partial Summary Judgment on Claims Based on the Actions of Christopher Quintana, M.D. and Memorandum in Support, filed December 19, 2016 (Doc. 218)("Quintana MSJ"); The United States of America's Motion for Partial Summary Judgment on Claims Based on the Actions of the Albuquerque VAMC Pharmacists and Memorandum in Support, filed December 19, 2016 (Doc. 220)("Pharmacists MSJ"). In the Quintana MSJ, the United States moves for partial summary judgment on the Plaintiffs' claim that "Quintana, a fellow who accompanied Defendant Wood on her rounds, failed to disclose lab results to Defendant Wood," because "Wood's medical records clearly establish that Defendant wood had actual knowledge of the same lab results." Quintana MSJ at 1. In the Pharmacists MSJ, the United States moves for partial summary judgment on the Plaintiffs' claim that a pharmacist who accompanied Wood on her rounds "every day" should have advised Wood "that the medications she prescribed were 'not appropriate,'" Pharmacists MSJ at 1, because (i) the Plaintiffs "have not provided expert opinion to substantiate the pharmacist 'rounds' claim"; (ii) the "IV antibiotics administered during Mr. Van Winkle's hospitalization were appropriate, so there could not be a breach of the standard of care by the VAMC pharmacist"; and (iii) "there was no

VAMC pharmacist attending rounds with Dr. Wood on the day that Dr. Wood discharged Mr. Van Winkle from the hospital," Pharmacists MSJ at 2. The United States also moves for partial summary judgment on the "VAMC protocol" theory, because (i) the "Plaintiffs have not supported the theory regarding the VAMC protocol and the purported state law analogue"; and (ii) "they have identified no evidence that the VAMC pharmacist who filled Mr. Van Winkle's discharge prescription knew for which infection the antibiotics were being prescribed." Pharmacists MSJ at 2.

Neither the Plaintiffs nor Wood and Medical Associates filed a response brief to the Quintana MSJ or the Pharmacists MSJ. See Notice of Completion Regarding the United States of America's Motion for Partial Summary Judgment at 1, filed January 4, 2017 (Doc. 228)(noting that, under rule 6(d) of the Federal Rules of Civil Procedure and D.N.M.LR-Civ. 7.4(a), "the time has passed for opposing parties to file a response" to the Quintana MSJ); Notice of Completion Regarding the United States of America's Motion for Partial Summary Judgment at 1, filed January 4, 2017 (Doc. 229)(noting that "the time has passed for opposing parties to file a response" to the Pharmacists MSJ").

**10.    The Hearing on the Motion to Extend and the Third MTD.**

The Court held a hearing on the Motion to Extend and the Third MTD on January 25, 2017. See Transcript of Motion Hearing (taken January 25, 2017)("2017 Tr."). The Court began the hearing with the Motion to Extend, noting that the United States initially consented to the extensions that the Plaintiffs request, see 2017 Tr. at 2:25-3:8 (Court), but that it now opposes the extensions, because the Plaintiffs blame the United States for discovery delays, see 2017 Tr. at 3:14-23 (Court). To resolve this dispute, the Court proposed that the parties submit an order that does not "blame anybody for the extension." 2017 Tr. at 3:19-23 (Court). In reply, the United States agreed with the Court's characterization of the dispute, but maintained that the Plaintiffs "have never shown good

cause . . . ." 2017 Tr. at 3:24-4:2 (Keegan).  The Court, however, countered that good cause exists if

the Plaintiffs relied on the United States' initial indication that it had no objection to the extensions.

See 2017 Tr. at 4:3-6 (Court).  The Plaintiffs, for their part, argued that they "weren't trying to blame

anybody" and noted that the relevant "witness has now been deposed."  2017 Tr. at 4:13-19 (Perrin).

Having heard argument from both sides, the Court granted the Motion to Extend.  See 2017 Tr. at

4:23-5:4 (Court).

      Turning to the Third MTD, the Court informed the parties that it is inclined to conclude that

the VA-protocol claim "falls outside of the notice[s]" that the Plaintiffs provided to the VA.  2017

Tr. at 5:8-10 (Court).  Accordingly, the Court stated that it is inclined to grant the Third MTD.  See

2017 Tr. at 5:13-6:2 (Court).  The United States, noting its agreement with the Court's inclination,

reserved argument on the Third MTD.  See 2017 Tr. at 6:6-9 (Keegan).

      In their argument, the Plaintiffs allowed that "the closest [they] got" to giving notice of the

VA-protocol claim "was a statement that the prescription and administration of medications were not

correct[.]"  2017 Tr. at 6:23-7:1 (Perrin).  The Plaintiffs noted that they had hoped to "latch onto"

Wood's VA-protocol theory, 2017 Tr. at 6:19-20 (Perrin), because their negligence claim against an

Unnamed Pharmacist who accompanied Wood on her rounds is "more evidentiary than an actual

theory of liability which would tie in with the filling of the prescription at the end when [J. Van

Winkle] was being discharged from the hospital," 2017 Tr. at 7:14-17 (Perrin).  The Plaintiffs noted,

however, that, if the Court grants the Third MTD, "that takes care of the claims against the United

States because we've already consented to dismissing the claims against Dr. Quintana[.]"  2017 Tr.

at 7:17-22 (Perrin).  See id. at 7:25-8:3 (Perrin)("[I]f we don't have a claim that we can assert on the

filling of that prescription when Mr. Winkle was discharged, I think the case is over against the

United States.").

The Court pressed the Plaintiffs to specify why, on this case's facts, an outpatient pharmacist would be liable. See 2017 Tr. at 8:4-7 (Court). The Plaintiffs stated that the pharmacist would have had access to J. Van Winkle's "full record" when filling his prescription and that, as a result, the pharmacist "would have known that Mr. Van Winkle had this significant sta[ph] aureus infection" for which Wood's prescription was ineffective. 2017 Tr. at 8:10-14 (Perrin). The Plaintiffs averred that the pharmacist should have "alerted Dr. Wood to that mistake so that perhaps the correct prescription could have been given at that point[.]" 2017 Tr. at 8:22-25 (Perrin). The Court interjected and asked why, if pharmacists have such responsibility, there is a dearth of New Mexico case law on the issue. See 2017 Tr. at 10:6-8 (Court). In reply, the Plaintiffs speculated that "there may be a large number of uninformed lawyers . . . who have missed that in cases." 2017 Tr. at 10:9-11 (Perrin). The Court again interposed and stated that, while it has been "fairly liberal" in concluding that the Plaintiffs gave sufficient notice of their "rounds" pharmacist claim, it would "stretch[] that first notice beyond reason" to conclude that the Plaintiffs gave notice of the VA-protocol claim. 2017 Tr. at 11:5-10 (Court).

The Court then invited the United States' rebuttal. See 2017 Tr. at 11:16 (Court). The United States argued, first, that "allowing this claim to go forward would be a stretch" and asserted that the Plaintiffs "admitted that they did not include such a claim in their notice of claim, because they said that they had no way of knowing that the outpatient pharmacy was specifically at play." 2017 Tr. at 11:17-23 (Keegan). The United States then reiterated its earlier argument that discovery is irrelevant to whether a party provides sufficient notice of a claim; rather, the United States argued, the relevant inquiry is "what the notice of claim actually said." 2017 Tr. at 12:1-8 (Keegan). The United States added that there is no equitable basis or other doctrine that permits supplementation of a notice after the agency issues a final decision. See 2017 Tr. at 12:8-16 (Keegan, Court).

Switching gears, the Court noted that, if it decides the Third MTD on jurisdictional grounds, it will not reach the issue whether, under New Mexico law, a private-person analogue exists for the VA-protocol claim.  See 2017 Tr. at 12:17-23 (Court).  The Court thus asked whether the United States is "comfortable" with the Court resting on jurisdictional grounds and whether, if the Plaintiffs appeal, the United States "can defend [] the dismissal on the notice basis."  2017 Tr. at 12:23-13:3 (Court).  The United States expressed that it is comfortable defending a jurisdictional-based decision, but maintained that no private-person analogue exists under New Mexico law.  See 2017 Tr. at 13:4-7 (Keegan).

Returning to the Plaintiffs, the Court asked "what happened to the walk around pharmacist." 2017 Tr. at 14:7-9 (Court).  The Plaintiffs answered that, as this case has developed, the central issue has narrowed to the medications which Wood prescribed for J. Van Winkle upon his discharge.  See 2017 Tr. at 14:10-12 (Perrin).  The Plaintiffs explained that, although they originally argued that Wood prescribed improper medications over the course of J. Van Winkle's treatment, their expert concluded that the medications, while "inelegant," were "okay."  2017 Tr. at 14:17-21 (Perrin). Accordingly, the Plaintiffs reasoned, "[i]t was at the end" -- i.e., upon J. Van Winkle's discharge -- "when the mistake was made . . . ."  2017 Tr. at 14:21-24 (Perrin).  In light of this explanation, the Court asked whether, if it grants the Third MTD, it should enter final judgment in the case.  See 2017 Tr. at 15:8-10 (Court).  The Plaintiffs answered that final judgment would be appropriate.  See 2017 Tr. at 15:11 (Perrin).  See id. at 16:11-13 (Perrin)("The case is going to be gone with the jurisdictional issue.").

11.    **The Joint Motions to Dismiss.**

Following the hearing on the Third MTD, the Plaintiffs and the United States jointly moved to dismiss with prejudice the claims "arising from the conduct of Dr. Quintana and claims based on

the actions of the pharmacists accompanying Dr. Wood on her rounds." Joint Motion for Dismissal with Prejudice of Portion of Plaintiffs' Third Claim at 1, filed January 26, 2017 (Doc. 246)("Joint Quintana/Pharmacists MTD")(noting that the Plaintiffs do not oppose the Quintana MSJ or "that portion of the [Pharmacists MSJ] . . . that address[es] Plaintiffs' claims arising out of the actions of pharmacists that accompanied Dr. Wood on rounds")(citing Fed. R. Civ. P. 41(a)(2); Morris v. City of Hobart, 39 F.3d 1105, 1109 (10th Cir. 1994)). The Court granted the motion on February 6, 2017. See Agreed Order Dismissing with Prejudice Claims Regarding Dr. Quintana and the Pharmacists that Attended Rounds with Defendant Wood at 1-2, filed February 6, 2017 (Doc. 249). The Plaintiffs, Wood, and Medical Associates subsequently moved to dismiss with prejudice all claims against Wood and Medical Associates. See Joint Motion to Dismiss with Prejudice at 1, filed May 3, 2017 (Doc. 255)("Joint Wood/Medical Associates MTD"). The Court granted the motion on May 30, 2017. See Order of Dismissal with Prejudice at 1, filed May 30, 2017 (Doc. 256). The only remaining issue, therefore, is Wood's claim that the United States is liable for an outpatient pharmacist's alleged noncompliance with internal VA protocols.

## LAW REGARDING MODIFICATION OF SCHEDULING ORDERS

"The District Court has wide discretion in its regulation of pretrial matters." Si-Flo, Inc. v. SFHC, Inc., 917 F.2d 1507, 1514 (10th Cir. 1990). Scheduling orders, however, "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). Accord Street v. Curry Bd. of Cty. Comm'rs, 2008 WL 2397671, at *6 (D.N.M. 2008)(Browning, J.). The advisory committee notes to rule 16 observe:

> [T]he court may modify the schedule on a showing of good cause if it cannot reasonably be met despite the diligence of the party seeking the extension. Since the scheduling order is entered early in the litigation, this standard seems more appropriate than a "manifest injustice" or "substantial hardship" test. Otherwise, a fear that extensions will not be granted may encourage counsel to request the longest possible periods for completing pleading, joinder, and discovery.

Fed. R. Civ. P. 16(b)(4) advisory committee's note to 1983 amendment.

The Tenth Circuit has held that the concepts of good cause, excusable neglect, and diligence are related. "The Tenth Circuit . . . has recognized the interrelation between 'excusable neglect' and 'good cause.'" Pulsecard, Inc. v. Discover Card Servs. Inc., 168 F.R.D. 295, 301 (D. Kan. 1996)(Rushfelt, J.)(citing In re Kirkland, 86 F.3d 172, 175 (10th Cir. 1996)). "Properly construed, 'good cause' means that scheduling deadlines cannot be met despite a party's diligent efforts." Street v. Curry Bd. of Cty. Comm'rs, 2008 WL 2397671, at *6. See Advanced Optics Electronics, Inc. v. Robins, 769 F. Supp. 2d 1285, 1313 (D.N.M. 2010)(Browning, J.)(noting that the "rule 16(b) good-cause inquiry focuses on the diligence of the party seeking [to] amend the scheduling order"). In In re Kirkland, the Tenth Circuit dealt with the definition of "good cause" in the context of a predecessor to modern rule 4(m) of the Federal Rules of Civil Procedure,[15] and noted:

> [W]ithout attempting a rigid or all-encompassing definition of 'good cause,' it would appear to require at least as much as would be required to show excusable neglect, as to which simple inadvertence or mistake of counsel or ignorance of the rules usually does not suffice, and some showing of 'good faith on the part of the party seeking the enlargement and some reasonable basis for noncompliance within the time specified' is normally required.

---

[15]Rule 4(m) provides:

If a defendant is not served within 120 days after the complaint is filed, the court -- on motion or on its own after notice to the plaintiff -- must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period. This subdivision (m) does not apply to service in a foreign country under Rule 4(f) or 4(j)(1).

Fed. R. Civ. P. 4(m). The Tenth Circuit in In re Kirkland interpreted rule 4(j), which was substantially identical. See 86 F.3d at 174 ("Rule 4(j) requires the court to dismiss a proceeding if service has not been made upon the defendant within 120 days after filing and the party responsible for service cannot show good cause why it was not made.").

86 F.3d at 175 (emphasis in original)(quoting <u>Putnam v. Morris</u>, 833 F.2d 903, 905 (10th Cir. 1987))(internal quotation marks omitted). The Tenth Circuit explained that <u>Putnam v. Morris</u> "thus recognized that the two standards, although interrelated, are not identical and that 'good cause' requires a greater showing than 'excusable neglect.'" <u>In re Kirkland</u>, 86 F.3d at 175.

Where a party is diligent in its discovery efforts and nevertheless cannot comply with the scheduling order, the Court has found good cause to modify the scheduling order if the requesting party timely brings forward its request. For example, in <u>Advanced Optics Electronics, Inc. v. Robins</u>, the Court concluded that, where the defendant did not conduct discovery or make any good-faith discovery requests, and where the defendant did not make efforts "diligent or otherwise" to conduct discovery, the defendant did not, therefore, show good cause to modify the scheduling order. 769 F. Supp. 2d at 1313 n.8. In contrast, in <u>Street v. Curry Board Of County Commissioners</u>, the Court concluded that the plaintiff had "shown good cause for a delay in seeking leave to amend," because she "was diligent in pursuing discovery . . . [and] brought to the Court's attention her identification of an additional claim in a timely manner," where she discovered the claim through "documents provided in discovery." 2008 WL 2397671, at *11. The Court arrived at a similar determination in <u>Abraham v. WPX Production, LLC</u>, 2016 WL 548251 (D.N.M. 2016)(Browning, J.). There, the Court found good cause to amend a pleading when the plaintiffs had a very short amount of time to amend the pleadings, "even though discovery had only just begun." 2016 WL 548251, at *20. "The Plaintiffs may not have obtained or reviewed all of the documents that might reveal their conspiracy claim's existence before the deadline to amend passed." 2016 WL 548251, at *20. Furthermore, the delay was minimal and would not prejudice the defendants. 2016 WL 548251, at *20.

Overall, good cause requires diligence and a conscientious attempt to comply with the Court's scheduling order. When parties have not done so, the Court has not found good cause. In Montoya v. Sheldon, 2012 WL 5353493 (D.N.M. 2012)(Browning, J.), the Court did not find good cause to modify the scheduling order and reopen discovery where the plaintiffs' excuse for not disclosing their expert before the close of discovery was that they thought that the case would settle and they would thus not require expert testimony. See 2012 WL 5353493, at *14. The Court noted:

> The [plaintiffs] filed this case on April 15, 2010. Because [Plaintiff] D. Montoya had seen the physician before that date, the fact that the [plaintiffs] are only now bringing the physician forward as a newly identified expert witness, over two years later, and over one and a half years after the deadline to disclose expert witnesses, does not evidence circumstances in which the Court can find excusable neglect nor good cause.

2012 WL 5353493, at *14.

Similarly, in Scull v. Management & Training Corp., 2012 WL 1596962 (D.N.M. 2012)(Browning, J.), the Court denied a plaintiff's request for an extension of time to name an expert witness against a defendant. See 2012 WL 1596962, at *8. The plaintiff asserted that he had waited to name an expert witness until a second defendant joined the case, but a scheduling order was in effect before the second defendant entered the case. See 2012 WL 1596962, at *8. The Court concluded that the plaintiff should have known that he would need to name an expert witness against the defendant already in the case. See 2012 WL 1596962, at *8. The Court decided that the plaintiff was seeking "relief from his own disregard" for the deadline. 2012 WL 1596962, at *8. "Despite his knowledge that [Defendant] PNA had yet to enter the case, [Plaintiff] Scull chose to allow the deadline to pass without naming expert witnesses against [Defendant] MTC." 2012 WL 1596962, at *8. Regarding the defendant who entered the case at a later date, however, the Court allowed the plaintiff an extension of time to name an expert witness, because it "was not unreasonable for Scull to expect a new deadline to name expert witnesses upon PNA's entrance into the case because he

had not yet had the opportunity to engage in discovery against PNA as he had against MTC." 2012 WL 1596962, at *9. The Court also noted that not naming an expert witness "is a high price to pay for missing a deadline that was arguably unrealistic when it was set," because Scull could not have determined the need for an expert witness until after PNA entered the case. 2012 WL 1596962, at *9.

When serious and unforeseen events prevent a party from complying with the Court's scheduling order, however, the Court has found good cause. In <u>Stark-Romero v. National Railroad Passenger Co. (AMTRAK)</u>, 275 F.R.D. 544 (D.N.M. 2011)(Browning, J.), the Court concluded that a lawyer had shown excusable neglect when he missed a scheduling deadline because soon after his son's wedding, his father-in-law developed a tumor in his chest, the lawyer arranged his father-in-law's medical care, and, only after the lawyer returned to his work did he realize that a deadline passed. <u>See</u> 275 F.R.D. 549-550. The Court noted that the lawyer could have avoided missing the deadline had he not left his work until the last minute, just before his son's wedding, but concluded that the lawyer had demonstrated good faith and missed the deadline because of "life crises," and not because of his inadvertence. 275 F.R.D. 549-550. In <u>West v. New Mexico Taxation and Revenue Department</u>, 2010 WL 3834341 (D.N.M. 2010)(Browning, J.), the Court allowed a plaintiff extended time to file a response to a defendant's motion for summary judgment, in part because of the difficulty the plaintiff's counsel experienced attempting to obtain depositions with certain defense witnesses, and thus it was not her fault, and in part because cross-motions on summary judgment are particularly helpful for the Court. <u>See</u> 2010 WL 3834341, at *4-5. On the other hand, in <u>Liles v. Washington Tru Solutions, LLC</u>, 2007 WL 2298440 (D.N.M. 2007)(Browning, J.), the Court denied a plaintiff's request for additional time to respond to a defendant's motion for summary judgment,

when the only rationale that the plaintiff provided was that his counsel's "family and medical emergencies" precluded the plaintiff from timely responding.  2007 WL 2298440, at *2.

## <u>LAW REGARDING RULE 12(b)(1) MOTIONS TO DISMISS</u>

"Federal courts are courts of limited jurisdiction; they are empowered to hear only those cases authorized and defined in the Constitution which have been entrusted to them under a jurisdictional grant by Congress." <u>Henry v. Office of Thrift Supervision</u>, 43 F.3d 507, 511 (10th Cir. 1994)(citations omitted).  A plaintiff generally bears the burden of demonstrating the court's jurisdiction to hear his or her claims.  <u>See</u> <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 104 (1998)("[T]he party invoking federal jurisdiction bears the burden of establishing its existence."). "[Because] federal courts are courts of limited jurisdiction, we presume no jurisdiction exists absent an adequate showing by the party invoking federal jurisdiction."  <u>United States ex rel. Hafter v. Spectrum Emergency Care, Inc.</u>, 190 F.3d 1156, 1160 (10th Cir. 1999).  Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a party to raise by motion the defense of the court's "lack of jurisdiction over the subject matter."  Fed. R. Civ. P. 12(b)(1).  The Tenth Circuit has held that motions to dismiss for lack of subject-matter jurisdiction "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject-matter jurisdiction; or (2) a challenge to the actual facts upon which subject-matter jurisdiction is based." <u>Ruiz v. McDonnell</u>, 299 F.3d 1173, 1180 (10th Cir. 2002).

> On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing a rule 12(b)(6) motion: the court must consider the complaint's allegations to be true.  <u>See</u> <u>Ruiz v. McDonnell</u>, 299 F.3d at 1180; <u>Williamson v. Tucker</u>, 645 F.2d 404, 412 (5th Cir. 1981).  But when the attack is aimed at the jurisdictional facts themselves, a district court may not presume the truthfulness of those allegations.  A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1).  In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 [summary-judgment] motion.

Alto Eldorado Partners v. City of Santa Fe, 2009 WL 1312856, at *8-9 (D.N.M. 2009)(Browning, J.)(citations omitted), aff'd on other grounds by 634 F.3d 1170 (10th Cir. 2011). The United States Court of Appeals for the Fifth Circuit has stated:

> [T]he trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction -- its very power to hear the case -- there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

Williamson v. Tucker, 645 F.2d at 412-13 (quoting Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).

When making a rule 12(b)(1) motion, a party may go beyond the complaint's allegations to challenge the facts upon which jurisdiction depends, and may do so by relying on affidavits or other evidence properly before the court. See New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995); Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995). In those instances, a court's reference to evidence outside the pleadings does not necessarily convert the motion to a rule 56 motion for summary judgment. See Holt v. United States, 46 F.3d at 1003 (citing Wheeler v. Hurdman, 825 F.2d 257, 259 n.5 (10th Cir. 1987)). Where, however, the court determines that jurisdictional issues raised in a rule 12(b)(1) motion are intertwined with the case's merits, the court should resolve the motion under either rule 12(b)(6) or rule 56. See Franklin Sav. Corp. v. United States, 180 F.3d 1124, 1129 (10th Cir. 1999); Tippett v. United States, 108 F.3d 1194, 1196 (10th Cir. 1997). "When deciding whether jurisdiction is intertwined with the merits of a particular dispute, 'the underlying issue is whether resolution of the jurisdictional question requires resolution of an aspect of the substantive claim.'" Davis ex rel. Davis v. United States, 343 F.3d

1282, 1296 (10th Cir. 2003)(quoting <u>Sizova v. Nat'l Inst. of Standards & Tech.</u>, 282 F.3d 1320, 1324 (10th Cir. 2002)).

<h2 style="text-align:center"><u>LAW REGARDING RULE 12(b)(6)</u></h2>

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." <u>Mobley v. McCormick</u>, 40 F.3d 337, 340 (10th Cir. 1994)(Brorby, J.). The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. <u>See</u> <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); <u>Smith v. United States</u>, 561 F.3d 1090, 1098 (10th Cir. 2009)(Briscoe, J.)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(citing <u>Moore v. Guthrie</u>, 438 F.3d 1036, 1039 (10th Cir. 2006)(McKay, J.)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" is insufficient. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)("<u>Iqbal</u>")(quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)("<u>Twombly</u>")). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Iqbal</u>, 556 U.S. at 678. "Factual allegations must be

enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 663 (citing Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(Kelly, J.)(emphasis omitted). The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(McConnell, J.)(quoting Twombly, 550 U.S. at 570).

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions. First, a defendant can argue an affirmative defense on a motion to dismiss where the defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss. See Robbins v. Oklahoma, 519 F.3d at 1247; Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009)). Second, the defendant can raise the defense on

a motion to dismiss where the facts establishing the affirmative defense are apparent on the complaint's face. See Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)(Hill, J.)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim. If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule."). The limitations defense is the affirmative defense that the complaint's uncontroverted facts are most likely to establish. See 5 Charles Alan Wright et al., Federal Practice & Procedure: Civil § 1277, at 643 (3d ed. 2004). If the complaint sets forth dates that appear, in the first instance, to fall outside of the statutory limitations period, then the defendant may move for dismissal under rule 12(b)(6). See Rohner v. Union P. R. Co., 225 F.2d 272, 273-75 (10th Cir. 1955)(Wallace, J.); Gossard v. Gossard, 149 F.2d 111, 113 (10th Cir. 1945)(Phillips, J.); Andrew v. Schlumberger Tech. Co., 808 F. Supp. 2d 1288, 1292 (D.N.M. 2011)(Browning, J.).

The plaintiff may counter this motion with an assertion that a different statute of limitations or an equitable tolling doctrine applies to bring the suit within the statute. The Tenth Circuit has not clarified whether this assertion must be pled with supporting facts in the complaint or may be argued in response to the motion. Cf. Kincheloe v. Farmer, 214 F.2d 604 (7th Cir. 1954)(Major, J.)(holding that, once a plaintiff has pled facts in the complaint indicating that the statute of limitations is a complete or partial bar to an action, the plaintiff must plead facts establishing an exception to the affirmative defense). It appears that, from case law in several Courts of Appeals, the plaintiff may avoid this problem altogether -- at least at the motion-to-dismiss stage -- by refraining from pleading specific or identifiable dates. See Goodman v. Praxair, Inc., 494 F.3d 458, 465-66 (4th Cir. 2007)(Niemeyer, J.); Hollander v. Brown, 457 F.3d 688, 691 n.1 (7th Cir. 2006)(Ripple, J.). Although the Tenth Circuit has not squarely addressed this practice, the Court has permitted this

practice.  See Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188 (D.N.M. 2014)(Browning, J.).

**LAW REGARDING THE FTCA**

As with any jurisdictional issue, the party bringing the suit against the United States bears the burden of proving that Congress has waived sovereign immunity.  See James v. United States, 970 F.2d 750, 753 (10th Cir. 1992).  It is "axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."  United States v. Mitchell, 463 U.S. 206, 212 (1983).  "Challenges to jurisdiction can . . . be raised at any time prior to final judgment."  Grupo Dataflux v. Atlas Global Group, L.P., 541 U.S. 567, 571 (2004)(citing Capron v. Van Noorden, 6 U.S. (2 Cranch) 126 (1804)).

The terms of the United States' consent define the parameters of federal court jurisdiction to entertain suits brought against it.  See United States v. Orleans, 425 U.S. at 814; Ewell v. United States, 776 F.2d 246, 248 (10th Cir. 1985).  When the United States waives its immunity from suit, a court should neither narrow the waiver nor "take it upon [itself] to extend the waiver beyond that which Congress intended."  Smith v. United States, 507 U.S. 197, 203 (1993)(quoting United States v. Kubrick, 444 U.S. 111, 117-18 (1979)).

In 1948, Congress enacted the FTCA, which waives the United States' sovereign immunity for certain torts that federal employees commit.  See FDIC v. Meyer, 510 U.S. 471, 475 (1994). Congress waived sovereign immunity only for certain torts that United States employees cause while acting within the scope of their office or of their employment.  See 28 U.S.C. § 1346(b).

**1.        Exhaustion Requirements.**

There are certain procedural requirements in suing the United States under the FTCA to which a plaintiff must strictly adhere before a district court can exercise jurisdiction.  The FTCA's

jurisdictional statute provides:

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have <u>first presented the claim</u> to the appropriate Federal agency and his claim shall have been <u>finally denied by the agency</u> in writing and sent by certified or registered mail.

28 U.S.C. § 2675(a)(emphasis added).  This statute "requires that claims for damages against the government be presented to the appropriate federal agency by filing (1) a written statement sufficiently describing the injury to enable the agency to begin its own investigation, and (2) a sum certain damages claim."  <u>Estate of Trentadue ex rel. Aguilar v. United States</u>, 397 F.3d at 852 (quoting <u>Bradley v. United States</u>, 951 F.2d 268, 270 (10th Cir. 1991)(Anderson, J.)).

"[A] claim should give notice of the underlying facts and circumstances 'rather than the exact grounds upon which plaintiff seeks to hold the government liable.'"  <u>Staggs v. United States ex rel. Dep't of Health and Human Servs.</u>, 425 F.3d at 884 (quoting <u>Estate of Trentadue ex rel. Aguilar v. United States</u>, 397 F.3d at 853).  The Tenth Circuit has added that "the FTCA's notice requirements should not be interpreted inflexibly."  <u>Estate of Trentadue ex rel. Aguilar v. United States</u>, 397 F.3d at 853.  Whether a plaintiff's administrative claim is sufficient to meet 28 U.S.C. § 2675(a)'s notice requirement is a question of law.  <u>See Staggs v. United States ex rel. Dep't of Health and Human Servs.</u>, 425 F.3d at 884.

**2.      Filing Deadlines.**

The Tenth Circuit recently observed:

> [T]he FTCA has both an administrative-exhaustion requirement, set forth in 28 U.S.C. § 2675(a), and a statute of limitations, set forth in 28 U.S.C. § 2401(b).  Combined, these provisions act as chronological bookends to an FTCA claim, marking both a date before which a claim may not be filed and a date after which any filing is untimely.

Barnes v. United States, 776 F.3d 1134, 1139 (10th Cir. 2015)(Holmes, J.). Once a tort claim accrues against the United States, 28 U.S.C. § 2401 gives a claimant two years to present that claim in writing to the appropriate federal agency. See 28 U.S.C. § 2401(b)(explaining that claim is "forever barred" unless presented within two years). After submission of a written claim, the agency usually has six months to reach a final disposition on the claim. If the agency denies the claim, the claimant has six months to file suit in federal court. See 28 U.S.C. § 2401(b).

If the agency fails to make a final disposition of the claim within six months, the claimant may "deem[]" that failure a "final denial of the claim," and proceed with his or her suit under the FTCA. 28 U.S.C. § 2675(a). In the Tenth Circuit, "(at least until there has been a final denial by the relevant agency) there is no limit on when a plaintiff may file a lawsuit predicated on a deemed denial." Barnes v. United States, 776 F.3d at 1140-41. An agency may "trigger[] § 2401(b)'s six-month limitations period through final denial of administrative FTCA claims after a 'deemed denial.'" Barnes v. United States, 776 F.3d at 1141.

**3.      Effect of Failure to Exhaust.**

"[A]s a general rule, a premature complaint cannot be cured through amendment, but instead, plaintiff must file a new suit." Duplan v. Harper, 188 F.3d 1195, 1199 (10th Cir. Okla. 1999)(internal quotation marks omitted). This rule exists because "[a]llowing claimants generally to bring suit under the FTCA before exhausting their administrative remedies and to cure the jurisdictional defect by filing an amended complaint would render the exhaustion requirement meaningless and impose an unnecessary burden on the judicial system." Duplan v. Harper, 188 F.3d at 1199. Courts must dismiss these claims "without regard to concern for judicial efficiency." Ruppert v. Aragon, 448 F. App'x 862, 863 (10th Cir. 2012)(O'Brien, J.)(unpublished). Even the

filing of an amended complaint may not serve to cure a prematurely filed original complaint.  See

Stevens v. United States, 61 F. App'x 625, 627 (10th Cir. 2003)(Baldock, J.)(unpublished).

There is at least one limited exception to the general rule.  Duplan v. Harper recognizes an

exception where the United States "expressly agreed" to the district court's decision to treat the

amended complaint as a new action.  188 F.3d at 1199.  See Mires v. United States, 466 F.3d 1208,

1211 (10th Cir. 2006)(McConnell, J.)(finding new action where plaintiff "sought permission to file -

- and, with the government's consent and district court's permission, did file -- an amended

complaint").

### 4.     **Definition of "Sufficient Notice".**

Courts define "sufficient notice" based on the facts of each case before them.  In Estate of

Trentadue ex rel. Aguilar v. United States, the United States contended that the plaintiffs'

administrative claim was insufficient for notice of intentional infliction of emotional distress,

because it was based on a theory that prison officials had murdered Trentadue, the inmate, and the

allegations did not discuss the specific grounds on which the district court relied in awarding

damages, "namely the government's treatment of the Trentadue family in the aftermath of his death

and its actions in conducting an autopsy after claiming that no autopsy would be performed without

prior approval."  397 F.3d at 852.  The Tenth Circuit disagreed, holding that the "plaintiffs'

administrative claim provided notice that [the United States Department of Justice] should

investigate the prison officials' conduct."  397 F.3d at 853.  The Tenth Circuit reasoned that

language within the administrative claim "gave DOJ notice of the facts and circumstances

surrounding plaintiffs' emotional distress claim and, moreover, is consistent with the plaintiffs'

subsequent allegations in their amended complaints."  397 F.3d at 853.

The Tenth Circuit contrasted Estate of Trentadue ex rel. Aguilar v. United States with Dynamic Image Techs., Inc. v. United States, 221 F.3d 34 (1st Cir. 2000)(Selya, J.), where the United States Court of Appeals for the First Circuit held that the plaintiff's administrative claim did not put the agency on notice that it should have investigated the potentially tortious conduct, because the plaintiff's administrative claims were for "misrepresentation, libel, slander, contractual interference, and discrimination," and the amended claims for false arrest arose out of two separate incidences. 221 F.3d at 40. The First Circuit stated: "Though prolix, that claim did not contain so much as a hint about the alleged false arrest or the incident that spawned it." 221 F.3d at 40. The First Circuit thus concluded that, "regardless of the labels employed in the amended complaint, that complaint, in substance, seeks recovery based solely on an incident that was not mentioned in the plaintiffs' administrative claim." 221 F.3d at 40 (emphasis omitted).

In Glade ex rel. Lundskow v. United States, a man receiving mental health treatment at a United States Veterans Administration facility alleged that his therapist worsened his condition by initiating a sexual relationship with him. See 692 F.3d at 720. He filed a notice of claim with the VA that "does not mention a failure of anyone to use due care besides the therapist." Glade v. United States, 692 F.3d 718, 722 (7th Cir. 2012). The United States Court of Appeals for the Seventh Circuit, reviewing the notice, commented that "reading the administrative claim you would think the plaintiff was just seeking damages under a theory of respondeat superior against an employer for an employee's battery, and we know that such a theory won't fly under the Tort Claims Act." 692 F.3d at 722. The plaintiff recognized this problem before filing his complaint and thus asserted a "special relationship" theory of liability instead. 692 F.3d at 723. The Seventh Circuit affirmed the district court's decision to dismiss the suit, explaining:

> The administrative claim need not set forth a legal theory, but it must allege facts that would clue a legally trained reader to the theory's applicability. *Palay v. United*

*States,* 349 F.3d 418, 425-26 (7th Cir. 2003); *Murrey v. United States,* 73 F.3d 1448, 1452-53 (7th Cir. 1996). The plaintiff's claim didn't do that. The legally trained reader would assume that the plaintiff simply was unaware that the mere fact of a battery by a VA employee would not impose liability on the employer. We're about to see that the "special relationship" tort theory advanced in the plaintiff's complaint (as distinct from the administrative claim) is outside the bounds of plausibility -- hardly the sort of theory that the VA's legal department should have guessed would be the ground of a lawsuit.

Glade v. United States, 692 F.3d at 722-23.

### 5. **Medical Cases.**

Some courts have required the claimant to provide extensive information about the injuries alleged in the complaint. In Staggs v. United States ex rel. Dep't of Health and Human Servs., the Tenth Circuit held that the plaintiff's administrative claim, accusing the hospital of "a substantial departure from the standard of care and . . . negligent management of her pregnancy and labor," was not sufficient to put the agency on notice that it should have investigated a claim based on lack of informed consent. 425 F.3d at 884. The Tenth Circuit stated that "[n]othing in Staggs' administrative claims suggests that Staggs consented to a course of treatment or remained on such a course without being informed of her options and risks." 425 F.3d at 884. The Tenth Circuit reasoned that, "given the length and factual specificity of Staggs' description of [the administrative] claim," and the claim's failure to "mention [] consent or a suitable synonym, [the government agency] could have reasonably concluded that a claim of lack of informed consent was not intended and that an investigation into lack of informed consent was unnecessary." 425 F.3d at 885.

Ham v. United States, a similarly restrictive case, involved a prisoner's claims against three dentists who attempted to fix a damaged tooth. See 2008 WL 818197, at *4. The plaintiff's administrative claim focused on the first two dentists' alleged errors, mentioning the third dentist only in passing. The complaint, however, focused on the third dentist's refusal to repair, rather than extract, the tooth. See 2008 WL 818197, at *4. Although the court said that the claim "encompasses

any cause of action fairly implicit in the facts," it dismissed the complaint, because it "offers the first notice that [the third dentist's] actions were legally objectionable." 2008 WL 818197, at *4.

In <u>Palay v. United States</u>, 349 F.3d 418 (7th Cir. 2003)(Rovner, J.), a prisoner sent a notice of a claim charging the Bureau of Prisons with failing to protect him from violence at the hands of fellow inmates and describing his injuries, but omitting "facts suggesting that the prison medical staff had treated him inappropriately." 349 F.3d at 426. The prisoner later brought suit on a medical malpractice theory. The Seventh Circuit held that, although it was a "close[] question," the prisoner failed to provide sufficient notice, because he "did not include facts in his [notice] from which a legally sophisticated reader might have discerned that he had received inadequate medical treatment." 349 F.3d at 427 (distinguishing this standard from the Fifth Circuit's more liberal standard in <u>Frantz v. United States</u>, 29 F.3d 222, 224-25 (5th Cir. 1994)). <u>See Bethel v. United States</u>, 495 F. Supp. 2d 1121, 1124 (D. Colo. 2007)(Figa, J.)(holding that the plaintiff's treatment-based claim, which focused on medical malpractice, was insufficient notice of subsequent negligent supervision argument).

Other courts have been more generous. In <u>Coffey v. United States</u>, 906 F. Supp. 2d 1114 (D.N.M. 2012)(Browning, J.), the Court determined that a ninety-word claim that alleged that a prisoner's "medical condition was ignored, that he was denied medication, and that he was transferred by the [United States Bureau of Indian Affairs]" provided sufficient notice of his mother's negligent screening and transfer theories. 906 F. Supp. 2d at 1153-54. The Court concluded that the claim, despite its brevity, "gave the BIA notice of the facts and circumstances surrounding [plaintiff Coffey's deceased son] Crutcher's medical needs and subsequent death [sufficient] to provide the BIA notice that it should have investigated the underlying conduct." 906 F. Supp. 2d at 1154.

## LAW REGARDING SOVEREIGN IMMUNITY AND THE FTCA

"The United States cannot be sued without its consent."  <u>Garcia v. United States</u>, 709 F. Supp. 2d 1133, 1137 (D.N.M. 2010)(Browning, J.).  "Congressional consent -- a waiver of the traditional principle of sovereign immunity -- is a prerequisite for federal-court jurisdiction." <u>Garcia v. United States</u>, 709 F. Supp. 2d at 1137-38.  "The plaintiff bears the burden of proving that Congress has waived sovereign immunity for all of his claims."  <u>Garcia v. United States</u>, 709 F. Supp. 2d at 1138.  <u>Accord</u> <u>Bork v. Carroll</u>, 449 F. App'x 719, 721 (10th Cir. 2011)(unpublished)("So it is that a plaintiff  seeking to invoke the jurisdiction of the federal courts bears the burden of identifying an applicable statutory waiver of sovereign immunity when challenged to do so."); <u>Summa v. United States</u>, 936 F.2d 584, 1991 WL 114638, at *3 (10th Cir. 1991)(unpublished table decision)(holding in an FTCA case that the "Plaintiffs bore the burden of proving that the district court had subject matter jurisdiction over their claims")(citing <u>Miller v. United States</u>, 710 F.2d 656, 662 (10th Cir. 1983)).

1.      **General Principles of Sovereign Immunity.**

It is "axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."  <u>United States v. Mitchell</u>, 463 U.S. at 212 (citations omitted).  <u>Accord</u> <u>FDIC v. Meyer</u>, 510 U.S. at 475; <u>United States v. Testan</u>, 424 U.S. 392, 399 (1976); <u>United States v. Sherwood</u>, 312 U.S. 584, 586 (1941).  The law generally places the burden of proving federal jurisdiction on the proponent of jurisdiction, and the party bringing suit against the United States thus similarly bears the burden of proving that sovereign immunity has been waived.  <u>See</u> <u>James v. United States</u>, 970 F.2d at 753.  A waiver of sovereign immunity cannot be implied and must be unequivocally expressed.  <u>See</u> <u>United States v. Nordic Vill., Inc.</u>, 503 U.S.

30, 33-34 (1992); <u>United States v. Mitchell</u>, 445 U.S. 535, 538 (1980); <u>United States v. Murdock Mach. & Eng'g Co. of Utah</u>, 81 F.3d 922, 930 (10th Cir. 1996).

## 2.    **The FTCA.**

The FTCA waives the United States' sovereign immunity in certain specific tort actions against the United States for money damages.  <u>See</u> <u>Romanach v. United States</u>, 579 F. Supp. 1017, 1019 (D.P.R. 1984)(Laffitte, J.)  Congress has explicitly provided, however, that the only proper party in an action under the FTCA is the United States.  <u>See</u> 28 U.S.C. § 2679(a); <u>Romanach v. United States</u>, 579 F. Supp. at 1018 n.1 (holding that no suit under the FTCA may lie against any agency of the United States eo nomine); <u>Painter v. FBI</u>, 537 F. Supp. 232, 236 (N.D. Ga. 1982)(Forrester, J.)(holding that "[t]he FBI may not be sued eo nomine").

In enacting the FTCA, Congress defined the terms and conditions under which the United States may be sued in tort.  28 U.S.C. § 1346(b) provides, in pertinent part:

> [T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be held liable to the claimant in accordance with the law of the place where the act or omission occurred.

A companion FTCA section provides that the United States is liable "in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 2674.  "The law of the place where the alleged negligent conduct took place determines the scope of employment under the FTCA."  <u>Garcia v. United States</u>, 2010 WL 2977611, at *18 (D.N.M. 2010)(Browning, J.)(citing 28 U.S.C. § 1346(b); <u>Richards v. United States</u>, 369 U.S. 1, 9 (1962); <u>Williams v. United States</u>, 350 U.S. 857, 857 (1955); <u>Henderson v. United States</u>, 429 F.2d 588, 590 (10th Cir. 1970)).

The Tenth Circuit has emphasized that all dismissals for lack of jurisdiction, including those for a failure to establish a waiver of sovereign immunity under the FTCA, should be without prejudice.  See Mecca v. United States, 389 F. App'x 775, 780 (10th Cir. 2010)(unpublished).  It has explained: "A longstanding line of cases from this circuit holds that where the district court dismisses an action for lack of jurisdiction . . . the dismissal must be without prejudice."  Mecca v. United States, 389 F. App'x at 780 (quoting Brereton v. Bountiful City Corp., 434 F.3d 1213, 1216 (10th Cir. 2006)).  The Tenth Circuit held in Mecca v. United States that the district court improperly dismissed with prejudice the plaintiff's FTCA claims after it concluded that it lacked jurisdiction over those claims.  See 389 F. App'x at 780-81 ("Here, because the district court found itself without jurisdiction over the FTCA claims, dismissal should have been entered without prejudice, even if the court deemed further amendment futile.  We therefore remand with instructions to enter dismissal of these claims without prejudice.").

### 3.        The FTCA's Scope of Liability.

The FTCA waives the United States' sovereign immunity for certain negligence claims, but it does so only if a private person, performing the same act as the United States, would be liable under the governing state law.  See 28 U.S.C. § 2674 ("The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances . . . .").  "[T]hese sections ensure that the United States is placed in the same position as a private individual by rendering the United States liable for the tortious conduct of its employees if such conduct is actionable in the state in which the United States' action or inaction occurred."  Cortez v. EEOC, 585 F. Supp. 2d 1273, 1284 (D.N.M. 2007)(Browning, J.).  "The FTCA's waiver of sovereign immunity is limited, however."  Cortez v. EEOC, 585 F. Supp. 2d at 1284.  "If the claim does not fall within the FTCA's express provisions, or if it falls within one of

its exceptions, the claim is not cognizable under the FTCA, and the court must deny relief." Cortez v. EEOC, 585 F. Supp. 2d at 1284 (citing Williams v. United States, 50 F.3d 299, 304-05 (4th Cir. 1995)).

### a. Liability Under the Same Circumstances Versus Like Circumstances.

The Supreme Court of the United States has rejected a reading of the FTCA that would impose liability on the United States only "to the same extent as would be imposed on a private individual 'under the same circumstances.'" Indian Towing Co. v. United States, 350 U.S. 61, 65 (1955)("The Government reads that statute as if it imposed liability to the same extent as would be imposed on a private individual 'under the same circumstances.' But the statutory language is 'under like circumstances[]' . . . ."). The FTCA did not spur "the creation of new causes of action but acceptance of liability under circumstances that would bring private liability into existence." Feres v. United States, 340 U.S. 135, 141 (1950). It is important for a court to consider the United States' liability under all circumstances presented in the case as opposed to selectively considering only a few of the circumstances. See Feres v. United States, 340 U.S. at 141-42. The Supreme Court has illustrated:

> One obvious shortcoming in these claims is that plaintiffs can point to no liability of a "private individual" even remotely analogous to that which they are asserting against the United States. We know of no American law which ever has permitted a soldier to recover for negligence, against either his superior officers or the Government he is serving. Nor is there any liability "under like circumstances," for no private individual has power to conscript or mobilize a private army with such authorities over persons as the Government vests in echelons of command. The nearest parallel, even if we were to treat "private individual" as including a state, would be the relationship between the states and their militia. But if we indulge plaintiffs the benefit of this comparison, claimants cite us no state, and we know of none, which has permitted members of its militia to maintain tort actions for injuries suffered in the service, and in at least one state the contrary has been held to be the case. It is true that if we consider relevant only a part of the circumstances and ignore the status of both the wronged and the wrongdoer in these cases we find analogous private liability. In the usual civilian doctor and patient relationship, there is of course a liability for malpractice. And a landlord would undoubtedly be held

liable if an injury occurred to a tenant as the result of a negligently maintained heating plant.  But the liability assumed by the Government here is that created by "all the circumstances," not that which a few of the circumstances might create.  We find no parallel liability before, and we think no new one has been created by, this Act.  Its effect is to waive immunity from recognized causes of action and was not to visit the Government with novel and unprecedented liabilities.

Feres v. United States, 340 U.S. at 141-42 (footnotes omitted).

      **b.**    **Considering the Liability Under State Law of Private Actors Versus Governmental Actors.**

The United States' liability is coextensive with that of private individuals under the respective States' law, even if comparable government actors would have additional defenses or additional obligations under that State's law.  See Ewell v. United States, 776 F.2d at 248-49; Proud v. United States, 723 F.2d 705 (9th Cir. 1984)("But appellants overlook the fact that in enacting the FTCA, Congress -- not the Hawaii Legislature -- determined the tort liability of the United States. And the FTCA specifically provides that the federal government's tort liability is co-extensive with that of a private individual under state law."); Cox v. United States, 881 F.2d 893, 895 (10th Cir. 1989)(citing Proud v. United States with approval)("This and other courts have applied the same rationale in holding that the United States may invoke the protection of a [private] recreational use statute.").  The Tenth Circuit illustrated some of these same principles in Ewell v. United States:

The main goal of the FTCA was to waive sovereign immunity so that the federal government could be sued as if it were a private person for ordinary torts. Congress was primarily concerned with allowing a remedy where none had been allowed. There is no evidence that Congress was concerned with the prospect that immunities created solely for private persons would shield the United States from suit.  The Supreme Court, in United States v. Muniz, 374 U.S. 150 . . . (1963), considered whether it is appropriate to apply immunities created by state law to the United States when it is sued under the FTCA.  The Court was concerned with state laws that immunized prison officials from suits by prisoners and concluded that it is "improper to limit suits by federal prisoners because of restrictive state rules of immunity." 374 U.S. at 164 . . . . The immunity under consideration in that case applied to state, county and municipal prison officials.  Noting its decision in Indian Towing Co. v. United States, 350 U.S. at 65 . . . wherein the Court determined that federal liability had to be determined as if it were a private person and not as if it were a municipal

corporation, it concluded that state law immunity applicable to state, county and municipal prison officials would not be applicable to a private person and, therefore, not applicable to the federal government in a suit under the FTCA.

Thus, while immunities afforded state, county and municipal employees are not applicable to the federal government when sued under the FTCA, immunities created by state law which are available to private persons will immunize the federal government because it is liable only as a private individual under like circumstances. It is evident, therefore, that the Utah district court was correct in granting the motion for summary judgment.

Ewell v. United States, 776 F.2d at 249.

In a unanimous decision, the Supreme Court recently reversed "a line of Ninth Circuit precedent permitting courts in certain circumstances to base a waiver" under the FTCA "simply upon a finding that local law would make a 'state or municipal entit[y]' liable." United States v. Olson, 546 U.S. at 44 (internal citation omitted). As the Supreme Court discussed in United States v. Olson, the United States Court of Appeals for the Ninth Circuit based its decision to find a waiver of liability under the FTCA on two principles:

In this case, two injured mine workers (and a spouse) have sued the United States claiming that the negligence of federal mine inspectors helped bring about a serious accident at an Arizona mine. The Federal District Court dismissed the lawsuit in part upon the ground that their allegations were insufficient to show that Arizona law would impose liability upon a private person in similar circumstances. The Ninth Circuit, in a brief per curiam opinion, reversed this determination. It reasoned from two premises. First, where "'unique governmental functions'" are at issue, the Act waives sovereign immunity if "'a state or municipal entity would be [subject to liability] under the law [. . .] where the activity occurred.'" Second, federal mine inspections being regulatory in nature are such "'unique governmental functions,'" since "there is no private-sector analogue for mine inspections." The Circuit then held that Arizona law would make "state and municipal entities" liable in the circumstances alleged; hence the FTCA waives the United States' sovereign immunity.

546 U.S. at 45 (alterations in original)(citations omitted). The Supreme Court "disagree[d] with both of the Ninth Circuit's legal premises." United States v. Olson, 546 U.S. at 45. Regarding the first premise, the Supreme Court held:

The first premise is too broad, for it reads into the Act something that is not there. The Act says that it waives sovereign immunity "under circumstances where the United States, if a private person," not "the United States, if a state or municipal entity," would be liable. Our cases have consistently adhered to this "private person" standard. In *Indian Towing Co. v. United States*, this Court rejected the Government's contention that there was "no liability for negligent performance of 'uniquely governmental functions.'" It held that the Act requires a court to look to the state-law liability of private entities, not to that of public entities, when assessing the Government's liability under the FTCA "in the performance of activities which private persons do not perform." In *Rayonier Inc. v. United States*, the Court rejected a claim that the scope of FTCA liability for "'uniquely governmental'" functions depends on whether state law "imposes liability on municipal or other local governments for the negligence of their agents acting in" similar circumstances. And even though both these cases involved Government efforts to escape liability by pointing to the absence of municipal entity liability, we are unaware of any reason for treating differently a plaintiff's effort to base liability solely upon the fact that a State would impose liability upon a municipal (or other state governmental) entity. Indeed, we have found nothing in the Act's context, history, or objectives or in the opinions of this Court suggesting a waiver of sovereign immunity solely upon that basis.

United States v. Olson, 546 U.S. at 45-46 (citations omitted).

The Supreme Court rejected the Ninth Circuit's second premise based on the following rationale:

The Ninth Circuit's second premise rests upon a reading of the Act that is too narrow. The Act makes the United States liable "in the same manner and to the same extent as a private individual under like circumstances." As this Court said in *Indian Towing*, the words "'like circumstances'" do not restrict a court's inquiry to the same circumstances, but require it to look further afield. The Court there considered a claim that the Coast Guard, responsible for operating a lighthouse, had failed "to check" the light's "battery and sun relay system," had failed "to make a proper examination" of outside "connections," had "fail[ed] to check the light" on a regular basis, and had failed to "repair the light or give warning that the light was not operating." These allegations, the Court held, were analogous to allegations of negligence by a private person "who undertakes to warn the public of danger and thereby induces reliance." It is "hornbook tort law," the Court added, that such a person "must perform his 'good Samaritan' task in a careful manner."

United States v. Olson, 546 U.S. at 46 (alterations in original).

The Court has not located any Tenth Circuit decisions that have discussed the related principles enunciated in United States v. Olson. The United States Court of Appeals for the Third

Circuit has since held, relying on United States v. Olson: "Under the FTCA, the federal government can only be held liable for breaches of duties imposed on private, rather than state, parties." DeJesus v. U.S. Dep't of Veterans Affairs, 479 F.3d 271, 283 n.9 (3d Cir. 2007). The Fifth Circuit has held, also relying on United States v. Olson: "Because the federal government could never be exactly like a private actor, a court's job in applying the standard is to find the most reasonable analogy. Inherent differences between the government and a private person cannot be allowed to disrupt this analysis." In re FEMA Trailer Formaldehyde Prod. Liab. Litig. (Miss. Plaintiffs), 668 F.3d 281, 288 (5th Cir. 2012)(citations omitted).

According to one commentator, courts have generally had little difficulty in finding a comparable factual analogy in the private sector for conduct in which the United States engages: "Although, as indicated above, courts have generally had little difficulty in finding sufficiently analogous private conduct, there have been exceptions, primarily in cases involving 'quasi-legislative' actions, such as administrative rulemaking, and in cases involving law enforcement officials, who, unlike private citizens, are required to make arrests in appropriate situations." 2 L. Jayson & R. Longstreth, Handling Federal Tort Claims § 9.08[1], at 9-219 (2011). The Tenth Circuit has stated: "It is virtually axiomatic that the FTCA does not apply where the claimed negligence arises out of the failure of the United States to carry out a [federal] statutory duty in the conduct of its own affairs." United States v. Agronics Inc., 164 F.3d at 1345. It recognized that "[o]ther courts invoke the same rule by the shorthand expressions of immune 'quasi-legislative' or 'quasi-judicial' action." United States v. Agronics Inc., 164 F.3d at 1345.

Thus, for example, courts have rejected FTCA claims premised upon such administrative/regulatory acts or omissions as (1) the Federal Aviation Administration's failure to take enforcement action against an entity not complying with federal laws and rules; (2) the United

States Department of Agriculture's failure to prohibit the exportation of disease-exposed cattle; and (3) various agencies' noncompliance with proper rulemaking procedures. See United States v. Agronics Inc., 164 F.3d at 1346 (citations omitted)(finding no FTCA waiver for "the unauthorized division of regulatory jurisdiction between two administrative agencies").

The Court examined the exceptions to the FTCA's waiver of sovereign immunity in Coffey v. United States, 906 F. Supp. 2d at 1157. In that case, a plaintiff brought a wrongful death and negligence action against the Bureau of Indian Affairs based on its decision to contract with a county detention center. See 906 F. Supp. 2d at 1121. The United States argued against liability on the grounds that the detention center was an independent contractor and that the United States' decision to contract with it fell within the FTCA's discretionary-function exemption. See 906 F. Supp. 2d at 1121. The Court agreed on both points. See 906 F. Supp. 2d at 1121. It explained that the BIA's decision to contract with the detention center was "a matter of the BIA's judgment and choice, which is susceptible to policy analysis," and thus protected under the discretionary function exemption. 906 F. Supp. 2d at 1157. It added that the United States "is liable under the FTCA for the actions of its employees only," thereby prohibiting liability for the detention center's actions. 906 F. Supp. 2d at 1164.

## NEW MEXICO LAW REGARDING NEGLIGENCE

Generally, a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based on a standard of reasonable care, and the breach being a cause-in-fact and proximate cause[16] of the plaintiff's damages. See Coffey v. United States, 870 F.

---

[16]The 2004 amendments to Uniform Instruction 13-305 eliminated the word "proximate" within the instruction. Use Note, N.M. Rul. Amend. Civ. UJI 13-305. The drafters added, however, that the change was "intended to make the instruction clearer to the jury and do[es] not signal any change in the law of proximate cause." Editor's Notes, N.M. Rul. Amend. Civ. UJI 13-305 (alteration added).

Supp. 2d 1202, 1225 (D.N.M. 2012)(Browning, J.)(citing Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 6, 73 P.3d 181, 185-86). "In New Mexico, negligence encompasses the concepts of foreseeability of harm to the person injured and of a duty of care toward that person." Ramirez v. Armstrong, 1983-NMSC-104, ¶ 8, 673 P.2d 822, 825, overruled on other grounds by Folz v. State, 1990-NMSC-075, ¶ 3, 797 P.2d 246, 249. Generally, negligence is a question of fact for the jury. See Schear v. Bd. of Cnty Comm'rs, 1984-NMSC-079, ¶ 4, 687 P.2d 728, 729. "A finding of negligence, however, is dependent upon the existence of a duty on the part of the defendant." Schear v. Bd. of Cnty Comm'rs, 1984-NMSC-079, ¶ 4, 687 P.2d at 729. "Whether a duty exists is a question of law for the courts to decide." Schear v. Bd. of Cnty Comm'rs, 1984-NMSC-079, ¶ 4, 687 P.2d at 729 (citation omitted). Once courts recognize that a duty exists, that duty triggers "a legal obligation to conform to a certain standard of conduct to reduce the risk of harm to an individual or class of persons." Baxter v. Noce, 1988-NMSC-024, ¶ 11, 752 P.2d 240, 243.

New Mexico courts have stated that foreseeability of a plaintiff alone does not end the inquiry into whether the defendant owes a duty to the plaintiff. See Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 7, 73 P.3d at 186. New Mexico courts have recognized that, "[u]ltimately, a duty exists only if the obligation of the defendant [is] one to which the law will give recognition and effect." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 9, 73 P.3d at 187 (internal quotation marks omitted). To determine whether the defendant's obligation is one to which the law will give recognition and effect, courts consider legal precedent, statutes, and other principles of law. See Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 9, 73 P.3d at 186.

"As a general rule, an individual has no duty to protect another from harm." Grover v. Stechel, 2002-NMCA-049, ¶ 11, 45 P.3d 80, 84. "[C]ertain relationships, however, that give rise to

such a duty [include]: (1) those involving common carriers, innkeepers, possessors of land; and (2) those who voluntarily or by legal mandate take the custody of another so as to deprive the other of his normal opportunities for protection." Grover v. Stechel, 2002-NMCA-049, ¶ 11, 45 P.3d at 84. "[W]hen a person has a duty to protect and the third party's act is foreseeable, 'such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the [person who has a duty to protect] from being liable for harm caused thereby.'" Reichert v. Atler, 1994-NMSC-056, ¶ 11, 875 P.2d 379, 382.

"[T]he responsibility for determining whether the defendant has breached a duty owed to the plaintiff entails a determination of what a reasonably prudent person would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all the surrounding circumstances." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 33, 73 P.3d at 194. "The finder of fact must determine whether Defendant breached the duty of ordinary care by considering what a reasonably prudent individual would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all surrounding circumstances of the present case . . . ." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 33, 73 P.3d at 195.

"A proximate cause of an injury is that which in a natural and continuous sequence [unbroken by an independent intervening cause] produces the injury, and without which the injury would not have occurred." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195. "It need not be the only cause, nor the last nor nearest cause." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195. "It is sufficient if it occurs with some other cause acting at the same time, which in combination with it, causes the injury." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195.

## ANALYSIS

The Plaintiffs initially commenced this action in state court on September 25, 2013, asserting negligence claims against Wood and Medical Associates for the improper medical treatment that J. Van Winkle received during his hospitalization at the Albuquerque VA between May 7, 2012, and July 27, 2012. See 2013 Complaint at 1. After Wood and Medical Associates removed the case to federal court, the Plaintiffs amended their complaint to assert a claim against the United States for the negligence of its agents -- i.e., Quintana and an Unnamed Pharmacist who accompanied Wood on her rounds -- in failing to notice that Wood prescribed improper medications for J. Van Winkle and failing to notify Wood that J. Van Winkle's blood tested positive for staphylococcus aureus. See 2014 Complaint ¶¶ 21-22, at 5. The United States twice moved to dismiss these claims, arguing that: (i) the Plaintiffs failed to exhaust their administrative remedies for the claims under the FTCA, see First MTD at 1; Second MTD at 8; and (ii) the claims have no "private person" analogue under New Mexico law, Second MTD at 8. In two memoranda opinions, the Court rejected the United States' arguments, holding that: (i) the Plaintiffs gave sufficient notice of their claims against both Quintana and the Unnamed Pharmacist in their pre-litigation correspondence with the VA; and (ii) the FTCA waives the United States' sovereign immunity, because private persons performing the same acts as Quintana and the Unnamed Pharmacist would be liable under New Mexico law. See First MTD Opinion, 2015 WL 6393561, at *18; Second MTD Opinion, 2016 WL 1426554, at *22-28. These conclusions notwithstanding, the Plaintiffs and the United States subsequently agreed to dismiss the claims "arising from the conduct of Dr. Quintana and claims based on the actions of the pharmacists accompanying Dr. Wood on her rounds." Joint Quintana/Pharmacists MTD at 1. In a separate joint motion, the Plaintiffs, Wood, and Medical Associates agreed to dismiss all claims against Wood and Medical Associates. See Joint Wood/Medical Associates MTD at 1.

One issue now remains in this litigation. Over the course of discovery, Wood has developed a theory that the United States is comparatively negligent for J. Van Winkle's treatment, because an outpatient pharmacist failed to comply with internal VA protocols in filling prescriptions that Wood ordered for J. Van Winkle upon his discharge from the VA on May 13, 2012. See Looney Depo. at 108:9-11, 116:13-16 (Gay); Jahng Motion Response at 8-9; Adams Motion Response at 7; Third MTD Response at 10-17. The United States, echoing its earlier motions to dismiss, moves to dismiss the VA-protocol claim, arguing that (i) neither the Plaintiffs nor Wood have exhausted their administrative remedies for the claim under the FTCA; and (ii) there is no state-law cause-of-action analogue for the claim. See Third MTD at 1. The Court addresses the Third MTD, as well as the Plaintiffs' Motion to Extend, in this Memorandum Opinion and Order.

The Court's analysis proceeds as follows. First, the Court concludes that the Plaintiffs have demonstrated good cause for the Court to modify its Second Scheduling Order and extend by two weeks the deadlines for the parties to identify testifying expert witnesses. Thus, the Court will grant the Motion to Extend, and (i) extend the Plaintiffs' deadline to identify expert witnesses to August 3, 2016; and (ii) extend the Defendants' deadline to identify expert witnesses to September 6, 2016. Second, the Court concludes that neither the Plaintiffs nor Wood have exhausted their administrative remedies under the FTCA for a claim that an outpatient pharmacist negligently failed to comply with VA pharmacy protocols in filling prescriptions that Wood ordered for J. Van Winkle upon his discharge from the Albuquerque VA. Accordingly, the Court concludes that it lacks subject-matter jurisdiction over the VA-protocol claim and will dismiss that claim under rule 12(b)(1). Because the Court concludes that it lacks jurisdiction, the Court does not reach the final issue whether New Mexico law recognizes a negligence cause of action similar to the VA-protocol claim such that the FTCA waives the United States' sovereign immunity from suit.

# I. THE COURT GRANTS THE MOTION TO EXTEND, BECAUSE THE PLAINTIFFS HAVE SHOWN GOOD CAUSE FOR THE REQUESTED EXTENSIONS.

According to the Court's Second Scheduling Order, the Plaintiffs must identify any testifying expert witnesses on or before July 20, 2016, while the Defendants must identify such witnesses on or before August 22, 2016. See Second Scheduling Order at 2. The Plaintiffs request that the Court extend these respective deadlines by two weeks to ensure "proper and complete presentation of the merits of this case . . . ." Motion to Extend at 1. The United States counters that the Court should deny the Motion to Extend, because the Plaintiffs have "failed to show good cause (or even a candid reason)" for the requested extensions. Motion to Extend Response at 1. The Court disagrees and will grant the Motion to Extend.

Although a district court ordinarily has "wide discretion in its regulation of pretrial matters," Si-Flo Inc. v. SFHC, Inc., 917 F.2d at 1514, rule 16 authorizes courts to modify scheduling orders "only for good cause," Fed. R. Civ. P. 16(b)(4). In this context, "'good cause' means that scheduling deadlines cannot be met despite a party's diligent efforts." Street v. Curry Bd. of Cty. Comm'rs, 2008 WL 2397671, at *6. See Advanced Optics Electronics, Inc. v. Robins, 769 F. Supp. 2d at 1313 ("[The] rule 16(b) good-cause inquiry focuses on the diligence of the party seeking [to] amend the scheduling order."). Here, the Plaintiffs argue that, despite their efforts to comply with the Court's deadlines, "conflicts in schedules, disagreements on discovery, and continued production of medical records" prevent them from meeting those deadlines. Motion to Extend at 1. The Plaintiffs explain that they need "additional time for experts to review the enormous quantity of records in this case," Motion to Extend at 1, including "documents which were only produced within the last month," Motion to Extend Reply at 2. The Plaintiffs also require time to depose a key witness. See Motion to Extend at 2. The Court concludes that these justifications constitute good cause for a brief two-week extension under rule 16(b). See Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n, 771

F.3d 1230, 1240 (10th Cir. 2014)("Rule 16's good cause requirement may be satisfied, for example,

if a plaintiff learns new information through discovery . . . .")(citing <u>Pumpco, Inc. v. Schenker Int'l,

Inc.</u>, 204 F.R.D.667, 668-89 (D. Colo. 2001)(Boland, M.J.)).

It is worth noting, moreover, that the United States initially consented to the extensions that

the Plaintiffs request, but that it switched positions after some time already elapsed.  With their July

20, 2016, deadline looming, the Plaintiffs emailed the United States on July 7, 2016, asking whether

a "two week extension for all parties' expert designations" was agreeable.  Extension Emails at 1.  A

couple hours later, the United States replied that it had no objection.  <u>See</u> Extension Emails at 1.  A

week later, on July 13, 2016, the Plaintiffs emailed the United States a proposed "Agreed Motion for

Extension of Deadlines."  Extension Emails at 7.  The United States promptly replied that it had "no

objection" to the requested extensions, but said that it opposed the motion "[a]s worded."  Extension

Emails at 7.  In a series of exchanges dated July 14, 2016, the United States explained that it opposed

the motion, because it purported to blame the United States for discovery disputes.  <u>See</u> Extension

Emails at 3-6.  Thus, for at least a week -- from July 7, 2016, to July 13 or 14, 2016 -- the Plaintiffs,

relying upon the United States' assurances that it did not oppose the requested extensions, operated

under the assumption that they had an additional two weeks to designate their experts.  By the time

the United States switched positions, just one week remained before the July 20, 2016, deadline,

leaving the Plaintiffs little time to review recently-disclosed documents and depose a key witness.

Had the United States expressed its opposition earlier, the Plaintiffs could have more effectively

utilized the time that remained before the July 20, 2016, deadline.

For all these reasons, the Court concludes that the Plaintiffs have demonstrated good cause

under rule 16(b) for a brief two-week extension of time to designate expert witnesses.  Accordingly,

the Court will extend the deadline for the Plaintiffs to identify testifying expert witnesses to August 3, 2016, and the Defendants' deadline to September 6, 2016.

## II. THE COURT GRANTS THE THIRD MTD AND DISMISSES WOOD'S VA-PROTOCOL CLAIM, BECAUSE NEITHER THE PLAINTIFFS NOR WOOD HAVE EXHAUSTED THEIR ADMINISTRATIVE REMEDIES FOR THAT CLAIM AS THE FTCA REQUIRES, AND THUS, THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER THE CLAIM.

Wood asserts, as an affirmative defense, that the United States is comparatively negligent for J. Van Winkle's treatment at the VA, because an outpatient pharmacist failed to comply with internal VA protocols in filling prescriptions that Wood ordered for J. Van Winkle upon his discharge from the VA. See Looney Depo. at 108:9-11, 116:13-16 (Gay); Jahng Motion Response at 8-9; Adams Motion Response at 7; Third MTD Response at 10-17. The United States moves to dismiss this claim under rules 12(b)(1) and 12(b)(6), arguing that the Court "lacks subject matter jurisdiction because the United States was never notified of any such claim, and because there is no private party analogue for such a claim." Third MTD at 1. In retort, the Plaintiffs, Wood, and Medical Associates contend that the Third MTD is premature given the United States' "lackluster production of medical records" and "persistent reluctance to produce material responsive to discovery requests . . . ." Third MTD Response at 3. Regardless, they argue, the Plaintiffs' pre-litigation correspondence with the VA provides sufficient notice of the VA-protocol claim. See Third MTD Response at 13.

The United States "is immune from suit unless it waives its sovereign immunity and consents to be sued." Harrell v. United States, 443 F.3d 1231, 1234 (10th Cir. 2006)(citing United States v. Thompson, 98 U.S. 486, 489 (1878)). The United States' consent to suit is thus "a prerequisite for jurisdiction," United States v. Mitchell, 463 U.S. at 212, which a plaintiff must show by "identifying an applicable statutory waiver of sovereign immunity when challenged to do so," Bork v. Carroll, 449 F. App'x at 721. See United States v. Nordic Vill., Inc., 503 U.S. at 33-34 (concluding that a

waiver of sovereign immunity must be unequivocally expressed and not implied). Here, the United States contends that the Court lacks subject-matter jurisdiction over Wood's VA-protocol claim, because it has not waived its sovereign immunity and consented to that claim. See Third MTD at 9. The Plaintiffs and Wood counter that, on these facts, the FTCA waives the United States' sovereign immunity. See Third MTD Response at 10-14. Accordingly, before reaching the VA-protocol claim's merits, the Court must first determine whether it has jurisdiction.

When evaluating a rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction, the Court must determine whether the motion is: (i) "a facial attack on the sufficiency of the complaint's allegations as to subject-matter jurisdiction"; or (ii) "a challenge to the actual facts upon which subject-matter jurisdiction is based." Ruiz v. McDonnell, 299 F.3d at 1180. Here, the United States challenges "the actual facts upon which subject-matter jurisdiction is based," Ruiz v. McDonnell, 299 F.3d at 1180, contending that the Plaintiffs and Wood have failed to take the necessary "pre-suit administrative steps" for the FTCA's waiver of sovereign immunity to apply, Third MTD at 9 (citing 28 U.S.C. § 2675). Accordingly, because "the attack is aimed at the jurisdictional facts themselves," the Court "may not presume the truthfulness of those allegations" as it would in the context of a rule 12(b)(6) motion to dismiss. Alto Eldorado Partners v. City of Santa Fe, 2009 WL 1312856, at *8-9. Moreover, unlike in the rule 12(b)(6) context, the Court may "weigh the evidence and satisfy itself as to the existence of its power to hear the case." Williamson v. Tucker, 645 F.2d at 412-13. With these standards in mind, the Court turns to the FTCA's waiver of sovereign immunity.

The FTCA provides a "limited waiver of sovereign immunity," making the United States "liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment." United States v. Orleans, 425 U.S. at 813. See Miller v. United States, 710 F.2d at 1123 ("This unequivocal waiver of immunity must be construed narrowly . . . ."). The

FTCA, however, "bars claimants from bringing suit in federal court until they have exhausted their administrative remedies." McNeil v. United States, 508 U.S. at 113. The FTCA requires, in relevant part, that: (i) a plaintiff "first present[] the claim to the appropriate Federal agency"; and (ii) the agency "finally den[y]" the claim in writing. 28 U.S.C. § 2675(a). "This exhaustion requirement is 'jurisdictional and cannot be waived.'" Lopez v. United States, 823 F.3d at 976 (quoting Bradley v. United States, 951 F.2d at 270). As a result, "the FTCA bars would-be tort plaintiffs from bringing suit against the government unless the claimant has previously submitted a claim for damages to the offending agency, because Congress wants agencies to have an opportunity to settle disputes before defending against litigation in court." Smoke Shop, LLC v. United States, 761 F.3d 779, 786 (7th Cir. 2014)(citing McNeil v. United States, 508 U.S. at 112 & n.7).

The Tenth Circuit construes the term "claim," as used in § 2675, as requiring: (i) "a written statement sufficiently describing the injury to enable the agency to begin its own investigation"; and (ii) a request for "a sum certain" in damages. Lopez v. United States, 823 F.3d at 976 (citing Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 852 (Bradley v. United States, 951 F.2d at 270))(internal quotation marks omitted). The claim need only "give notice of the underlying facts and circumstances 'rather than the exact grounds upon which plaintiff seeks to hold the government liable.'" Staggs v. United States ex rel. Dep't of Health and Human Servs., 425 F.3d at 884 (quoting Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 853). Thus, "'no statement of legal theories is required,'" and "the 'claim' asserted 'encompasses any cause of action fairly implicit in the facts.'" Lopez v. United States, 823 F.3d at 976 (quoting Murrey v. United States, 73 F.3d at 1452). Whether an administrative claim provides sufficient notice is a question of law. See Staggs v. United States ex rel. Dep't of Health and Human Servs., 425 F.3d at 884.

Here, neither Wood nor Medical Associates have filed an administrative claim with the VA; only the Plaintiffs have filed administrative claims. See April 2 Letter at 1; December 2 Letter at 1. Accordingly, whether the VA had sufficient pre-litigation notice of the VA-protocol claim turns on the content of the Plaintiffs' April 2 Letter and December 2 Letter.[17] The Court concludes that the facts alleged in these administrative claim letters are insufficient to encompass, and give the VA notice of, an outpatient pharmacist's alleged noncompliance with internal VA protocols.

First, the April 2 Letter focuses on the care that J. Van Winkle received while hospitalized at the Albuquerque VA. See April 2 Letter at 1-3. The VA, therefore, investigated whether J. Van Winkle "received good care from" VA-employed medical personnel during his hospitalization. First VA Letter at 1-2. As the Court concluded in its First MTD Opinion, it is immaterial that the April 2 Letter did not expressly name Quintana or the pharmacist who accompanied Wood on her rounds; the April 2 Letter gave sufficient notice of the Plaintiffs' claims against both individuals, because the claims stem from their participation in the "single incident" of J. Van Winkle's hospitalization. First MTD Opinion, 2015 WL 6393561, at *21. Nothing in the April 2 Letter, however, provides the VA with notice that it should investigate the events following J. Van Winkle's hospitalization. The April 2 Letter mentions, at most, the prescriptions that Wood ordered, but it does not discuss the "facts and circumstances," Staggs v. United States ex rel. Dep't of Health and Human Servs., 425 F.3d at 884, of the outpatient pharmacy's post-discharge fulfilment of those prescriptions.

---

[17]In its First MTD Opinion, the Court held that the Plaintiffs' Final Letter "listing specific claims against Dr. Quintana was premature to provide sufficient notice." First MTD Opinion, 2015 WL 6393561, at *23. For the Court's present purposes, whether the Final Letter constitutes a proper notice of claims is immaterial, because the letter restates the same factual allegations as the April 2 Letter and the December 2 Letter, adding only that Quintana had notice of a positive urine test result for staphylococcus aureus but failed to convey that information to Wood. See Final Letter at 1.

The December 2 Letter is likewise silent as to any post-discharge events. See December 2 Letter at 1. The December 2 Letter does no more than incorporate the April 2 Letter's allegations, and adds that the Plaintiffs recently discovered that "a pharmacist or representative of the pharmacy department at the VA Hospital in Albuquerque accompanies physicians on their rounds of patients everyday [sic]." December 2 Letter at 1. The December 2 Letter focuses solely on the "rounds" pharmacist's actions during J. Van Winkle's hospitalization; it does not allude to Wood's discharge prescriptions or to an outpatient pharmacist's fulfillment of those prescriptions. December 2 Letter at 1. Thus, the December 2 Letter does not put the VA on notice of the "facts and circumstances," Staggs v. United States ex rel. Dep't of Health and Human Servs., 425 F.3d at 884, of Wood's VA-protocol claim.

The Plaintiffs and Wood effectively concede this analysis, admitting that, when the Plaintiffs sent their notices of claims, they "had no way of knowing" that an outpatient pharmacist verified and filled the discharge prescriptions that Wood ordered for J. Van Winkle. Third MTD Response at 12. Nevertheless, they contend that the notices "sufficiently advised" the VA "that the areas of potential liability involved the diagnoses and treatments given or prescribed for Mr. Van Winkle." Third MTD Response at 13. This argument is unavailing, because, to the extent that the Plaintiffs' notices suggest impropriety in J. Van Winkle's "diagnoses and treatment," Third MTD Response at 13, they do so only in connection with his hospitalization, see April 2 Letter at 1-3; December 2 Letter at 1. The facts and circumstances of J. Van Winkle's inpatient care at the VA, however, are distinct from those underlying his outpatient treatment, and the former incident's facts do not fairly "encompass," Lopez v. United States, 823 F.3d at 976, claims predicated on the latter incident.

The Tenth Circuit's decision in Salas v. United States, 527 F. App'x 813 (10th Cir. 2013), is persuasive on this point. There, the plaintiff filed administrative claims alleging that the Department

of Homeland Security negligently deported her son in 2001 and again in 2007.  See 527 F. App'x at

816.  When the plaintiff brought suit pursuant to the FTCA, the Tenth Circuit rejected her attempt to

add a 2008 deportation in her complaint, reasoning that she "did not present that basis of her claim to

the DHS."  527 F. App'x at 816-17.  The Tenth Circuit thus distinguished between notices of earlier

incidents and events that logically form a series of similar incidents.  Similarly, here, the Plaintiffs'

notices reference only the facts underlying J. Van Winkle's hospitalization.  See April 2 Letter at 1-

3; December 2 Letter at 1.  The notices do not mention an outpatient pharmacy, nor do they allege

facts from which the VA could infer that the Plaintiffs believe an outpatient pharmacist's negligence

contributed to J. Van Winkle's death.  Alleging that Wood ordered certain prescriptions and that J.

Van Winkle eventually died does not suffice to present an administrative claim to the VA that an

outpatient pharmacist failed to comply with internal VA protocols.

The Plaintiffs and Wood attempt to salvage the VA-protocol claim by asserting that, at a

minimum, the VA "knew that a physician working at the VAMC wrote a prescription and that the

VAMC's outpatient pharmacy dispensed the medication to Mr. Van Winkle."  Third MTD Response

at 13.  The VA's knowledge of certain facts not contained in the administrative notice, however, is

irrelevant to the presentment issue.  The FTCA requires that "the claimant . . . present[] the claim to

the appropriate Federal agency," 28 U.S.C. § 2675(a) (emphasis added), by submitting "a written

statement sufficiently describing the injury," Estate of Trentadue v. United States, 397 F.3d at 852.

An agency need not "cast about in the wilderness for every possible source of liability lurking in an

administrative claim," Benally v. United States, 2016 WL 3200125, at *4; rather, the agency need

investigate only areas of inquiry that the facts alleged in the notice fairly "encompass," Lopez v.

United States, 823 F.3d at 976.  As the Tenth Circuit has explained, "simply because an agency is in

possession of information relevant to a claim does not mean that the agency is aware of the claim

itself." Lopez v. United States, 823 F.3d at 977.  Here, because the Plaintiffs' notices proffered no allegations suggesting that an outpatient pharmacist acted negligently, the VA had no obligation to investigate such potential negligence simply because it knew an outpatient pharmacist "dispensed the medication to Mr. Van Winkle."  Third MTD Response at 13.

Perhaps anticipating that neither the April 2 Letter nor the December 2 Letter give adequate notice of the VA-protocol claim, the Plaintiffs and Wood devote the majority of their responsive brief to arguments about discovery.  See Third MTD Response at 3-10, 18.  The Plaintiffs and Wood aver that the United States only "produced the records pertinent to the pharmacy's having dispensed the oral antibiotics to Mr. Van Winkle [] long after the limitations period attendant to Plaintiffs' and these Defendants' respective claims expired."  Third MTD Response at 5.  The Plaintiffs and Wood thus attempt to blame their defective notice on the United States' "lackluster production of medical records" and "persistent reluctance to produce material responsive to discovery requests . . . ."  Third MTD Response at 3.  They also contend that further discovery is necessary regarding "the cause of the extreme delay in the USA's disclosing the involvement of [] the outpatient pharmacy . . . ."  Third MTD Response at 18.

Whatever the merit of these discovery arguments, they are "irrelevant" to exhaustion under the FTCA.  Lopez v. United States, 823 F.3d at 977.  In Lopez v. United States, the district court held that the plaintiff, who suffered injuries after undergoing surgery at the VA in Denver, Colorado, exhausted his administrative remedies as to a negligent credentialing and privileging claim.  See 823 F.3d at 977.  The Tenth Circuit reversed, holding that nothing in the plaintiff's "administrative claim provided the government with notice that it needed to investigate whether the VA Hospital was negligent in credentialing and privileging" the doctor who performed the surgery.  823 F.3d at 977.  The Tenth Circuit stressed that, "[i]n concluding otherwise, the district court focused primarily on

irrelevant factors," namely, that the plaintiff's counsel "had no information about the competence of [the doctor] at the time of the filing of the administrative claim," and that the claim was "based on information known to the VA hospital." 823 F.3d at 977. The Tenth Circuit allowed that "both of these facts may be true," but emphasized that nothing in the plaintiff's "administrative claim would have caused the government to investigate" whether the doctor was properly credentialed. 823 F.3d at 977. The Tenth Circuit also stated that "simply because an agency is in possession of information relevant to a claim does not mean that the agency is aware of the claim itself." 823 F.3d at 977. Similarly, here, that the Plaintiffs had no information about the outpatient pharmacy's fulfillment of J. Van Winkle's post-discharge medications at the time they sent their administrative claims notices is irrelevant to exhaustion; rather, the relevant inquiry is whether the Plaintiffs' notices alleged facts that would have caused the VA to investigate the outpatient pharmacy's actions. As detailed above, the Plaintiffs' notices did not allege such facts.

Ultimately, even assuming that further discovery would substantiate the VA-protocol claim, the Court must still dismiss the claim for failure to exhaust. "[A] premature complaint cannot be cured through amendment, but instead, plaintiff must file a new suit." Duplan v. Harper, 188 F.3d at 1199 (internal quotation marks omitted). The Tenth Circuit has explained that "[a]llowing claimants generally to bring suit under the FTCA before exhausting their administrative remedies and to cure the jurisdictional defect by filing an amended complaint would render the exhaustion requirement meaningless and impose an unnecessary burden on the judicial system." Duplan v. Harper, 188 F.3d at 1199. Thus, allowing further discovery to substantiate a claim which Wood first asserted mid-litigation would render the FTCA's exhaustion requirement "meaningless." Duplan v. Harper, 188 F.3d at 1199. The Court must dismiss the VA-protocol claim "without regard to concern for judicial efficiency." Ruppert v. Aragon, 448 F. App'x at 863.

The Court has taken a liberal approach to construing the scope of administrative tort claims -- in prior cases and in this case.  In the First MTD Opinion, the Court liberally construed the April 2 Letter to encompass allegations against an unnamed "rounds" pharmacist, reasoning that, because the pharmacist participated in the "incident" of J. Van Winkle's hospitalization, the April 2 Letter's general allegations concerning that hospitalization were sufficient.  First MTD Opinion, 2015 WL 6393561, at *21.  It would stretch the April 2 Letter's scope beyond reason, however, to determine that it encompasses a claim against an unnamed outpatient pharmacist who, admittedly, played no role in J. Van Winkle's inpatient care.  The Court declines to adopt such a construction.

In addition to arguing that the Plaintiffs and Wood failed to exhaust their administrative remedies as to the VA-protocol claim, the United States contends that there is "no private party analogue for such a claim."  Third MTD at 1.  Consequently, the United States argues that the Court should dismiss the claim under rule 12(b)(6).  See Third MTD at 1.  Whatever this argument's merit, the Court does not reach the issue, because it lacks subject-matter jurisdiction over Wood's VA-protocol claim.  Accordingly, the Court grants the Third MTD and dismisses the VA-protocol claim on jurisdictional grounds.

**IT IS ORDERED** that (i) the Plaintiffs' Motion for Extension of Deadlines to Identify Expert Witnesses, filed July 14, 2016 (Doc. 142), is granted; and (ii) Defendant United States of America's Motion to Dismiss for Lack of Subject Matter Jurisdiction Claims Based on a Pharmacists' [sic] Purported Failure to Follow VAMC Protocals [sic], filed September 23, 2016 (Doc. 167), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Doug Perrin
The Perrin Law Firm
Santa Fe, New Mexico

      *Attorney for Plaintiffs*

Melissa A. Brown
Remo Gay
Brown & Gay, P.C.
Albuquerque, New Mexico

      *Attorneys for Defendants Maureen Wood, M.D. and Medical Doctor Associates, LLC*

Damon P. Martinez
  United States Attorney
Ruth Fuess Keegan
  Assistant United States Attorney
Albuquerque, New Mexico

      *Attorneys for Defendant United States of America*